UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| TECSEC, INCORPORATED, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:10cv115 |
| | ) | (LMB/TCB) |
| INTERNATIONAL BUSINESS MACHINES | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| *Defendants* | ) | |

## DEFENDANT IBM'S COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFF'S JULY 16, 2010 DISCOVERY MOTIONS

Plaintiff, TecSec, Incorporated ("TecSec"), has filed three motions (Doc. Nos. 227, 229 & 231), that defendant International Business Machines Corporation ("IBM") opposes in this combined brief. Relying on rhetoric instead of reasoning and strenuously arguing that there has been a "pattern of discovery abuse" practiced by IBM which has "continue[d] unabated" since the outset of the action, "TecSec urgently requests the Court's intervention to bring these discovery abuses to a halt" (Doc. No. 230 at 2). These three motions are baseless and unnecessary, and all three should be denied.[1]

For example, in support of the *Document Motion* (Doc. No. 229), TecSec argues that "IBM has made improper [General] Objections to virtually all of [TecSec's] Requests" for the production of documents, and wrongfully stated that it will produce documents "subject to" those objections (Doc. No. 230 at 2). TecSec itself asserted "General Objections" to all of the document requests served on it by IBM and stated in its responses that it was producing documents "[s]ubject to and without waiving any of the foregoing objections" (Exhibit A).

---

[1] IBM refers to the three motions as follows: Doc. No. 227, "*Reconsideration Motion*"; Doc. No. 229, "*Document Motion*"; and Doc. No. 231, "*Sanctions Motion*".

TecSec attempts to absolve itself of this merely by stating, in a footnote, that IBM and the Court can trust TecSec to have done the right thing (Doc. No. 230 at 7 n.2).  Although TecSec claims it is not "withholding" documents based on its general objections, it has acknowledged that it has **not searched** for potentially responsive documents because TecSec's own counsel deemed them irrelevant or burdensome (Exhibit B).  Thus, TecSec is in no position to accuse IBM of "discovery abuse" that TecSec is practicing itself.

For its part, IBM is not "withholding" documents on the basis of its "General Objections;" instead, it has produced over 7 million pages of documents.  Though TecSec now claims this is too much, TecSec continues to seek even more documents from IBM and has demanded that IBM essentially withdraw all objections (Doc. No. 232-28(27) at 1).  That overreaching demand is unwarranted.  Moreover, IBM did not refuse to discuss its document production with TecSec, or merely claim it will "stand on its objections;" instead, IBM offered to discuss these objections with TecSec on a particularized, rather than blanket, basis (Doc. No. 232-31(30) at 2).[2]  TecSec did not follow up, choosing instead to file this motion.

Likewise, in support of its *Sanctions Motion* (Doc. No. 231), TecSec now vigorously complains about IBM's postponement of the O'Donnell deposition to allow IBM to produce more documents related to his work, arguing that the rescheduling of that deposition has caused delay and expense (Doc. No. 232 at 4-6).  Yet at the time, TecSec proposed that O'Donnell be deposed **twice** (Doc. No. 232-38(37)), which would have compounded the delay and expense of which it now complains.  While postponement of depositions should be avoided, taking depositions twice is no solution.  These deposition scheduling issues can be—and are being—

---

[2]  In the ECF numbering, TecSec's exhibits have one higher number (*e.g.*, TecSec's Exhibit *1* is Doc. No. 232-*2*) because Doc. No. 232-1 is an Index.  The exhibit number is included in parentheses (*e.g.*, Doc. No. 232-13(12)).

worked out on a mutually agreeable schedule.  TecSec merely jumped the gun with this motion and proposes that various overreaching and unnecessary sanctions be imposed on IBM.

Finally, in support of its *Reconsideration Motion* (Doc. No. 227), TecSec simply reargues its prior motion, and does not have proper grounds for reconsideration.  TecSec has shown no evidence of spoliation or other proper grounds on which to seek "discovery about discovery."

Upon examination of the record, it is clear that the precipitating event of these motions is not discovery misconduct, but miscommunications.  Those miscommunications are a direct result of TecSec's practice of barraging IBM with letters and email, demanding that IBM do something immediately or lecturing IBM about its supposed discovery obligations and failings (*e.g.*, Doc. Nos. 232-13(12), -14(13), -16(15), -19(18); -21(20); -23(22); -25(24); -26(25); & -27(26)).  This barrage of emails and letters is the type of "a lot of correspondence without a lot of communication" problem that IBM brought to the Court's attention at the Rule 16(b) conference and again at the June 25 hearing (June 25 *Hrg. Tr*. at 17:7- 18:11).  The Court directed each side to designate a "point person"—preferably a partner-level—to conduct the meet and confer sessions (*Id*. at 18:15-19:7).  The parties have now instituted weekly meet-and-confer conference calls, which while not guaranteed to resolve all issues, will substantially narrow them.  These motions heedlessly by-passed a meaningful meet-and-confer process, and therefore are needlessly before the Court.

### STATEMENT OF MATERIAL PROCEEDINGS

**PRE-SUIT COMMUNICATIONS**: TecSec's arguments about IBM's "litigation hold" are unfounded.  IBM first received a letter from Mr. Andrew G. DiNovo (on behalf of TecSec) November 21, 2008, listing various products and listing the identity of five patents (Doc. No. 232-2(1)).  Mr. DiNovo proposed a "business discussion" regarding these patents, but did not

provide any explanation regarding how any IBM product, product feature, technology, or method allegedly falls within the scope of any claim of any of the patents-in-suit.  Mr. DiNovo subsequently wrote IBM on February 24, 2009 seeking the status of IBM's investigation in response to the November letter, and seeking to discuss on an "amicable basis," but again the letter did not include any explanation regarding how any IBM product, product feature, technology, or method allegedly falls within the scope of any claim of any of the patents-in-suit (Doc. No. 232-3(2)).   No threat or even mention of litigation was made in either letter from TecSec to IBM.

IBM responded to Mr. DiNovo on March 23, 2009, explaining that based on its investigation from the very limited information provided in TecSec letters, IBM had not identified a need for a license to the patents identified by TecSec.  (Doc. No. 232-5(4)).  IBM invited TecSec to contact IBM if it had any further questions or concerns (*see id.*).  TecSec never responded.  IBM did not receive any pre-suit communication by or on behalf of TecSec explaining how any IBM product, product feature, technology, or method allegedly falls within the scope of any claim of any of the patents-in-suit, or any pre-suit communication from TecSec indicating or implying imminent litigation.

After remaining silent for almost a year, TecSec filed the instant litigation on February 5, 2010, asserting claims regarding eleven patents and against no less than 10 IBM product families (with countless versions), as well as products identified only as "other IBM products which include or are bundled with the aforementioned products, and other IBM products that include the ability" to perform identified functions (*see, e.g.*, Doc. No. 1, *Complaint* ¶ 31).

***IBM's Initial Document Production***: Upon being served with the Complaint, IBM immediately began the process of identifying custodians with potentially relevant information.

Less than a month later, IBM sent out an initial litigation hold on March 3 to custodians with potentially relevant information, instituting preservation of any information in the custodians' possession—including electronically stored information—that may be relevant to ***this litigation***.

TecSec served its First Requests for Production on April 9, with 50 requests for production seeking "all documents" related to numerous broad categories of information (Doc. No. 232-7(6)).  Notably, many of the requests were not limited in time or geography, or limited to the specific products accused of infringement in this case (*see, e.g.*, *id.* at Request No. 1: "All documents and things that refer to or relate to the organizational structure of Defendant or that are sufficient to identify the names and titles of all supervisory or managerial employees of Defendant, including but not limited to all employees in Defendant's research and development, marketing and sales departments.").   IBM timely objected to TecSec's requests for production on April 29, asserting both generally applicable objections (such as temporal scope) ***and*** specific objections to each request (Doc. No. 232-9(8)).[3]

On May 7, IBM served its first Initial Disclosures, identifying eight IBM employees, including seven technical persons with knowledge spanning all of the products identified in the Complaint and the author of the March 23, 2009 communication to TecSec (*see* Doc. No. 232-5(4), -10(9)).   On May 12, TecSec served its final Infringement Contentions, identifying no less than 17 additional accused products not previously identified in any pleading.  On May 13, IBM served its responses to TecSec's first requests for production (Doc. No. 232-12(11)).  Notably,

---

[3] TecSec took the same approach in response to IBM's requests for production, asserting numerous general and specific objections to each document request (Exhibit A).  TecSec's counsel also issued similar objections in response to document subpoenas served on third-party inventors and prosecuting attorneys by IBM (Exhibit C).

with the exception of Request No. 16,[4] IBM did not refuse to produce documents in response to the requests.

The meet-and-confer process regarding document production was initiated by TecSec's unreasonable and inflexible demands. On May 25, prior to the June 4 severance and stay order (Doc. No. 161), TecSec wrote all Defendants, demanding a joint meet and confer regarding the Defendants' objections to requests for production and demanding Defendants designate one counsel to speak on behalf of all of the Defendants (Doc. No. 232-14(13)). On May 27, IBM responded, opposing TecSec's demand that Defendants—who are independent companies, with separate products, separate documents, separate concerns, and separate counsel—be required to conduct a joint meet and confer regarding objections. IBM indicated that any meet and confer regarding IBM's production will be with IBM's counsel. IBM also confirmed by same letter that it is not refusing to produce documents and intended to produce its initial production shortly (Doc. No. 232-15(14)). Ignoring IBM's—and all other Defendants'—request that any meet and confer regarding each Defendants' objections must be with each Defendants' counsel, on May 28, TecSec inflexibly demanded a joint meet and confer (Doc. No. 232-16(15)). Only once the case was severed on June 4 did any meaningful one-on-one meet-and-confer process begin between IBM and TecSec.

On May 28, TecSec also identified 29 additional IBM employees it alleged had relevant information. On June 15, TecSec served supplemental initial disclosures identifying 58 total IBM employees as purportedly likely to have discoverable information.

---

[4] Request No. 16 seeks "[a]ll documents and things that refer to, relate to, or evidence any contingency plan or other plan of Defendant that might by implemented in the event that Defendant is enjoined from infringement of any of the patents-in-suit." Any responsive documents are clearly protected from production under the attorney-client privilege and/or work product doctrine.

On June 17, IBM produced a document production of over two million pages (as compared to TecSec's production at the time of 310,000 pages). On June 18, IBM supplemented its initial disclosures to add fifteen additional IBM employees based on TecSec's Infringement Contentions, which identified several additional accused products. On June 25, IBM produced the remainder of its initial production—for a total of over seven million pages. IBM's production included document production from IBM's identified custodians, development and design documents from IBM accused product "teamrooms" (that is, computer storage devices to which all members of an IBM-internal team have uploaded files), product announcements and other product materials, and worldwide revenues for the accused products.

After the June 25 motions hearing, at which the Court encouraged the parties to convene regular meet-and-confer calls, TecSec sent an "agenda" for the parties' weekly meet-and-confer scheduled for the following Tuesday[5] (Doc. No. 232-25(24)). TecSec's agenda merely listed broad categories of "issues," however, with no detail providing IBM any idea regarding what specific issues it should be prepared to discuss during the meet and confer. For instance, TecSec's agenda included simply "IBM's general objections." IBM responded to TecSec's agenda, and requested identification of specific issues IBM should be prepared to discuss in order to have a productive meet and confer (Doc. No. 232-27(26)). Despite TecSec's unwillingness to identify specific issues for discussion, IBM did not "renege" on any agreement or refuse to meet and confer with TecSec. IBM and TecSec conducted a meet and confer on Tuesday, June 29 as previously agreed. During the meet and confer—as IBM anticipated—TecSec simply demanded IBM to withdraw **all** of its objections, without

---

[5] Following the hearing with the Court on June 25, the parties agreed to meet and confer weekly on Tuesday at 2pm. The parties agreed to identify specific discovery issues in advance of the call so the parties can engage in productive discussions.

identification of any specific concerns or issues (Doc. No. 232-31(30)).  In response, IBM stated its willingness to discuss with TecSec the production of any specific materials it believes are missing from IBM's production (*Id.*)

TecSec *sua sponte* raised the issue during the weekly meet and confer on Tuesday, July 13, and again demanded that IBM waive all of its objections to TecSec's documents requests. IBM indicated that it would not waive its proper objections.  Importantly, though, IBM specifically indicated that IBM is not withholding any particular documents based on its objections and was producing documents consistent with the scope of this patent case.  IBM has repeatedly told TecSec what it has produced in response to TecSec's broad document requests and has repeatedly expressed its willingness to discuss with TecSec the production of any specific materials TecSec believes are missing.  TecSec did not follow up, choosing instead to file this motion.

***EMAIL PRODUCTION IN ACCORDANCE WITH THE ESI ORDER:***  Recognizing that "the review of emails in this case will be unduly burdensome unless a search protocol is implemented to narrow the universe of email (and attachments) subject to review and production," the Court on June 25 entered its *Order Governing the Production of Electronically Stored Information* (Doc. No. 203) ("ESI Order").  The ESI Order sets out a process for the identification and negotiation of appropriate topics, keywords and custodians to use in searching email in this action (*Id.*).  The ESI Order expressly requires that the email discovery topics be "narrowly tailored" to avoid undue burden (*Id.* at ¶ 2.a.).

Pursuant to Clause 2.a. of the ESI Order, on June 29 TecSec served IBM with a list of 24 separate topics for email discovery (*see* Exhibit D).  Rather than being "narrowly tailored," many

of TecSec's proposed topics were very broad (*Id.*).[6]  The identification of topics, of course, is the starting point for developing search terms and identifying custodians for email searches.  Broad and vaguely worded topics do not advance the follow-on tasks.  In an effort to avoid dispute and move the email discovery process forward, IBM responded to TecSec's proposed topics with a proposed set of targeted search terms for use in IBM's email search (*see* Exhibit E).  The parties subsequently conducted a meet and confer on July 2.  During that meet and confer, the parties agreed that IBM would provide formal objections to TecSec's email topics and, where appropriate, identify custodians and search terms for each of TecSec's topics, and that TecSec would also provide a list of proposed custodians and search terms for each topic (*see* Exhibit F).  On July 7, IBM provided its objections to TecSec's email topics, and also identified proposed custodians and search terms for most of TecSec's topics (*see* Exhibit G).  On the same day, TecSec provided its preliminary list of proposed email topics, custodians, and search terms (*see* Exhibit H).  Notably, TecSec's list included over 200 separate search strings, ***but*** did not identify individual proposed custodians instead proposing that the terms be applied to the email of "All Custodians" (*Id.*).

The parties conducted a meet and confer regarding these submissions on July 8, during which IBM expressed its concern at the breadth of many of TecSec's proposed search terms, and the fact that TecSec had not identified specific custodians.  TecSec agreed to modify some of its proposed search terms and provide a list of custodians, while IBM agreed to run a test search

---

[6] Representative proposed topics included: (1) all emails concerning Sub-File Encryption, XML Encryption, Split Key Cryptography, Access Control or Encryption with Parallel Processors; (3) all emails concerning the pricing of the Accused Products and/or Infringing Services; and (4) all emails concerning IBM's efforts to implement or comply with encryption or security-related standards, including without limitation those concerning the W3C XML security standard, Web Security Services (WSS) standard, FIPS 140-2, ANSI X9.69, ANSI X9.73, or ANSI X9.96 (*see* Exhibit D).

using these modified search terms of the email files of the two deponents whose depositions were scheduled for the following week, Mr. Bill O'Donnell and Ms. Lynn Klar.

TecSec did not provide its proposed modified search terms until the afternoon of Friday July 9 (*see* Exhibit I).  TecSec specifically requested that IBM apprise it of the number of documents "hit"[7] after running the search terms on Mr. O'Donnell's and Ms. Klar's email files before initiating production of these custodians' emails (*see id.*).  Upon receiving TecSec's proposed search terms, IBM immediately initiated the test searches of Mr. O'Donnell's and Ms. Klar's email files using **all** of TecSec's search terms, as it had requested.  Because of the large number of search terms that needed to be coded by the vendor, the results of the test searches were only available the following Monday July 12 (for Mr. O'Donnell)[8] and Tuesday July 13 (for Ms. Klar) (*see* Exhibit J).  The results of these searches indicated that TecSec's search terms had hit over 70% of Mr. O'Donnell's email files and that a large proportion of Ms. Klar's email files had also received hits (*Id.*).  The parties subsequently conducted a meet and confer on July 13, but TecSec would not agree to modify or narrow any of its search terms.  Instead, it asked IBM to review and produce a sample of the documents identified by the search terms.

IBM immediately commenced the process of reviewing and preparing for production a set of sample documents according to TecSec's request.  It also initiated an investigation into the high hit rates for some of the search terms and upon discovering a coding error, IBM provided revised search results on July 14 (*see* Exhibit K).  Even as revised, however, TecSec's search

---

[7]  In ediscovery jargon, a "hit" is the number of times a search term is found in the emails being searched.  A high yield of hits does not necessarily mean a high volume of relevant documents— it usually indicates that the search term is imprecisely drafted and hit on irrelevant files.

[8] Mr. O'Donnell's deposition was originally scheduled for July 13 (as discussed further below). On July 12, the parties were still negotiating the search terms for production of Mr. O'Donnell's emails.

terms identified over 60% of Mr. O'Donnell's email files (*Id.*).   Despite this extremely high hit-rate, TecSec agreed only to minor modifications to two of its over 200 search terms, and otherwise demanded that IBM review and produce all of the O'Donnell and Klar emails identified by its search terms (*see id.*).  The large number of TecSec's search terms, the number of custodians involved, as well as the high hit-rates realized in the initial searches has been materially impeding the swift completion of the ESI production of emails.

On July 15, IBM's vendor completed processing of Bill O'Donnell's archive email files, as well as the email of two additional custodians, Chris Rayns and Ernest Mancill, whose depositions were scheduled for the following week (*see* Exhibit L).  After receiving the results, IBM informed TecSec that it would immediately commence review and production of the email files for Mr. Rayns and Ms. Klar, but that the search of Mr. Mancill's and Mr. O'Donnell's email files according to TecSec's search terms had identified an extremely large number of hits (*Id.*). Specifically, the search of Mr. Mancill's files had identified over 14,200 emails with over 7,000 attachments, and the search of Mr. O'Donnell's files had identified over 21,000 emails with over 90,000 attachments (*Id.*).  IBM again requested that TecSec narrow its search terms, at least as applied to these custodians, to avoid the need for review and processing of an unduly large number of email (*Id.*). TecSec responded that it would re-evaluate Mr. O'Donnell's email report, but that it would not agree to narrow the search terms for the search of Mr. Mancill's files (*see, e.g., id.* ("As for Mancill's files, I am puzzled by your response that the number of hits is too many.  It isn't.")).  Despite its concerns that reviewing such a large number of emails would cause delay in the discovery process, IBM commenced review of Mr. Mancill's email files (*Id.*).

IBM continues to work diligently to search the email files of IBM's custodians using TecSec's revised search terms and, where those terms did not produce an overwhelming number

of hits, to review the identified emails for production (*see, e.g.*, *id.*; Exhibit M). IBM has prioritized the email files of those custodians whose depositions are upcoming. In that regard, IBM completed production of Lynn Klar's, Chris Rayns's and Ernest Mancill's email files on July 16, 19 and 20, respectively, and the review of the email files of a number of other custodians is ongoing.

However, TecSec still has not provided the specific list of custodians whose email it wants to be searched. Accordingly, IBM has been collecting, processing and searching of the emails files of *all* custodians identified by IBM in its initial disclosures, as well as *all* custodians noticed for deposition by TecSec. This is over 45 custodians, each of which requires a time-consuming collection, processing, search and review effort. In addition, the large number of emails identified by TecSec's search terms is causing delay in the review and production of emails. Apart from two minor amendments that did not significantly lessen the amount of documents with hits, TecSec has refused to modify any of its search terms for any other custodians. TecSec's search terms continue to identify extremely large number of hits (*see, e.g.*, *id.* (noting that the hit count for IBM custodian Todd Arnold is over 23,000 emails and over 10,000 attachments)).[9]

Nonetheless, TecSec continues to seek all emails in response to its broad search terms, claiming they are "responsive" (*see* Exhibit N). As IBM has repeatedly explained, hits on TecSec's search terms do not necessarily indicate an email is relevant. Indeed, the opposite conclusion is more probable, that the high hit-rate shows the search terms are hitting emails that

---

[9] A number of custodians have been identified only on the basis that they had contacts or communications with TecSec, but that did not otherwise have any involvement in the development of, or knowledge of, the accused products. IBM has proposed that the email for those custodians be searched using a narrower subset of TecSec's search terms relating directly to TecSec, TecSec's personnel, and the patents-in-suit (*see* Exhibit N). TecSec has refused (*see id.*).

are not relevant—it simply is implausible that numerous IBM custodians have 20,000 or more emails that are relevant and necessary for TecSec's case.  TecSec's broad search terms also reveal TecSec has failed to identify with any specificity the exact accused features in this case.  IBM has continuously invited TecSec to consider limiting the terms to help move the discovery process along.  Thus far, TecSec has refused, and insists that IBM produce all emails.  IBM remains willing to work with TecSec to streamline the email discovery process, as provided for by the ESI Order.  TecSec's refusal to meaningfully engage in this process, however, is causing considerable delay in the schedule for ESI discovery in this action.

*DEPOSITIONS OF IBM EMPLOYEES*:  IBM has been working diligently to provide dates for depositions of IBM employees.  TecSec's demands, however, have been erratic.  TecSec first sought the deposition of an IBM employee on May 25, demanding IBM produce the previously unidentified IBM employee for deposition on June 11 (Doc. No. 232-13(12)).  On June 3, based on witness' availability, IBM offered to make the IBM employee available on July 1 (Doc. No. 232-17(16)).   TecSec waited two weeks before it turned down the July 1 deposition (Doc. No. 232-21(20)).   On the same day—June 17—TecSec demanded dates in July for 21 additional witnesses (*Id.*).  IBM promptly responded that it would get back to TecSec with dates for the witnesses (Doc. No. 232-22(21)).

Thereafter, IBM began offering dates for deponents on almost a daily basis.  By July 1, IBM offered dates for 12 depositions in July alone (Doc. No. 232-30(29)), which TecSec—who originally demanded dates in July for all 22 depositions—indicated would only accept "some" (Doc. No. 232-28(27)).   Of those 12 deposition dates IBM offered for July, TecSec only accepted seven and requested alternative dates for the other five (*see* Exhibit O).  To date, IBM has provided depositions dates for 16 of the total 22 deponents originally identified by TecSec,

including witnesses who are no longer employed by IBM and one witness outside the country. (*see*, *e.g,* Exhibit P; Exhibit Q; Exhibit R; Exhibit S; Exhibit T).

Although at least five deposition dates offered by IBM remain outstanding, TecSec has neither accepted nor declined these offers.  Of the remaining six for which IBM has not offered a deposition date, three are former employees of IBM and two are international employees.  IBM is in the process of determining the status of these deponents or has indicated TecSec must go through the proper international channels (Exhibit U). Therefore, IBM has not delayed the scheduling of depositions in this case, and has worked diligently to provide dates for the witnesses requested by TecSec.

In contrast, despite IBM's requests, ***not one*** TecSec employee or inventor has been offered for deposition (*see* Exhibit V).

**ARGUMENT**

## I.      GOVERNING PRINCIPLES OF LAW

***GOVERNING LAW:***   In patent cases, procedural matters, including discovery, are governed by regional circuit law and local rules.  *See Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 & n.4 (Fed. Cir. 1986) (regional circuit law govern discovery); *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 857 (Fed. Cir. 1991) (regional circuit law and local rules govern procedure); *Semiconductor Energy Lab. Co., Ltd. v. Samsung Electronics Co., Ltd.*, 24 F. Supp. 2d 537, 539 n.2 (E.D. Va. 1998) (same).  Nonetheless, Federal Circuit law is applied to determine what is "relevant" for the purposes of discovery.  *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1325-26 & n.2 (Fed. Cir. 1990).  Thus, there are several sources of law to consider for application to particular issues involved in TecSec's motions.

## II.    TECSEC'S SANCTIONS MOTION SHOULD BE DENIED

Without citing a particular provision, TecSec filed its *Sanctions Motion* under "Rule 37,"

asking the Court to sanction IBM "for its discovery abuses regarding document production, and

last-minute cancellation of the deposition of a key IBM employee-witness, who had been duly

subpoenaed" (Doc. No. 231).   No sanctions should be imposed.   TecSec has both exaggerated

the alleged problem and proposes a grossly overreaching solution.

Rule 37 motions for discovery sanctions are governed by regional circuit law.

*Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1362 (Fed. Cir. 1990).   Under Fourth Circuit

law, the district court enjoys wide discretion in deciding whether to impose sanctions under Rule

37, and if so, what sanction to impose, but the district court must impose the least severe

sanction.   *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40-41 (4th Cir. 1995).   When

determining whether to impose sanctions under Rule 37, a district court must consider four

factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that

noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-

compliance, and (4) whether less drastic sanctions would have been effective."   *Southern States

Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).   IBM has not

acted in bad faith; no prejudice has occurred; and because IBM has in good-faith more than

complied with its discovery obligation, no deterrent is necessary.   As such, sanctions are not

warranted.

***IBM IS PRODUCING ADDITIONAL CUSTODIAN DOCUMENTS:***   TecSec's allegation that

IBM disregarded this Court's directive to complete its initial document production by June 25,

2010 is wrong.   IBM produced over 7 million pages of documents by June 25, including

documents (excluding emails) collected from the custodians identified by IBM, documents from

accused product "teamrooms," product announcements and other product materials, and worldwide revenues for the accused products. Following IBM's initial collection of documents, TecSec identified numerous other IBM employees as sources of purportedly relevant information and requested the documents from these additional custodians. IBM is in the process of collecting and producing those documents. IBM already produced documents from additional custodians, including Mr. O'Donnell and Ms. Klar, and is in the process of producing other custodians' documents in advance of their deposition. IBM at no time has refused to produce documents from relevant custodians or has withheld any documents.

**DEPOSITIONS OF MR. O'DONNELL AND MS. KLAR:** IBM identified Mr. Bill O'Donnell in its May 7 initial disclosures as knowledgeable regarding IBM's WebSphere Application Server products.[10] Mr. O'Donnell is an IBM employee in Madison, Wisconsin who works from his home. IBM contacted Mr. O'Donnell to collect documents when he was identified as a custodian. When TecSec requested his deposition, IBM offered Mr. O'Donnell for deposition on July 13 in Madison, Wisconsin and TecSec accepted (*see* Exhibit W; Doc. No. 232-28(27)). TecSec's counsel issued a subpoena seeking production of documents on July 9 and a deposition on July 13.

During counsel's discussions with Mr. O'Donnell prior to his deposition, however, it was learned that he may have relevant documents on his home workstation that were mistakenly believed to have already been collected for this litigation (for example, from the applicable

---

[10] TecSec repeatedly makes misleading statements regarding IBM's discovery in this case. Mr. O'Donnell is not just one of eight people IBM has identified in this case—IBM has supplemented its initial disclosures to identify additional custodians, as well as identified additional knowledgeable employees in its supplemental interrogatory responses, including other witnesses knowledgeable about WebSphere Application Server and other WebSphere products at issue in this case. TecSec's motion simply ignores IBM's supplemental disclosures.

teamroom).  Moreover, due to the parties' ongoing negotiations regarding email search terms, Mr. O'Donnell's emails had not been produced to TecSec.  Accordingly, IBM postponed the deposition pending the production of Mr. O'Donnell's documents and emails.[11]  However, IBM immediately offered a later date for the deposition in Madison, Wisconsin—July 30th—to provide sufficient time for the parties to conclude negotiations regarding Mr. O'Donnell's emails and to produce any relevant documents from his workstation (Doc. No. 232-37(36)).

TecSec's arguments that the necessary rescheduling of Mr. O'Donnell's deposition is improper and that the time for depositions has been "impermissibly compressed as a result of IBM's dilatory conduct" is disingenuous.  TecSec itself has refused numerous offered dates in July for depositions of IBM employees in this case, requiring that many will take place in August.  Furthermore, common sense dictates that the time for depositions would be even more compressed—and the cost to all parties greater—if IBM's employees were subject to multiple depositions, as TecSec proposed (Doc. No. 232-38(37)).  Postponing the O'Donnell deposition pending complete document production was the only reasonable alternative.  And, the postponement of that deposition is not just the result of the home workstation documents discovered before the deposition—the parties were also still engaged in the negotiations regarding email production due to TecSec's insistence on overbroad search terms.  As a result of those ongoing negotiations, Mr. O'Donnell's emails would not have been produced in time for the deposition in any event.  Thus, Mr. O'Donnell would have been subjected to two depositions,

---

[11] TecSec seeks sanction because of Mr. O'Donnell's failure to meet the July 9 date for production of documents under the subpoena, when TecSec's counsel likewise has failed to meet one date for the production documents of the inventors and the prosecuting attorneys under subpoenas issued by IBM.  To date, IBM is still waiting on production of documents by the inventors and the prosecuting attorneys, which were due weeks ago pursuant to the subpoenas.

regardless of the production of additional non-email documents by IBM.   Therefore, it was proper for IBM to postpone the deposition so it only had to be taken once.[12]

IBM immediately provided another date for the deposition of Mr. O'Donnell.   IBM conducted a meet-and-confer with TecSec on Tuesday, July 13 and informed TecSec it would produce Mr. O'Donnell's non-email documents that week.   IBM produced those documents as promised, on July 16.   Mr. O'Donnell's deposition is now scheduled for July 30.   However, Mr. O'Donnell's emails have not been produced.   Despite its complaints regarding IBM's rescheduling of Mr. O'Donnell's deposition and the upcoming deposition, it has now been a week since IBM provided the search results of Mr. O'Donnell's email files (resulting in over 20,000 hits), and TecSec has still not responded to IBM's request for TecSec's proposal for the search and production of Mr. O'Donnell's emails.   IBM is ready to produce Mr. O'Donnell emails when TecSec provides a reasonable proposal for narrowing the search and production of Mr. O'Donnell's emails.

Regarding the deposition of Ms. Klar, Ms. Klar's documents (including emails) have been produced and the deposition rescheduled.   To be clear, contrary to TecSec's characterization, the "same scenario" did not happen regarding the deposition of Ms. Klar.   Ms. Klar is not a custodian with technical knowledge of the IBM accused products or TecSec's allegations of infringement.[13]   Furthermore, the parties' ***agreed*** to postpone the deposition,

---

[12] Moreover, TecSec did not "immediately" protest the postponement sent on Friday, July 9. TecSec waited until Monday afternoon July 12 to "protest." If TecSec was concerned regarding rescheduling the deposition and any resulting cost to TecSec, TecSec could have immediately responded to IBM's postponement of the deposition on Friday. By the time TecSec lodged its "protest" on Monday, it was impossible for counsel to travel for the deposition to go forward the next day, July 13. TecSec's belated "protest" seems more calculated to facilitate TecSec's arguments in this motion than to facilitate the O'Donnell deposition.

[13] IBM disputes Ms. Klar's relevance to this litigation. Ms. Klar's communications with TecSec were limited in timeframe and scope to a potential joint initiative for government contracts,

pending the complete production of documents *and* emails.  Ms. Klar's deposition has been rescheduled, and as IBM promised in the July 13 meet and confer, Ms. Klar's documents and emails were produced on July 16.

**IBM HAS NOT COMMITTED DISCOVERY-RELATED MISCONDUCT:**  IBM did not "abuse the discovery process" by insisting that TecSec comply with the law and subpoena these employees where they are located.[14]   Moreover, IBM did not simply disregard the subpoena—IBM postponed the deposition of Mr. O'Donnell based on TecSec's request for complete production of documents and email prior to the deposition.[15]  The parties agreed to do the same for Ms. Klar.  IBM promptly rescheduled the Mr. O'Donnell's and Ms. Klar's depositions and produced the documents.

Accordingly, IBM has not committed any discovery misconduct and therefore any sanctions are unwarranted.  Indeed, in the most recent meet-and-confer conference call the parties discussed approaches to facilitating the depositions in the various locations by grouping the dates at each location to the extent feasible.  This issue can be—and should be—resolved by the parties' mutual cooperation.  Sanctions are not appropriate.

---

specifically for a West Virginia project, in 2007-2008.  As a Senior Managing Consultant, Ms. Klar had no role in reviewing patents and IBM's products.   Though, TecSec claims its production has "scores" of documents related to Ms. Klar, it appears most of the emails are no more than friendly exchanges between Ms. Klar and Mr. Jay Wack of TecSec.

[14] TecSec's demand that IBM produce for deposition its employees from across the country in Virginia is nonsensical.  In accordance with Rule 45, the deposition must be where the deponent is located.  And, Local Civil Rule 30(a) in inapplicable.  Not all of the IBM deponents are officers, directors, or managing agents—indeed, most (if not all) are not.

[15] If IBM has "disregarded" a specific date in a subpoena and thus committed discovery-related misconduct, then   TecSec's   counsel   has   committed   extensive   discovery-related misconduct—TecSec's counsel has repeatedly failed to timely produce documents subpoenaed by IBM from the inventors and the prosecuting attorneys. For instance, IBM subpoenaed documents from inventor Mark Odell and attorney Jon Roberts—both represented by TecSec's counsel—for July 6, 2010, but the documents have still not been produced.

## III.    TECSEC'S DOCUMENTS MOTION SHOULD BE DENIED

IBM is not withholding documents based on General Objections, but properly standing on such objections as temporal scope because that information is irrelevant.   TecSec's *Documents Motion* is overreaching.

All matters concerning "the scope and conduct of discovery" are committed to the "sound discretion" of the Court.  *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 792 (4th Cir. 1988).  This discretion includes "ample powers" to curb "undue and uncontrolled discovery." *Herbert v. Lando*, 441 U.S. 153, 176-77 (1979).  Thus, the Court may preclude a "fishing expedition" into matters not in issue, or otherwise protect a party from "annoyance, and undue burden or expense" during discovery.  *Van Arsdale v. Clemo*, 825 F.2d 794, 798 (4th Cir. 1987). Thus, Rule 26 does not "permit free and untrammeled use of discovery," but requires that there be "good cause" behind each request.  *Lykins v. Attorney General*, 86 F.R.D. 318, 319 (E.D. Va. 1980).  Discovery is a "litigating tool which should be used with discretion."  *Id.*  Here, TecSec has served overbroad requests, seeking "all" documents on particular topics and IBM properly served generally applicable objections.

Several of the generally applicable objections asserted by IBM are routinely asserted in almost all civil litigation—and particularly in patent litigation—and generally enforced by the federal courts.  For example, information is not "relevant" for discovery purposes if it "occurred before the applicable limitations period."  *Oppenhiemer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978).  The general objection to temporal scope in patent cases is properly asserted to preclude discovery of, inter alia, sales and revenue information because of the six-year statute of limitations under the Patent Act.  35 U.S.C. § 286.  Likewise, a generally applicable objection to geographic scope is proper and enforceable.  *See Charlottesville Music Cntr. v. Magnepan, Inc.*,

655 F.2d 38, 39-40 (4th Cir. 1981).  Under the Patent Act, an accused infringer may be liable

only for infringing activities in the United States.  35 U.S.C. § 271.  Thus, generally applicable

objections to temporal scope and geographic scope, for example, may be properly asserted.

In light of this settled law, the assertion of generally applicable objections is not improper

*per se*.  Simply demanding, as TecSec has done, that the opposing party "waive" all general

objections is overreaching, however, and IBM should not be required to do that.  IBM's

objections are based on not only basic tenets of relevance in patent law, but also on privilege[16]

and the scope of the assertions in the case—as purportedly TecSec's "general" objections are as

well (Exhibit A).  For TecSec to claim that IBM's objections are sanctionable is disingenuous.

As an example, for the first time in its motion, TecSec claims that it "knows certain

categories of documents exist" and so speculates that IBM must have withheld these documents

based on general objections.  That is nonsense.  Despite IBM's repeated offers to discuss any and

all specific categories of documents, TecSec did not even discuss these particular categories with

IBM prior to filing this motion, let alone point out their purported absence from IBM's document

production—if they even are absent.  TecSec has more than once professed an inability to find a

particular document or category of documents in IBM's production, and IBM has obliged by

specifying its discovery number.  Moreover, IBM has been and remains willing to discuss these

specific categories of documents with TecSec without the Court's intervention.

---

[16] TecSec cannot claim that IBM is not entitled to its objections to production of attorney-client privileged, common interest privileged and work product documents.  TecSec itself has asserted general objections based on privilege.  Unquestionably, IBM's objections on these grounds are proper and TecSec cannot claim it does not know what IBM is withholding on this basis—it has IBM's privilege log.

As illustrated below, IBM's objections to these requests are clear, and, for example, TecSec cannot claim it is unaware of what documents IBM has produced—or withheld on the basis of privilege—in response to these requests.

*IBM'S ORGANIZATIONAL CHARTS:*   TecSec claims that IBM is withholding organizational charts in response to Request No. 1.  Request No. 1 is not limited in temporal or geographic scope, nor is it even limited to the organization of any particular group in IBM related to the accused products and features in the case.  Instead, Request No. 1 seeks "[a]ll documents and things that refer to or relate to the organizational structure of Defendant" or "to identify the names and titles of all supervisory or managerial employees of Defendant."  This request is clearly overbroad and IBM properly objected as such.[17]  Organizational charts for an unspecified time period for all supervisory and managerial employees across IBM's 400,000 employees worldwide are simply irrelevant, and to require IBM to collect all of these charts would be unduly burdensome.  In response, in accordance with the scope of this litigation, IBM has produced organizational charts for the IBM employees identified as most knowledgeable about the accused products.  If TecSec believes it needs additional organizational charts for its case, IBM has been and remains willing to discuss the production of additional charts consistent with the scope of this case.

*COMMUNICATIONS WITH OTHER DEFENDANTS REGARDING TECSEC:*  TecSec claims IBM is withholding "IBM's communications with other defendants, with which it was co-developing encryption technology, encompassed by TecSec's Request No. 12."  However, Request No. 12 does not seek documents regarding IBM's co-development of encryption

---

[17]   The Fourth Circuit has expressly held that district courts have "wide discretion … to deny indiscriminate, blanket requests for all files" on a particular topic, "which represent fishing expeditions."  *Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994).  IBM's objection to the production of "all" organizational charts, therefore, was well founded.

technology with any party, let alone other defendants.  Request No. 12 seeks "[a]ll documents and things concerning Defendant's discussions or communications with any other party concerning TecSec, including but not limited to all discussions and communications relating to any patents, patent applications and/or licensing agreements."  As TecSec is fully aware, IBM is in the process of producing emails from identified custodians using TecSec's search terms and to the extent any communications regarding TecSec exist, those communications will be produced in accordance with TecSec's proposed search terms.  With regards to communications with other Defendants regarding this litigation, TecSec is also fully aware that IBM objects to the production of those communications in accordance with the common interest/joint defense privilege (*see* Exhibit X).

*"POLICIES AND PROCEDURES RELATING TO AVOIDING PATENT INFRINGEMENT":* TecSec next claims IBM has withheld "IBM's policies and procedures relating to avoiding patent infringement, as requested in TecSec's Request No. 15."   It is not clear what exactly TecSec seeks that is relevant to this case and what "policies and procedures relating to avoiding patent infringement" TecSec is certain exist.  IBM has a broad patent portfolio and is a party to numerous patent licenses, including cross licenses.   Information about IBM Intellectual Property and Licensing is publicly available (http://www.ibm.com/ibm/licensing/).  In addition, IBM has produced patent license agreements in this litigation.  Furthermore, as reflected in IBM's Privilege Log and IBM's communications with TecSec produced in this case, when TecSec contacted IBM in late 2008, IBM conducted a privileged investigation, responded to TecSec that IBM did not need a license, and invited further discussion.  IBM did not hear back from TecSec for almost a year until they filed this lawsuit.  To the extent TecSec seeks any additional information specific to IBM's litigation strategy in this case, IBM has properly objected to

production of those documents on the basis of the attorney-client privilege and/or work product doctrine.

*"CONTINGENCY PLANS":*  TecSec claims IBM has withheld "IBM's contingency plan(s) in the event that it is enjoined from infringing any or all of the patents-in-suit, as requested by Request No. 16."  This request clearly seeks legal documents and analysis directly related to this litigation and therefore IBM has properly objected to the production of any responsive documents on the basis of the attorney-client privilege and/or work product doctrine.

As demonstrated above, IBM's objections and production in this patent litigation are not a mystery.  To be clear, IBM is not actively "withholding" any non-privileged documents.  To the extent responsive documents exist consistent with the scope of this patent litigation, IBM has produced those documents.  IBM has identified, collected and produced documents from custodians and common repositories that have documents and materials regarding the accused products including design and development document.  IBM has also produced product announcements and product manuals.  IBM is producing for inspection the source code for all of the products.  IBM is producing emails as requested by TecSec, despite TecSec's overbroad search terms and requests.  IBM has produced revenue for the accused products back six years—the statute of limitations for this patent action.  IBM even produced worldwide revenue, despite IBM's standing objections to the recovery of damages outside the United States in this case.  In sum, IBM has produced information relevant to the issues in this case.

However, TecSec served broad requests in this litigation—seeking "all" documents, not necessarily limited to the accused products, not limited geographically, and not limited in time.  TecSec also served requests that clearly implicate the attorney-client privilege, common interest/joint defense privilege and work product doctrine.  As such, IBM's objections to

producing privileged documents, producing "all" documents and documents outside the scope of this litigation are proper and should stand.

Furthermore, though TecSec now complains of being forced to "hunt" through seven million pages of documents, it is TecSec who brought this case accusing dozens of products of patent infringement and it is TecSec that requested "all" documents related to those products. TecSec cannot now be heard to complain when it has received the documents it asked for. Despite IBM's attempts to reasonably limit the production of emails, TecSec insists that IBM must produce all "responsive" emails, regardless of whether they are duplicative of other information or provide any additional information relevant to this patent infringement action. And, by its motion, TecSec purportedly seeks even more documents.  Thus, TecSec's attempt to characterize IBM's production as a "document dump" and a "haystack … when TecSec has requested a needle" is disingenuous at best.  IBM has produced the documents related to the accused products that TecSec has requested.  Moreover, IBM has never refused to tell TecSec what it has produced in this litigation in response to TecSec's broad requests.  IBM has been, and remains, willing to discuss the production of any additional information TecSec believes is missing from IBM's production, but IBM will stand on its proper objections to the scope of discovery in this case.   Accordingly, the Court should deny TecSec's *Documents Motion*.

## IV.   TECSEC'S RECONSIDERATION MOTION SHOULD BE DENIED

TecSec's *Reconsideration Motion* (Doc. No. 227) should be denied.  In this motion, TecSec asserts its alarmist arguments based on rhetoric instead of reason.  Using adjectives and

adverbs instead of facts, TecSec merely re-argues this issue regarding "discovery about discovery," which the Magistrate Judge has already considered and denied.[18]

Ordinarily, a party aggrieved of the Magistrate Judge's order must seek review from the district judge under Rule 72(a).   Although not specifically provided for in Rule 72, reconsideration and revision by the Magistrate Judge may be appropriate under another rule. Generally, any order that is not "final" under Rule 54(a) is subject to reconsideration and revision under Rule 54(b) in the Court's discretion.  *See generally Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.14 (1983); *accord, e.g., High Country Arts & Craft v. Hartford*, 126 F.3d 629, 635 (4th Cir. 1997).  The Magistrate Judge's June 25 order, of course, was not "final," and reconsideration under Rule 54(b) may be proper.  In fact, on occasion, the Magistrate Judges will reconsider their own orders.  *See, e.g., Wang Labs., Inc. v. America Online, Inc.*, No. 1:97cv1628, 1998 U.S. Dist. LEXIS 6798 (E.D. Va. 1998) (entertaining motion for reconsideration of motion to compel privileged documents in patent case, but denying same). Rule 54(b), however, is not open invitation for reconsideration of all orders for any reason.

Under Rule 54(b), federal courts usually require a showing of good cause for reconsideration, such as these grounds: (1) the discovery of new material evidence, (2) an intervening change in controlling law, or (3) the prevention of a manifest injustice.  *See* 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4478.1 (2002); *accord Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983) (grounds for reconsideration of interlocutory order).  A motion to reconsider is not proper for mere reargument.  *Above the Belt*, 99 F.R.D. at 101. A good cause showing is necessary

---

[18]  Reconsideration motions are not unique to patent law, and therefore are governed by regional circuit and local district law.  *See University of Colorado Fndn., Inc. v. American Cyanamid*, 902 F. Supp. 221, 222 (D. Colo. 1995) (applying regional and district law).

because a trial court simply "could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment." *See* 18B Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 4478.1 at 692 (2002). Thus, motions for reconsideration should be rarely granted, *Above the Belt*, 99 F.R.D. at 101, and are disfavored because they prolong the litigation and bog the case down in rehashing of arguments. *Shepherd v. Health Drinks of America, Inc*., 66 F.R.D. 607 608 (E.D. Va. 1976). TecSec fails to make a showing of good cause for reconsideration.

TecSec's brief largely reargues its prior brief (*compare* Doc. No. 180 *with* Doc. No. 228). The only "new evidence" that TecSec presents in its effort to justify this extraordinary discovery is the "startling revelation" that IBM did not place a "litigation hold" until after it was sued (Doc. No. 228 at 4). TecSec then leaps to the conclusion that since the "litigation hold" was not issued until in fact there was litigation, that there may have been spoliation of evidence prior to the lawsuit was filed. That is not the case.

Extensive "discovery about discovery" can become unduly burdensome and unfairly expensive—particularly if based solely on one party's speculation that the other one might be defaulting on its discovery obligations. *See Veliz v. Cintas Corp.*, 2008 U.S. Dist. LEXIS 45822, *7-9 (N.D. Cal. June 11, 2008) (denying "discovery about discovery" in the absence of a showing of good cause). That is exactly what is occurring here. Rather than showing any spoliation or misconduct, TecSec merely complains that IBM's litigation hold letter was not sent earlier. But that does not prove that there has been any spoliation as a result. TecSec offers nothing but rank speculation, which is not "new evidence" that would justify a motion for reconsideration.

Moreover, there must be a duty to preserve before there can be any wrongdoing in destroying relevant documents.  *See Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 286-87 (E.D. Va. 2001).  TecSec cites to no authority to support any argument that IBM was required to put a litigation hold in place any earlier than it did.  There is no requirement that IBM  put into place a litigation hold in response to the two TecSec letters, which provided absolutely no facts or analysis to support an allegation of infringement and did not even imply imminent litigation. Instead, TecSec declined to respond to IBM's response that it had found no need for a license to the patents.  IBM reasonably concluded the matter was closed.  In fact, not only did TecSec never respond to IBM, it waited almost a year to file this suit.[19]  And, to require IBM to initiate a litigation hold in response to every unsolicited letter sent to IBM from any third party mentioning patents would no doubt cripple IBM's business.

Nor does IBM's privilege log support any argument that IBM anticipated this litigation. TecSec specifically identifies IBM's Privilege Log at P-12, P-14, P-20, P-22 and boldly claims that IBM has asserted work product protection over "all documents and information generated during this time period (*see id.*) which necessarily means that IBM must have anticipated litigation at that point" (*see Sanctions Motion* at 2).  A simple review of these entries *reveals that IBM did not assert work product protection in this case over any communications related to the TecSec letters in 2008 and 2009*.  IBM claimed attorney-client privilege only.  Indeed, on the three pages spanning TecSec's citation to IBM's privilege log, there is not one assertion of privilege based on work product protection.  Therefore, there is simply no argument that IBM

---

[19] TecSec admits it needed that entire year after contacting IBM to continue its pre-suit investigation (*see Sanctions Motion* at 2).   Therefore, IBM cannot be expected to have anticipated litigation when TecSec clearly did not have a basis for filing litigation when it contacted IBM.  Indeed, TecSec failed to provide any details regarding any alleged infringement of its patents by IBM products in either letter sent to IBM.

was under any obligation to put into place a litigation hold any earlier than it did and TecSec's "grave concerns" about preservation in this case are unwarranted.

Moreover, discovery about discovery would be invasive of privileges.[20]   Document retention letters and other communications between counsel and client about document retention, collection, and production are privileged or protected as work product.  *See In re eBay Seller Antitrust Litig.*, 2007 U.S. Dist. LEXIS 75498 (N.D. Cal. Oct. 2, 2007) (plaintiff's efforts to take "discovery about discovery" concerning document retention practices would be limited to "facts"—*but* not include work product and privileged document retention notices).  TecSec seeks exactly that information in its motion—details of the litigation hold, include the categories the hold instructed to preserve or collect.  But, document retention letters, for example, are privileged and protected.  *Id*.  TecSec's Reconsideration Motion should be denied on this basis, as well.

Finally, even the cases cited by TecSec do not support its overreaching arguments.  For example, in *Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 U.S. Dist. LEXIS 68128 (D.N.J. Aug. 4, 2009), the plaintiff sent an explicit pre-litigation notice of its racial profiling claim to the defendants on September 11, 2003.  *Id*. at *11.  The district court found that plaintiff's 2003 notice letter triggered the defendants' obligation to preserve evidence, and specifically found that there was actual evidence of spoliation after that date based on the deposition testimony of the lead defendant, who admitted to not having save any emails despite an instruction to save them. *Id*. at *8-11.  The district court adopted and applied the rule that "when spoliation occurs [litigation hold] letters are discoverable."  *Id*. at *7.  Finding actual evidence of spoliation, the

---

[20] IBM does claim privilege for its March 3, 2010 litigation hold—the absence of the hold from IBM's privilege log is merely the result of the parties' agreement as expressed in the Revised Joint Discovery Plan that the parties are not required to log privileged documents following the commencement of the litigation.

district court ordered production of the litigation hold letters.  *Id.* at 17.  Thus, production in that case was not based on the date of the litigation hold letter, but on the deposition testimony of the lead defendant that he had not saved any of his emails despite the instruction to do so.  No such facts are found here.  In the absence of such facts, reconsideration is not warranted.

## CONCLUSION

For the reasons argued above, the Court should deny TecSec's, *Reconsideration Motion* (Doc. No. 227), *Document Motion* (Doc. No. 229), and *Sanctions Motion* (Doc. No. 231).


Dated: July 21, 2010                                    Respectfully submitted,

| | |
|---|---|
| *Of Counsel for Defendant IBM:* | /s/ Craig C. Reilly |
| | Craig C. Reilly VSB # 20942 |
| | 111 Oronoco Street |
| John M. Desmarais | Alexandria, Virginia 22314 |
| DESMARAIS LLP | TEL:   (703) 549-5354 |
| 230 Park Avenue | FAX:   (703) 549-2604 |
| New York, NY 10169 | E-MAIL: craig.reilly@ccreillylaw.com |
| Tel: 917-340-6940 | *Counsel for Defendant IBM* |
| Fax: 914-666-6962 | |
| Email: jdesmarais@desmaraisllp.com | *Of Counsel for Defendant IBM:* |
| | |
| Jon T. Hohenthaner | Elizabeth Bernard |
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| 601 Lexington Avenue | 655 15th Street, N.W. |
| New York, NY 10022-4675 | Washington, D.C. 20005 |
| TEL:   (212) 446-4800 | TEL:   (202) 879-5000 |
| FAX:   (212) 446-4900 | FAX:   (202) 879-5200 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of July 2010, a true and correct copy of the foregoing pleading or paper was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record:

| | |
|---|---|
| Brian Mark Buroker<br>HUNTON & WILLIAMS<br>1900 K St NW<br>Washington , DC 20006-1109<br>TEL: (202) 955-1500<br>FAX: (202) 778-2201<br>Email: bburoker@hunton.com<br><br>Thomas J. Cawley<br>HUNTON & WILLIAMS<br>1751 Pinnacle Drive<br>McLean, VA 22102<br>Tel: (703) 714-7400<br>Email: tcawley@hunton.com<br>*Counsel for Plaintiff* | Andrew James Isbester<br>TOWNSEND AND TOWNSEND AND CREW LLP<br>Two Embarcadero Ctr., 8th Floor<br>San Francisco, CA 94111<br>Tel: (415) 273-4335<br>Email: jisbester@townsend.com<br><br>Jonathan Dyste Link<br>TOWNSEND AND TOWNSEND AND CREW LLP<br>1301 K St NW, 9Th Floor, East Tower<br>Washington, DC 20005<br>Tel: (202) 481-9900<br>Email: jlink@townsend.com<br>*Counsel for Defendants Oracle America, Inc.*<br>*and Oracle Corp.* |
| Michael Robinson<br>Stephen K. Gallagher<br>VENABLE LLP<br>8010 Towers Crescent Drive<br>Vienna, VA 22182<br>mwrobinson@venable.com<br>skgallagher@venable.com<br><br>Jeffri Kaminski<br>VENABLE LLP<br>575 7th Street, NW<br>Washington, DC 20004<br>jakaminski@venable.com<br>*Counsel for Software AG Defendants* | Jeffrey K. Sherwood,<br>Frank C. Cimino<br>Matthew Weinstein<br>Megan Sunkel Woodworth<br>DICKSTEIN SHAPIRO LLP<br>1825 Eye Street NW<br>Washington, DC 20006<br>sherwoodj@dicksteinshapiro.com<br>ciminof@dicksteinshapiro.com<br>weinsteinm@dicksteinshapiro.com<br>woodworthM@dicksteinshapiro.com<br>*Counsel for SAP Defendants* |
| Walter D. Kelley, Jr.<br>Tara Lynn R. Zurawski<br>JONES DAY<br>51 Louisiana Avenue, NW<br>Washington, DC 20001<br>Tel: (202) 879-3939<br>Fax: (202) 626-1700<br>Email: wdkelley@jonesday.com<br>*Counsel for Defendant SAS* | Henry C. Su<br>HOWREY LLP<br>1950 University Ave<br>4th Floor<br>East Palo Alto, CA 94303-2250<br>suh@howrey.com<br>*Counsel for Defendant Adobe* |

| | |
|---|---|
| Sarah Hall<br>George Pappas<br>Gary Rubman<br>COVINGTON & BURLING LLP<br>1201 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>shall@cov.com<br>gpappas@cov.com<br>grubman@cov.com<br><br>Nitin Subhedar<br>Bhanu Sadasivan<br>COVINGTON & BURLING LLP<br>333 Twin Dolphin Drive<br>Redwood Shores, CA 94065<br>nsubhedar@cov.com<br>bsadasivan@cov.com<br>*Counsel for Defendant Sybase* | William H. Boice<br>bboice@kilpatrickstockton.com<br>Mitchell G. Stockwell<br>mstockwell@kilpatrickstockton.com<br>KILPATRICK STOCKTON LLP<br>1100 Peachtree Street, N.E.<br>Suite 2800<br>Atlanta, Georgia  30309<br>(404) 815-6500<br>(404) 815-6555 (Facsimile)<br>*Counsel for Defendant Cisco Systems*<br><br>Amr O. Aly<br>aaly@kilpatrickstockton.com<br>KILPATRICK STOCKTON LLP<br>31West 52nd Street, 14th Floor<br>New York, NY  10019<br>(212) 775-8700<br>(212) 775-8800 (Facsimile)<br>*Counsel for Defendant Cisco Systems* |
| Blair Jacobs<br>Christina Ondrick<br>Karla Palmer<br>MCDERMOTT, WILL & EMERY LLP<br>600 13th Street, N.W.<br>Washington, D.C. 20005<br>bjacobs@mwe.com<br>kpalmer@mwe.com<br>condrick@mwe.com<br><br>Terrence McMahon<br>Vera Elson<br>Yar Chaikovsky<br>Hong Lin<br>MCDERMOTT WILL & EMERY LLP<br>275 Middlefield Road<br>Menlo Park, CA 94025<br>tmcmahon@mwe.com<br>velson@mwe.com<br>hlin@mwe.com<br>*Counsel for Defendants eBay and PayPal* | |
| |   s/    Craig C. Reilly<br>Craig C. Reilly (VSB No. 20942)<br>craig.reilly@ccreillylaw.com<br>111 Oronoco Street<br>Alexandria, Virginia  22314<br>(703) 549-5354<br>(703) 549-2604 (Fax)<br>*Counsel for Defendant IBM* |