1

1              STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3  TECSEC, INCORPORATED,        .       Civil Action No. 1:10cv115
                                .
4            Plaintiff,         .
                                .
5      vs.                      .       Alexandria, Virginia
                                .       August 27, 2010
6  INTERNATIONAL BUSINESS       .       11:29 a.m.
   MACHINES CORPORATION, et al., .
7                               .
             Defendants.        .
8                               .
   .   .   .   .   .   .   .   .   .
9
                  TRANSCRIPT OF MOTIONS HEARING
10      BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
              UNITED STATES MAGISTRATE JUDGE
11
   APPEARANCES:
12
   FOR TECSEC, INCORPORATED:      THOMAS J. CAWLEY, ESQ.
13                                Hunton & Williams
                                  1751 Pinnacle Drive, Suite 1700
14                                McLean, VA 22102
                                    and
15                                BRIAN M. BUROKER, ESQ.
                                  MICHAEL A. OAKES, ESQ.
16                                RYAN P. PHAIR, ESQ.
                                  Hunton & Williams
17                                1900 K Street, N.W.
                                  Washington, D.C. 20006-1109
18

19

20          (APPEARANCES CONT'D. ON FOLLOWING PAGE)

21

22                        (Pages 1 - 54)

23

24

25 (Proceedings recorded by electronic sound recording, transcript
   produced by computerized transcription.)

```
 1   APPEARANCES:   (Cont'd.)

 2   FOR INTERNATIONAL BUSINESS      CRAIG C. REILLY, ESQ.
         MACHINES CORPORATION:       Law Office of Craig C. Reilly
 3                                   111 Oronoco Street
                                     Alexandria, VA 22314
 4                                      and
                                     JOHN M. DESMARAIS, ESQ.
 5                                   Desmarais LLP
                                     230 Park Avenue
 6                                   New York, NY 10169
                                        and
 7                                   JON T. HOHENTHANER, ESQ.
                                     Kirkland & Ellis LLP
 8                                   601 Lexington Avenue
                                     New York, NY 10022-4675
 9                                      and
                                     ELIZABETH BERNARD, ESQ.
10                                   Kirkland & Ellis LLP
                                     655 - 15th Street, N.W.
11                                   Washington, D.C. 20005

12

13   TRANSCRIBER:                    ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
14                                   401 Courthouse Square
                                     Alexandria, VA 22314
15                                   (703)299-8595

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

THE CLERK:  TecSec, Inc. v. International Business Machines Corporation, Case No. 10cv115.

THE COURT:  All right, good morning.  Would you-all identify yourselves for the record, please.

MR. CAWLEY:  Your Honor, Tom Cawley for the plaintiff, TecSec, and with me is Ryan Phair of our firm, Mike Oakes, and Brian Buroker.

THE COURT:  All right, good morning.

Good morning.

MR. REILLY:  Good morning, Your Honor.  Craig Reilly for IBM together with Jon Hohenthaner, John Desmarais, and Elizabeth Bernard.

THE COURT:  All right.  Let's deal first with TecSec's motion to prevent Dr. Cole from viewing protected material.  Did you have anything you want to add to that motion?

MR. PHAIR:  Your Honor, I don't think we have anything specific to add to what we have stated in our papers.  The only thing that I would add is that the information that we presented in our papers as to how Mr. Cole is representing himself, we actually checked this morning the McAfee Web site.  He continues to hold himself out as a senior vice president and CTO of McAfee.

We Googled his name this morning again.  He's still being presented in conferences and so forth as the senior vice president and CTO at McAfee, so just to clarify that that's up to

1   date.

2          THE COURT:  Okay.  Did you have anything to add to the

3   opposition?

4          MR. REILLY:  I think when we went over this, Your

5   Honor -- Craig Reilly for IBM on this -- it is a motion for

6   protective order.  They have to show good cause.  The burden of

7   proof is on TecSec on this.

8          We've presented the Court with a five-factor test.  We

9   can't presume or speculate what the bases would be for a conflict

10  of interest here.  They have to actually demonstrate a conflict of

11  interest.

12         We've provided the Court with the affidavit from

13  Dr. Cole.  Notwithstanding the label that is assigned to him by

14  McAfee in his role as a consultant, he's not an officer and

15  employee.  His designation as CTO, or chief technology officer, is

16  not really determinative here as to what he does.

17         TecSec's link to McAfee, for example, in their reply

18  brief, I went and clicked on that link, and it shows the

19  management team from McAfee, which does not include Dr. Cole.  So

20  it is not as if he is, you know, the key manager over there.

21         More importantly, though, he's not involved in any of

22  the specific McAfee products that they identified as the conflict.

23  He's not involved in product design or architecture.  He's not

24  involved in --

25         THE COURT:  Could he not be, though?

1              MR. REILLY:  What's that?

2              THE COURT:  Why could not he be in the future?  Why

3   couldn't he be involved in that from here on out for McAfee?

4              MR. REILLY:  He will not be under the protective order

5   that he signed, the same undertaking that their experts are

6   signing.

7              THE COURT:  Right.

8              MR. REILLY:  There's nothing to prevent -- their expert,

9   for example, today doesn't work for Dell, but there's nothing in

10  the protective order other than the undertaking that they've

11  signed --

12             THE COURT:  Right.

13             MR. REILLY:  -- that would prevent Dr. Stubblebine from

14  working for Dell in the future.

15             THE COURT:  I understand that, but he already works for

16  McAfee.

17             MR. REILLY:  Hmm?

18             THE COURT:  Understanding that, but he already works for

19  McAfee.

20             MR. REILLY:  As a consultant, yes, Your Honor.

21             THE COURT:  All right.

22             MR. REILLY:  He does.

23             THE COURT:  Okay.

24             MR. REILLY:  But that alone isn't sufficient under the,

25  under the test unless he has an involvement in the or access to --

1  in this case, access to their technical information or source code

2  would have a direct relationship to the products or services he's

3  actually working on for McAfee, which has not been shown and isn't

4  the case.

5         So with respect to Dr. Cole, they're making broad

6  generalizations based on this title, chief technology officer, and

7  trying to then generalize from that and say that he does pose a

8  competitive threat.

9         For example, in their reply brief, they seized upon a

10  single sentence in a 17-page document that they cited to, there's

11  another link in their reply brief, and I clicked on that, looked

12  for the sentence, and this is at their reply brief at page 3, and

13  it talks about a new trend in encryption technology that says

14  this:  that the movement in -- the trend in the industry, not just

15  what Dr. Cole is doing, the trend in the industry is shifting from

16  focusing on data encryption to key management and that the most

17  robust algorithms in the world are not any good without proper

18  management of the keys, and then they put a footnote to where

19  that's found, and then they say, of course, as the Court is likely

20  aware, one of their products is CKM, constructive key management.

21  So they say, well, obviously, he's working in key management

22  technology.

23         Your Honor, this is like -- computer security people

24  talk about keys and algorithms the way carpenters talk about

25  hammers and nails.  This is -- these are terms of art.  This is

1    the way they talk.  This is what they, what they do.

2            It doesn't show in any way that he's working on these

3    algorithms or the key management, because his declaration says

4    he's not involved in product architecture or design.  He's not

5    working on particular products that they've identified.

6            So again, they're speculating that he might breach the

7    undertaking he signed to become an expert in this court --

8            THE COURT:  Okay.

9            MR. REILLY:  -- and that's the same risk that any expert

10   finds.

11           There's nothing that stops their expert from deciding to

12   become a consultant from one of our competitors, IBM's competitors

13   in the future other than the undertaking of this case.

14           So their argument really admits to much when they say,

15   well, he might do something in the future.  He's not doing

16   anything now, and anything is possible in the future, but the one

17   thing that the courts consistently look to is with respect to an

18   expert who has signed an undertaking like this -- and this is not

19   the first case he's been an expert witness in.  He's never been

20   disqualified before.  He holds security clearances from the

21   government, worked at the CIA just like their people did.  He

22   knows the drill in something like this.  He's never been

23   disqualified as an expert in litigation before.

24           THE COURT:  Right.

25           MR. REILLY:  So for those reasons, Your Honor, I think

1   that what they're attempting to do is based on the broad

2   generalizations, they've not made a showing, a specific showing

3   with good cause to limit Dr. Cole's participation in this case.

4           THE COURT:  All right.  All right, you're right that any

5   of the experts could certainly go out tomorrow after this case is

6   over and start working for one of the competitors and they would

7   have some of the confidential information already in their head,

8   but -- and I don't mean to accuse Dr. Cole of in any way intending

9   to violate the confidentiality provisions of the protective order,

10  but the problem is he does directly work for a competitor at this

11  point.  Although not currently on one of the alleged infringing

12  devices, he has the title -- and perhaps this is just fluff -- but

13  he does have the title of chief technical officer for, for the

14  Americas for McAfee.

15          He says that he analyzes security needs of prospective

16  customers and trends in the information security industry, which I

17  understand, but his -- the knowledge that he would gain through

18  looking at TecSec's confidential, highly confidential proprietary

19  business information and source code is really dangerous, I think,

20  when he already does work for McAfee.

21          It may -- he may not intentionally disclose information

22  to McAfee, but you can't unthink something that you already know,

23  and if he were, if he were allowed to continue as IBM's expert, he

24  would be in a position to see all of this confidential information

25  and perhaps even unwittingly use it to McAfee's benefit without

1   directly meaning to.

2        The title suggests and the information that was

3   submitted to me especially in the reply brief by TecSec suggests

4   that he has the capability of representing or giving advice to

5   McAfee in a number of different ways and that his title or the

6   minimization of his title is not, I think, as simple as the

7   defendant would like me to believe.

8        So I do not think it appropriate given his position with

9   McAfee that Mr. -- Dr. Cole be allowed to view TecSec's

10  confidential business information, so I'm going to grant the

11  motion to prevent Dr. Cole from seeing that information.

12        Now, let's move to the TecSec's two motions to extend

13  the discovery schedule and to -- let's deal with that first and

14  then go on to the motion to compel.

15        MR. CAWLEY:  Good morning, Your Honor.

16        THE COURT:  Good morning.

17        MR. CAWLEY:  Tom Cawley for TecSec.  Your Honor, it may

18  be that this motion might be more properly addressed --

19        THE COURT:  Do you want to do it in reverse?

20        MR. CAWLEY:  Because the motion to compel may impact on

21  Your Honor's decision.

22        THE COURT:  All right, let's go through it in reverse.

23  It doesn't much matter.  Go ahead.

24        MR. CAWLEY:  Thank you.

25        MR. OAKES:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. OAKES:  Michael Oakes for plaintiff TecSec.  We're

3    going to do this in pieces.  We're going to start with the

4    damages.

5          THE COURT:  Okay.  Let's -- all right.  Do you mean you

6    want to split it up within the motion?

7          MR. OAKES:  If that's all right, the damages.

8          THE COURT:  Okay.  So you're dealing with damages.

9          MR. OAKES:  Yeah.  Right.  We did it in three, three

10   sort of categories that we are having issues with.

11         THE COURT:  Okay.

12         MR. OAKES:  So we've been before the Court several

13   times --

14         THE COURT:  Right.

15         MR. OAKES:  -- on the damages issue, and we're still

16   having difficulty with the production today.

17         We've got very limited -- although we've got a very

18   large production from IBM today, the financial production is very

19   small.  It's ten spreadsheets that we had handed up to the Court

20   last time that were indecipherable, with just negative numbers and

21   don't really make sense.

22         THE COURT:  Right.  You were going to take a deposition.

23   Have you done that yet?

24         MR. OAKES:  We had difficulty identifying who created

25   the spreadsheets, and we asked immediately after the hearing who

1  made these spreadsheets --

2          THE COURT:  Right.

3          MR. OAKES:  -- and it took a little time for them to

4  tell us who that was.

5          THE COURT:  Right.

6          MR. OAKES:  Once we figured it out, we noticed that

7  person for a deposition and secured it with a subpoena.  That was

8  supposed to take place this morning.  We got a letter from them

9  last night cancelling the deposition again, which is a recurring

10 problem here.

11         This is -- the key issue is that we don't understand

12 their financial information.  We finally figured out --

13         THE COURT:  Who was the deposition supposed to be of?

14         MR. OAKES:  It was Corina Crawford.  She was the person

15 who created some of these negative spreadsheets.

16         THE COURT:  Okay.

17         MR. OAKES:  And the other key damages person is Price

18 Varty, and we have been asking repeatedly for a deposition date

19 for them and secured it with a subpoena again, and they said that

20 that date was not acceptable and they want to do it on September

21 14, which is right before the close of discovery, and that's

22 just -- it's too late for us.

23         THE COURT:  Price who?

24         MR. OAKES:  Price Varty, V-a-r-t-y.

25         THE COURT:  Okay.

1          MR. OAKES:  And the date is so late, and our expert

2    reports are due right after that, that I think these damages

3    reports are so indecipherable that to get the information that

4    close to the deadline --

5          THE COURT:  Okay.

6          MR. OAKES:  -- is going to be very challenging for us to

7    make any sense of this, when it's fairly clear from other

8    presentations and marketing and sales presentations that these

9    negative number spreadsheets is really not how they keep their

10   numbers, and they have clear revenue numbers and costs, and this

11   doesn't look like the information that we're getting is really how

12   they track information.

13         We think these witnesses will be able to explain to us

14   that we keep a database and we can run certain queries against

15   that database and create realistic-type financial numbers.  Very

16   simply, they just run a report off a database, but we can't get to

17   the witnesses when they're cancelling depositions at the last

18   minute and not giving us witnesses until the last day.

19         THE COURT:  All right.  Is there anything else that

20   relates to the damages information that you're seeking?

21         MR. OAKES:  We just need -- I think we need accurate

22   financials, because what we've got so far, it's just -- it's clear

23   from the documents, they'll say in their annual report revenue was

24   up 8 percent over last year, but then the spreadsheets they give

25   us don't even have revenue numbers.  They've got negative numbers

1    that don't even add up to the numbers that they report elsewhere.

2              THE COURT:  Okay.

3              MR. OAKES:  So the numbers aren't clear.  And then we

4    really need real numbers, and then we need witnesses to explain

5    it, and then I think we're going to see from the witnesses that

6    there are actually more documents that would make --

7              THE COURT:  All right.  Well, I mean -- okay.  Let me

8    hear from the defendants.  The problem I have was your motion, of

9    course, didn't deal with the depositions, and I understand you

10   didn't know about Ms. Crawford until last night, but, you know,

11   IBM is telling me they don't have the specific information that

12   you have in the form that you have it.  So, you know, until you

13   take the depositions and can show me that that's untrue, I can't

14   really deal with it otherwise.

15             Let me hear from the defendants.

16             MR. OAKES:  I do want to just point to a couple of

17   exhibits that --

18             THE COURT:  I've looked at those.  I don't know what

19   they mean, either.  I mean, I really -- I mean, you can guess as

20   to what they mean, and I understand your argument as to what they

21   mean, but I don't know what that means.

22             MR. OAKES:  But if you do look at the marketing

23   spreadsheets that we're able to find elsewhere, it's clear that

24   they're tracking, you know, very clearly revenue, positive revenue

25   for the year that are numbers substantially higher than what's

1   showing up these strange negative number spreadsheets.

2           THE COURT:  Okay.  Sure.  Well, and they said the

3   negatives might not be negatives anyway.

4           So what's going on with the depositions?

5           MR. HOHENTHANER:  Your Honor, I wasn't directly involved

6   in the deposition, but I think I know enough of the background to

7   try to address it.  As I understand, we take issue with the

8   suggestion that some deposition was cancelled.

9           THE COURT:  Ms. Crawford?  Is she being deposed today?

10          MR. HOHENTHANER:  She's not being deposed today.  The

11  history of our team that's been handling the depositions is that

12  both parties get together, work with the witnesses to find when

13  they're actually available, and we've done this for dozens and

14  dozens of witnesses.

15          This particular deposition, they served deposition

16  notice with the dates.  As with all others, we went to the

17  witness, thought the witness was available, it turns out she was

18  on vacation this date, sent them a letter, and they said that's

19  unacceptable.

20          So it's not a deposition that was confirmed as every

21  other deposition has been done in this case.  This is one that

22  plaintiff unilaterally --

23          THE COURT:  They said that you cancelled it last night.

24          MR. HOHENTHANER:  I don't believe that came last night.

25  If it did, I wasn't directly involved.

1          THE COURT:  Do you have something?

2          MR. HOHENTHANER:  Nonetheless, what -- there was never a

3    confirmation that this was going forward, as has been the history

4    with every single witness proposed to date.

5          THE COURT:  All right.  What about Price Varty?

6          MS. BERNARD:  For all these witnesses, Your Honor, we've

7    gone back to the witness to see when they're available.  A lot

8    of --

9          THE COURT:  Look, we can't make this at their

10   convenience.  It's too late now.  We've got, what, two weeks left

11   of discovery?  This has just got to get done.

12         MS. BERNARD:  I mean, understood.  We're actually

13   waiting for some dates for their witnesses as well.  They haven't

14   given us three dates.  So, you know, we're trying to go forward.

15   There's a lot of depositions still going forward, so we're trying

16   to work with the schedules of the witnesses and with the attorneys

17   in getting this done.

18         Now, Price Varty --

19         THE COURT:  So how long has it been going on that you've

20   been trying to get a date for Mr. Varty?  When did you contact

21   him?

22         MS. BERNARD:  Not very long at all.

23         THE COURT:  Well, how long are we talking about?

24         MS. BERNARD:  I think his request maybe came through in

25   the past week or so.

1        THE COURT:  Well, why should it take more than a couple

2   of days to figure this out?

3        MS. BERNARD:  Well, just getting in contact with the

4   witness, we have a lot of people who have been on vacation, so

5   we've been reaching out to the witness.  I've talked to him

6   myself.  Those are the dates he's available.

7        Now, he's going to testify about the DB2 data, which is,

8   you know, clear on its face from what we see with the data they've

9   presented to you, which is ledger data, it's raw ledger data, so

10  just to clear any issue with the negative numbers, that is,

11  reflects positive revenue.  When you bring revenue into a ledger,

12  you credit it, so it comes up with a negative, but it is positive

13  revenue.

14       So after the last time we were here, I went back to IBM,

15  and I confirmed that.  The witnesses will tell them that and

16  testify to those numbers.

17       THE COURT:  When you look at those sheets, I couldn't --

18  I don't know how anybody could decipher what the heck they mean,

19  but at any rate, how many witnesses are we talking about that

20  you've still got out there that you're trying to get dates for,

21  when you guys have got less than three weeks for discovery to

22  close?

23       MS. BERNARD:  I think we've offered dates for two of the

24  three damages witnesses.  Ms. Crawford is coming back from

25  vacation on Monday, and we will speak to her on Monday morning and

1   get --

2          THE COURT:   Does she not have a cell phone when she's on

3   vacation?   I mean, really, most businesspeople take phones with

4   them when they're on vacation, and they are available for a

5   business-related call even if they are on vacation.   Have you

6   tried to call her?

7          MS. BERNARD:   We've tried to call her.   We've tried to

8   call a lot of people.   I mean, she just needs to get back to the

9   office to determine her availability.   I've actually talked to her

10  manager already.   The manager didn't know --

11         THE COURT:   You know, this is kind of ridiculous,

12  ridiculous.   Isn't somebody else at IBM capable of looking at her

13  calendar and saying yeah, you're free, there's nothing on your

14  calendar for that day?

15         MS. BERNARD:   Again, I went to speak to her manager.

16  The manager couldn't give me any details about it, so we're going

17  to talk to her first thing when she comes back Monday morning, and

18  we'll get them a date.   We're not trying to withhold the witness.

19  We're not trying to delay.

20         THE COURT:   Well, it's just -- it is getting too late.

21  It's really getting too late now, and you can't put them off until

22  the last day for a deposition as important as this kind of

23  deposition.

24         So what you're going to do is this:   I want you-all to

25  consult today and Monday, when Ms. Crawford comes back, I want a

1    status report by Wednesday.  I want both parties to call me on

2    Wednesday.  I have to figure out the time.  I'll give you a time.

3    And I want you to tell me if you've gotten the deposition dates

4    scheduled, agreed to for anybody else who's left out there.

5         If you can't agree to a schedule, then on Wednesday, I

6    want you to tell me what the date is that each party wants to take

7    the deposition, why or why not is that person available -- why is

8    that person not available on the date that they want to take the

9    deposition, and what the reason is that they're not available.

10        And if there's anybody else out there who doesn't have a

11   deposition date scheduled by Wednesday, I'm going to, I'm going to

12   set them on Wednesday.  I'm going to set every deposition left on

13   Wednesday if you-all haven't figured them out by that time for

14   both sides, all right?

15        And you call me at -- do you have my calendar there,

16   Glenda?  How about 11 a.m. on Wednesday?  Sure.  I'm pretty sure

17   I'm open.

18        Okay.  11 a.m. on Wednesday I'll expect a conference

19   call from the parties.  You originate it, okay?  We'll deal with

20   that.

21        MS. BERNARD:  Thank you, Your Honor.

22        THE COURT:  So what I'm going to do is I'm going to deny

23   without prejudice as it relates to the damages, because you have

24   to take the depositions, and then we'll just have to evaluate it

25   at that point as to whether there's documents out there that IBM's

1   been withholding and -- I would hope -- I would think that they

2   are not misrepresenting to me that those documents -- that they

3   don't have these documents.  If you don't have what you need after

4   the depositions, then I'll just -- then I'll reconsider that.

5          All right, now on the customer usage of the patented

6   features, do you have anything else to add to that?

7          MR. PHAIR:  Your Honor, I think that the issue with the

8   customer usage is basically a repeat of the last motion.  As you

9   know, we've moved on customer use.

10          THE COURT:  It is.  It is.  I mean, they're telling me

11  they don't keep it that way and that there's no information that

12  they have -- I mean, the depositions you've taken so far don't

13  seem to indicate that they would keep that sort of information.

14          MR. PHAIR:  So two points on that.

15          THE COURT:  Okay.

16          MR. PHAIR:  One, as we mentioned, we have deposed

17  TecSec -- I'm sorry, IBM witnesses.  They said the people that

18  usually gather this information are the product managers, so what

19  we did after we learned that piece of information is we requested

20  dates for the product managers.

21          The product managers at least for DB2 are Drew Bradstock

22  and Katherine Franklin.  We promptly issued subpoenas compelling

23  their deposition, and just in general so I can back up, the reason

24  why we started issuing subpoenas at the start of this month is

25  because we were running out of time and we needed to secure the

1  deposition dates in time, and if we had waited --

2          THE COURT:  So this is the same issue.

3          MR. PHAIR:  It's the same issue.

4          THE COURT:  Well, as I said, then on Wednesday, I'm

5  telling you every single witness that's supposed to be deposed on

6  both sides will be in that report on Wednesday, okay?

7          Now, let's deal with also the source code.

8          MR. BUROKER:  Yes, Your Honor.  Brian Buroker.  I think

9  what we're trying to get here is some clue as to where within the

10 volume and mountains of source code --

11         THE COURT:  Why can't your experts figure that out just

12 as easily as their experts?

13         MR. BUROKER:  Well, because it's not intuitive, and I

14 think the example we gave you in the reply brief is an example.  I

15 deposed a gentleman who's called the Pope of RACF.  RACF is one of

16 the features that plays into it, and I said, "Sir, when you're

17 looking for the source code for RACF, how do you know what it is?"

18         And he said, "It starts with the letters 'ICH.'"

19         Well, who else would figure out that "ICH" corresponds

20 to the RACF source code except the person who wrote it?  It's

21 internal to them.  We're not asking --

22         THE COURT:  But that's not what you're asking them to

23 produce.

24         MR. BUROKER:  That is what we're asking them to produce.

25         THE COURT:  Well, not exactly.  I mean, you're asking

1  them to be able to point out within their source code where the,

2  the line items are for your particular alleged infringing

3  elements, and what I'm -- what I don't get is, I mean, you may

4  have a question, as I understand it, about what means what in the

5  source code, and that you can ask of the defendants as to, you

6  know, what does this code mean, what does "ICH" mean, what does

7  this mean, or what code relates to this, but that's not what

8  you're asking them to do.  You're asking them to go through the

9  source code and point out what specifically relates to the

10 features that you're concerned with.

11        How is that type of work any easier or less burdensome

12 for them than it is for you?  And how do we deal with the

13 nightmare problem that their experts may fail to include something

14 that you think is important and then we have a whole other issue

15 about IBM, whether or not that they would purposely deceive you or

16 your experts as to what areas of the source code deal with certain

17 product features?

18        Then, you know, in addition to that, they're claiming

19 that they don't infringe to begin with, so that therefore it's not

20 in there.  So how do we do this?  I really don't understand how

21 asking them to identify what you need to prove is appropriate.

22        MR. BUROKER:  And that's not what we asked.

23        THE COURT:  Okay.

24        MR. BUROKER:  And maybe there's a misunderstanding about

25 the way the interrogatories should have been interpreted.  We --

1   in the reply brief, I think we've set out specific features in

2   these products to make it easier.

3           THE COURT:  Right.

4           MR. BUROKER:  So that DB2, there's a feature called

5   ICFS -- ICSF.  Where is that in the code is what we're asking.

6   How do we know if we've found the right code?

7           And we're worried about the flip side problem.  You've

8   pointed out one problem of us pointing, saying that their experts

9   misled us.  What if we find something in the source code and they

10  later at trial say, "Well, you found an old version," or "You

11  found source code that we didn't actually implement"?  And so --

12          THE COURT:  Well, that's why you take a deposition.

13          MR. BUROKER:  Okay.  So of their -- of all the technical

14  people and ask them where -- we've been trying to, and some of the

15  times people know; sometimes the people don't know.

16          THE COURT:  Well, then that's -- well, I understand

17  that, but I don't see how that's any different than your people

18  knowing or don't knowing.

19          MR. BUROKER:  Well, for example, what Mr. Pickel said

20  when he was deposed is he could find it.  He didn't have the

21  source code at his fingertips to be able to go search the code to

22  find the modules.  He would just -- he would go back to his

23  computer and search, and he would find those modules.

24          THE COURT:  But that's different.  I understand what

25  you're saying, but not understanding what part of the code means

1  and asking for clarification on that is different than asking

2  their in-house person or expert person to go find it for you, and

3  that's what I've got a problem with.

4         MR. BUROKER:  Well, I think what we're asking is, you

5  know, of all these lines of code and codes can have different lots

6  of different nomenclatures, is for the product, the features we've

7  listed in the reply brief, what, what is the nomenclature for that

8  feature?  How do we know if we've found the right nomenclature?

9         We're not asking them to admit that it infringes.  We're

10  not asking them to admit that it has that kind of feature.

11         THE COURT:  But I don't think that's what your question

12  says.  Let me find it again.

13         MR. BUROKER:  I think it's in their opposition brief.

14         THE COURT:  I've got it.  I've got it.  I did have it.

15  Hold on a second.  I thought that was it, but that wasn't it.

16         All right, somebody hand it to me and help me stop

17  wasting my time here.  I'm sorry, I should have marked it to begin

18  with.  I read it; I just didn't mark it.  Thanks.

19         That's -- okay.  He said, "Separately for each of the

20  accused products, identify in the source code by product, Bates

21  number, software version, file name, module, and line (or other

22  pinpoint citation) each of the subfile encryption access

23  control" -- blah, blah, blah, blah, blah -- "with parallel

24  processor features in any of the accused products or infringing

25  services."

1        To me, as I understand it, that's not asking them, well,

2  what's the name of the -- what do you call, you know, what relates

3  to, you know, subfile encryption, or what code relates to this?

4  You're asking them to go find it for you.

5        MR. BUROKER:  Well, that's one of the elements.  The

6  other element, though, is identify the file name or module name.

7  So in other words --

8        THE COURT:  Well, what do you want me to do, ignore the

9  rest of your interrogatory?  I mean, which is it that you want?

10  Do you want only the file name, or do you want them to have to

11  point this out?

12        MR. BUROKER:  We would be happy at this point with the

13  file name or module name.  What is the name of these features

14  within your source code?  That's what we tried to clarify in the

15  reply brief, that we just need basically a road map -- not a road

16  map, but a legend.  When we look at this source code, how do I

17  know if I've found the RACF source code?  You know --

18        THE COURT:  Well, what about when you took the

19  depositions?  Did you ask them that?

20        MR. BUROKER:  We've asked some witnesses.  We've got

21  again other witnesses yet to go.  We haven't gotten them yet, and

22  yet we still need to be reviewing the source code now, because our

23  September 8 deadline, we've got, for example, Paul Bird, one of

24  their experts on security for DB2, wasn't scheduled until

25  September 10, which is after our September 8.

1    So we're trying to get this information in a different

2  format that they can go out and ask before our depositions are

3  scheduled.  So that's why we served this interrogatory, and that's

4  why we're trying to get this information.

5          THE COURT:  Okay.  All right, thank you.

6          Does IBM have anything to add?

7          MR. HOHENTHANER:  Just briefly, Your Honor.  One of the

8  primary issues here is their experts haven't even bothered to go

9  look at the source code yet.  We were here two-and-a-half weeks

10  ago, plaintiff demanding that their experts get in to see the

11  source code, Mr. Reilly representing that day that it was there,

12  ready to go.

13          Not until a week later do we first receive a

14  notification that they wanted to see it the following week by some

15  attorneys.

16          THE COURT:  Right.

17          MR. HOHENTHANER:  Their experts still to this date

18  haven't spent one minute even trying to find --

19          THE COURT:  Well, and that's another issue that I, that

20  I plan to deal with.  So --

21          MR. HOHENTHANER:  So other than that, what we're facing

22  here is largely moving target interrogatories where the

23  interrogatory seeks one thing, their reply brief is now focusing

24  on some other features, some of which we don't even know what

25  they're talking about, for example, roles, privileges.  I don't

1  even know what that is in these products.

2          Again, these are terms that they have an understanding

3  what they might mean.  These aren't features in these products

4  that we can point to anything specific.

5          THE COURT:  Right.

6          MR. HOHENTHANER:  So it really gets to the same problem

7  that Your Honor alluded to.

8          THE COURT:  Okay.  And I understood IBM's brief to that

9  issue in that you don't call things necessarily what they're

10  calling them.  So, you know, maybe you can get this out of them in

11  depositions, and I'm going to deal with that, as I said, on

12  Wednesday, but I do think that these interrogatories are asking

13  IBM to prove your case for you and to do the work of your experts,

14  which should have already been done.

15          I think the *CIF v. Agere* case is right on point, and I

16  agree with the District Court in Delaware in that case.  I think

17  that it is inappropriate to essentially shift the burden here to

18  IBM's experts to give you this information, so I'm going to deny

19  it at this point.

20          If you cannot get out of the deponents, you know, some

21  of the terminology you need, that's a different question, and

22  that's a different interrogatory, quite frankly, than the one that

23  you've propounded, and we just would have to deal with that if

24  that's the case, but really it should have been done long before

25  now.

1          So I'm going to deny the motion to compel without

2    prejudice as to the first two parts of it, and as to the source

3    code information, I'm going to just deny that.

4          Now, let's deal with the motion to extend the schedule,

5    and I gotta tell you, I -- exactly what IBM was saying, I was

6    shocked to see when I read the briefs on this that after you were

7    in here on August 11 and on that date IBM specifically represented

8    in court that it was ready to go and it was ready for you to come

9    look at and then I saw that it wasn't until the 18th of August

10   that you even gave them the names that you proposed, that should

11   have been done long ago, cleared.

12         I mean, when they said on the 11th that this stuff was

13   ready, why weren't your experts there the next day looking at it?

14         MR. PHAIR:  Your Honor, two things:  Our experts were

15   cleared a long time ago, long before the source code was ever

16   made.

17         THE COURT:  So why haven't they seen it?

18         MR. PHAIR:  The, the issue on the 11th was they came in

19   and they said that the source code is ready.

20         THE COURT:  Right.

21         MR. PHAIR:  The next day, I got an e-mail from

22   Mr. Nalevanko from their firm saying that there was some BIOS

23   issue with the computers, and we tried to seek clarification on

24   that.  It took us about a week to resolve that issue.  We

25   eventually had to have our own people, meaning Hunton's IT tech

1   people, go over and work with their tech people, fix, fix the

2   issue.  The issue was fixed.  At that point, the computers were

3   ready.

4           The day that the computers --

5           THE COURT:  So that would have been about the 18th.

6           MR. PHAIR:  The day, the day that the letter was sent --

7   I sent the letter saying okay, the computers are ready, we all

8   agree the computers are ready, that very day, I sent the letter

9   saying we're sending our people over.

10          THE COURT:  Right.  Well, have they looked at it yet?

11          MR. PHAIR:  Yes.

12          THE COURT:  All right.  So they've now been looking at

13  the source code.  Have they --

14          MR. PHAIR:  We sent our people over.  They objected to

15  our people under the protective order, as is their right, but we

16  had --

17          THE COURT:  Why do you need to have the lawyers standing

18  there?  What the heck do they know, honestly?  What would you know

19  standing over the expert's shoulder looking at a source code?  Why

20  can't the -- why wouldn't the experts go ahead and proceed without

21  the lawyers there?

22          MR. PHAIR:  When we say "the lawyers," the lawyers that

23  we sent over were, were computer people, for, for lack of a better

24  term.

25          THE COURT:  But you need the experts.  The lawyers

1   aren't going to be testifying, are they?

2            MR. PHAIR:  No, but the idea was that we wanted to

3   orient the experts -- I mean, the experts had told us basically

4   that this is proprietary IBM code.  We need to sort of have a

5   legend, as we were just talking about.

6            We sent our computer specialist over there to try and

7   figure that out.  He's actually, I believe, there right now.

8   He --

9            THE COURT:  Today for the first time?

10           MR. PHAIR:  He's there -- well, it's the first time he's

11  been cleared.

12           THE COURT:  Wait a minute.  You just told me your

13  experts were cleared weeks ago.

14           MR. PHAIR:  Our experts were cleared in July.

15           THE COURT:  Okay.  I'm still at a loss to understand why

16  your experts haven't been doing this work before today.

17           MR. PHAIR:  Our experts haven't been able to -- I mean,

18  the computers weren't ready until August 17-August 18, so about a

19  week ago.

20           THE COURT:  All right, that was a week ago.

21           MR. PHAIR:  Right.

22           THE COURT:  So what have they been doing the last week?

23           MR. PHAIR:  In the last week, we've been -- as I said,

24  the experts had directed us to send the lawyers first,

25  orientate --

1          THE COURT:  Do they know the deadline that you're under?

2    I mean, really, why would you do that?

3          MR. PHAIR:  I -- that's what they had suggested.  I

4    mean, the motion that we just decided --

5          THE COURT:  And so now I understand you're telling me

6    that there was a problem for several days, but once that was

7    cleared up, you hadn't had anybody go over there and work on this

8    until today.

9          MR. PHAIR:  They objected.  We said, "We're sending our

10   people over."  They have a three-day review period under

11   the stipulated protective order.

12         THE COURT:  Okay.  I'm just at a loss to understand

13   given the time crunch that you're under, why you would waste time

14   doing it that way instead of telling the experts to just get over

15   there and get going.

16         MR. PHAIR:  Well, I mean, we're talking about a matter

17   of, I mean, days here.  I mean, the experts --

18         THE COURT:  I know.  And all you've got is days left.

19         MR. PHAIR:  Right, right.  No, I mean, obviously, in a

20   perfect world, you know, we would have, we would have sent them

21   over there earlier.  Like I said, the experts had told us that

22   they needed some orientation before they went over there, because

23   we don't have the review tools from IBM, we don't know how to look

24   at IBM proprietary code.  That's, that's the best we can do under

25   the circumstances.

1        THE COURT:  I'm having a hard time understanding that.

2        MR. PHAIR:  Okay.

3        THE COURT:  Do you have anything to add to your motion?

4        MR. PHAIR:  Yes, Your Honor.  On the, on the motion to

5   extend, I mean, I think it's important, things are sort of

6   changing rapidly on the ground, including just this week, you

7   know, one issue that would obviously bear heavily on the motion to

8   extend would be on Wednesday, IBM filed a 68-page amended answer,

9   had about thousands of pages of claim charts, about 5,000 pages of

10  documents accompanying that, that basically accused all of our

11  inventors and our, and our senior executives of engaging in a

12  massive conspiracy to defraud the United States government with

13  respect to each and every patent in suit over the past two

14  decades.

15        The -- obviously, our client as former government

16  employees themselves takes that issue very, very seriously, that

17  whether or not that comes in the case is going to be before Judge

18  Brinkema.  I understand she's hearing the motion for leave as of

19  September 3, but obviously, if leave is granted on that, I think

20  we've seen there's some case law, that's going to open up a whole

21  can of worms.  I mean, we're going to need a new expert.  We're

22  going to need discovery.  There's a lot of things that that's

23  going to open up.

24        So I just want to sort of make sure that we're aware

25  that if that comes down, if that's allowed in, we're going to have

1   to come back.

2          THE COURT:  Well, I know you've got a motion before her

3   on the 3rd --

4          MR. PHAIR:  Okay.

5          THE COURT:  -- and she can deal with that and the

6   consequences of that.

7          MR. PHAIR:  Okay, all right.  So the practical issues,

8   we mentioned some of the depositions.  The, the real issue here

9   is, as I think we've been sort of previewing for a while, is the

10  documents.  We can't take depositions without documents.  We're

11  still getting documents.  This week we got -- on Monday, I think

12  we got, we got over 100,000 new documents.  On Tuesday, we got

13  34,000 new documents.  On Wednesday --

14         THE COURT:  Relating to what?

15         MR. PHAIR:  To -- well, we don't know.  They just

16  produced them to us.  And --

17         THE COURT:  They must have said what the heck they were.

18         MR. PHAIR:  They give us people.

19         THE COURT:  This is related to the depositions of people

20  that are coming up?

21         MR. PHAIR:  Yes.  Well --

22         THE COURT:  Well, that's what I ordered them to do.

23         MR. PHAIR:  Right.  Although, but we -- we're going to

24  be getting documents for, I mean, right up until the 17th for

25  depositions, and I --

1           THE COURT:  Right.  That's the way we planned it the
2   last time you were here --
3           MR. PHAIR:  Okay.  Right.  Well --
4           THE COURT:  -- for their individual files.
5           That's what -- I mean, we already did the e-mails.  This
6   was for what they had in their individual possession that was
7   going to be produced I forget how many days I said prior to the
8   deposition.
9           MR. PHAIR:  Four days, right.
10          THE COURT:  Right, okay.
11          MR. PHAIR:  And then as soon as Your Honor ordered that,
12  we got a letter back from them cancelling depositions, saying that
13  we can't comply with the deadline because we can't produce them
14  four days in advance.  So the depositions that we already had
15  scheduled they cancelled because they said, well, you know,
16  there's an order --
17          THE COURT:  How many was that?  Who are we, who
18  specifically are we talking about?
19          MR. PHAIR:  I believe that was two.
20          THE COURT:  Who?
21          MR. PHAIR:  I believe it was, I believe it was Chung and
22  another individual.  There's, there's probably --
23          THE COURT:  Were those people that were scheduled within
24  four days already of --
25          MR. PHAIR:  Yes.

1        THE COURT:  Well, then that makes sense, does it not?

2        MR. PHAIR:  Well, Mr. Chung had been scheduled since, I

3  believe August 31 was his date.

4        THE COURT:  Right.  The point is but their deposition

5  was coming up, I'm guessing, within just a few days of when I

6  ordered that?  Is that -- isn't that the problem?

7        MR. PHAIR:  The problem was --

8        THE COURT:  Okay.  So you're talking about two people,

9  right?

10        MR. PHAIR:  Of depositions that we don't have?

11        THE COURT:  No.  Two people whose depositions you now

12  say IBM cancelled because they said they didn't have the documents

13  ready.

14        MR. PHAIR:  Well, we have, we have, I mean, the latest

15  letter that we have from them is that all the people that we

16  subpoenaed for dates like this week and next, they're not going to

17  go forward on those dates.

18        THE COURT:  Okay.

19        MR. PHAIR:  They're September 14, September 16.  Then

20  we're going to have to turn around and flip it, you know, expert

21  reports within seven days.

22        THE COURT:  I'm dealing with all the deposition dates on

23  Wednesday --

24        MR. PHAIR:  Okay.

25        THE COURT:  -- but I feel like I've got a moving target

1   trying to pin you down as to what the problem is.

2          MR. PHAIR:  Okay.

3          THE COURT:  You said that you're still getting

4   documents.  Then it turns out that these documents are the ones

5   that are being provided to you as ordered four days prior to the

6   deposition dates.  There were two that were cancelled because they

7   were too close to the date that I had made that order; is that

8   correct?

9          MR. PHAIR:  It wasn't too close to the date.

10         THE COURT:  What was the problem?

11         MR. PHAIR:  They just -- well, one of them, I think,

12   with Mr. Chung, I think there was an e-mail issue, but I don't

13   want to create the impression that it's only the custodian-based

14   production that we have an issue with.  I mean, we are still

15   missing large quantities of documents from the production.

16         THE COURT:  What is it?

17         MR. PHAIR:  We're missing, you know, for example, we've

18   asked for -- I believe they moved last time for documents relating

19   from the F&C matter, there was prior litigation between IBM and

20   TecSec.  They moved on that.  We gave them our documents.  We

21   said, "Well, where are your documents?"

22         We've asked them several times for that.  We haven't

23   gotten an answer to that yet.

24         THE COURT:  Did you propound discovery requesting that?

25         MR. PHAIR:  Yes.

1         THE COURT:  When did you propound it?

2         MR. PHAIR:  April 9, 2010.

3         THE COURT:  Why didn't you bring a motion to compel

4   about that then?

5         MR. PHAIR:  Your Honor, the way they produce documents,

6   like, it's, it's just a mass production.  It's --

7         THE COURT:  Why would you have waited from April until

8   now to complain about this?  I don't quite understand.

9         MR. PHAIR:  Well, they haven't -- I mean, they didn't

10  even start producing documents until --

11        THE COURT:  No, why did you not tell me this earlier?

12  Why did you not tell me this earlier about those specific

13  documents or bring a motion to compel?

14        MR. PHAIR:  We didn't know.  I mean, we asked them --

15        THE COURT:  You didn't even know what you had or didn't

16  have?

17        MR. PHAIR:  We asked them.  We said, "Have you produced

18  this?"  We've asked them several times.

19        THE COURT:  So let me ask you this:  You've got all of

20  these documents, and from what you're telling me, you know,

21  discovery cutoff is coming up.  You're at the end of fact

22  discovery here, and you haven't even gone through the documents

23  they provided you to know what you have and you don't have?

24        MR. PHAIR:  We don't think we have them.  That's what

25  I'm saying.  I mean, we have a list a mile long of documents that

1  we don't have.  I mean, I can be very specific --

2        THE COURT:  Then why haven't you brought a motion to

3  compel on these?

4        MR. PHAIR:  Well, some of them we have.  Some of them, I

5  mean, it takes -- the documents have just started being produced.

6  Remember, we originally had a date of June 25.

7        THE COURT:  They haven't just started to be produced.  I

8  know that's not correct.  They've been being produced for, you

9  know, the last two months.

10        MR. PHAIR:  Right, yes.

11        THE COURT:  Okay.

12        MR. PHAIR:  Right.

13        THE COURT:  So have you gone through all of those and

14  figured out what you're missing?

15        MR. PHAIR:  We've gone through the 10 million documents,

16  yes, and we have figured out what we're missing.  We've asked them

17  about it, and we haven't gotten a response, and they're documents

18  that we need.

19        THE COURT:  Okay.  So this relates to the prior

20  litigation that you're complaining about.  What else?

21        MR. PHAIR:  We're missing documents regarding IBM and

22  TecSec's relationship over the years.  In 1998, IBM and TecSec

23  entered into a nondisclosure agreement by which IBM evaluated

24  TecSec's patented technology.  Our -- one of our theories of the

25  case is that when they evaluated that technology, they basically

1   took it and incorporated it into their own product.  There are

2   several instances of that.

3           In 2002, there was a TULA that was signed between the

4   parties, and we don't have any documents --

5           THE COURT:  When did you figure out you didn't have

6   these documents?  I mean, these were -- I remember you mentioning

7   these quite some time back.

8           MR. PHAIR:  Well, because it's a custodian-based e-mail

9   search as far as we can tell, the things that we expected to see

10  in the production weren't there.  So things that were produced

11  from IBM custodians just recently we would have expected to have

12  included certain things.  They're not there.  We don't know why,

13  but they're not there.

14          And that's not to say, I mean, they may have a perfectly

15  reasonable explanation for that, and I don't mean to impugn their

16  motives, but, I mean, we need to know one way or another why

17  they're not there.

18          Pricing information, we need pricing information.  We

19  don't have any pricing information.  Pricing information is

20  relevant to damages.  If the price of the product increased after

21  the infringing technology was included, that's one way to measure

22  damages.  So we need pricing information.

23          Customer documents we've discussed, but it's, it's

24  broader than just the usage information.  For example, they have

25  customer surveys that we have where they've given us the sample

1  customer survey but not the results of the survey.  They have a

2  Customer Advisory Council.  We've asked for documents relating to

3  that.  There's a whole --

4          THE COURT:  When were these things due?

5          MR. PHAIR:  Well, I mean, we would have said June 25,

6  but --

7          THE COURT:  Why haven't you brought a motion to compel

8  on those particular documents then?

9          MR. PHAIR:  With respect to those, we -- we certainly

10  did with respect to the interrogatories to the extent they 33(d)'d

11  it, but we have moved on the pricing information.  The Court had

12  said, "Work together on that when you" --

13          THE COURT:  They were supposed to have provided it to

14  you.  Then that's the one I ordered to be provided in July?

15          MR. PHAIR:  When was the date -- I can't recall the

16  date, but there were several categories of documents relating to

17  damages, like pricing information, customer information, convoy

18  sales, market studies that you had asked that we work together on.

19  We've been trying to do that.  We don't see the documents in the

20  production, and, and we need those.

21          THE COURT:  All right.

22          MR. PHAIR:  Worldwide sales data, you know, one of the

23  biggest issues in this case is going to be whether we get U.S. or

24  worldwide sales if there are any damages.  That's a highly factual

25  determination.  We've asked for documents pertaining to that, such

1  as, you know, where the servers are located, things like that.  We

2  don't have that information.

3         We've asked specifically -- on August 17, I asked them

4  for license agreements that we were missing.  Our damages experts

5  went through all of the 6,000 license agreements that they

6  produced and said we couldn't find the ones that we believe to be

7  the most relevant.

8         I sent them a letter on the 17th asking where those

9  license agreements were.  I never got a response.

10         THE COURT:  On August 17?

11         MR. PHAIR:  August 17.  That was the first that we were

12  able to identify.

13         THE COURT:  Okay.

14         MR. PHAIR:  We have -- I mean, I can go through it if

15  you want, but it's a, it's a pretty long list.

16         THE COURT:  Okay.  All right, anything else?

17         MR. PHAIR:  So the basic issue with respect to that is,

18  you know, in order to take the depositions, we need the documents.

19  So when they produce the documents after the deposition has

20  already occurred, you know, for example, we got some documents

21  that were produced just this week that we would have used for

22  depositions that we previously took but now we can't because they

23  were produced after the deposition, so, you know, we're -- we

24  can't take a deposition even if we subpoena it unless we have the

25  documents beforehand.

1          THE COURT:  Okay.

2          MR. PHAIR:  So that's, that's, you know, one big issue.

3          You know, on the depositions, I think it's important, I

4    mean, to the extent that we're looking at dates, there's three big

5    dates that are coming up that I think, you know, the Court -- that

6    we need to discuss.  The first is September 8, which is the

7    contention deadline.

8          The issue with the September 8 contention deadline,

9    that's going to require us to come forth with our technical

10   explanation of infringement.

11         THE COURT:  Right.

12         MR. PHAIR:  We have -- and this is tied up in the

13   deposition issue, but we don't have the deponents that we need in

14   order to do that.  We still don't have technical deponents.  I

15   mean, Mr. Buroker mentioned Paul Bird.  Paul Bird, I requested on

16   July 17 that we get his deposition.  They told us that we can't

17   have him until September 10.  That's like a month and a half, two

18   months --

19         THE COURT:  Well, I'm dealing with the depositions on

20   Wednesday.

21         MR. PHAIR:  So, but in terms of the September 8

22   deadline, you know, we can't supplement fully our contentions

23   unless --

24         THE COURT:  I tell you what I'm frustrated with and it's

25   driving me crazy is there's been, like, no orderly control over --

1  I understand that you've complained constantly to me about them

2  producing things, but I don't get anything in an orderly manner

3  from you in terms of what it is that you're missing and a motion

4  to compel to go with that.

5        I mean, I dealt with -- I've dealt with motions to

6  compel a couple of times, but you're telling me about things that,

7  for instance, should have been done a month or two ago but you

8  didn't figure out until just now that you're still missing it, or

9  this last deponent that you said you asked for July 17 or

10  something like that, and now here we are August 24, and you're

11  just telling me the first time that you haven't been able to get a

12  deposition date for him.

13        I'm frustrated by the fact that, that I think -- let me

14  tell you what I think.  I think that this case has been too large

15  from the very beginning, and I think that the only reason it was

16  narrowed was because Judge Brinkema basically forced it on you,

17  and yet at least with regards to your initial discovery that I

18  looked over with the motion to compel, it was so broad that I

19  ended up denying a lot of it because you just had -- you were

20  asking for too much, and I knew that when you were asking for that

21  much, you would never be able to handle what you got, and that's

22  basically what's happening here.

23        MR. PHAIR:  Well, the documents that are outstanding are

24  not documents that are in the "too much" category.  These are

25  documents that have been agreed to produce, have survived the

1  rulings that have been made, and that should have been produced.

2          Now, what happens is, you know, as I said just this

3  week, we get a --

4          THE COURT:  But you haven't known what you had -- what

5  you've had and didn't have until recently, and you didn't bring a

6  timely motion to compel because you didn't know what you had or

7  you didn't have.

8          MR. PHAIR:  Because the production -- because there has

9  been no deadline, there's been a rolling production.  So I

10 don't -- even standing here today, for all I know, they're

11 planning to produce it tomorrow.  So, like, our database gets

12 updated every day with new documents.

13         So we can't know, I mean, literally even standing here

14 today, I can't say that they're not going to produce it on

15 September 17.  I mean, until we have -- I mean, the real issue is

16 that we need just certainty a date by which the documents are

17 going to be produced and then, and then we're done, and then we

18 can move forward with discovery.

19         THE COURT:  You're talking about documents other than

20 the documents that were going to be produced prior to each

21 deposition.

22         MR. PHAIR:  Yes.  I mean, I think that just a

23 suggestion -- and I know we've asked for, I believe, a general

24 45-day extension.  I actually think that given recent events, I

25 think we can, we can be more modest than that.  I think if we --

1 our written discovery is done.  We're not asking for any more

2 documents, no more interrogatories, no more RFAs.  I believe the

3 same is for them.

4        If we could just complete the written discovery by the

5 17th and then have a little bit more time after that to do the

6 depositions, I think we can get it done without jeopardizing the

7 existing schedule, but we need to know a date by which the

8 documents are done so that we can, A, know what's missing, if

9 anything, and B, take depositions with certainty, knowing that we

10 have the documents that we can depose the individuals on.

11        THE COURT:  Are you still asking me to sever the case

12 down further?

13        MR. PHAIR:  My understanding from Judge Brinkema this

14 morning was that was not going to be the case.

15        THE COURT:  You met with her this morning?

16        MR. PHAIR:  Judge Brinkema, yeah.

17        THE COURT:  Oh, okay.  I didn't know that.

18        That's right; she said she had a small matter.  All

19 right.

20        MR. PHAIR:  If Your Honor were so inclined --

21        THE COURT:  No.  I was going to deny it.  I didn't know

22 she jumped the gun on me.  Okay.

23        MR. REILLY:  She said she was going to leave it to you,

24 but she suggested that that's probably how it's going to come out.

25        THE COURT:  Yeah, that's how it's going to come out.

1          MR. PHAIR:  But I do think that that sort of more modest

2   proposal, if we could just get the documents done by the 17th and

3   just have a little more time after that to take the depositions --

4          THE COURT:  You're talking about what 17th?  September

5   17th?

6          MR. PHAIR:  September 17 is the current close of fact

7   discovery.

8          THE COURT:  Right.

9          MR. PHAIR:  I think both parties will agree that there's

10  no more written discovery.  If we can get all of that done by the

11  17th and then we could just have maybe, I don't know, three weeks

12  after the 17th to complete the depositions, I think we can do it

13  in the orderly fashion that Your Honor has suggested.

14         THE COURT:  And what about your contention deadline?

15  That's going to stay the same?

16         MR. PHAIR:  I think with the contention deadline, the

17  only thing with that, I mean, if we can get the technical

18  depositions before that date, before the date that we have -- as

19  of right now, the dates that they're giving us are after the

20  contention deadline.

21         THE COURT:  Okay.

22         MR. PHAIR:  So if we can get the technical depositions

23  done, you know, before the 17th, I think we would be in a position

24  to supplement on the 17th with the rest of written discovery, and

25  then everything from written discovery will be completely

 1  finished, and all we'll need to do after the close of fact

 2  discovery would be about three weeks' worth of, of depositions.

 3           THE COURT:  All right, let me hear from IBM.

 4           MR. HOHENTHANER:  Just one issue on scheduling, Your

 5  Honor.  A lot of this is driven by the infringement contentions

 6  that we still don't have from the plaintiff, which is itself

 7  driven by the source code that IBM has made available.  I think

 8  there's one not misrepresentation necessarily but mis-suggestion

 9  that was set forth on the record.  To date, none of TecSec's

10  experts have looked at the source code.  The person there today is

11  not an expert.

12           THE COURT:  Right, I understood that.

13           MR. HOHENTHANER:  It's a law student.

14           So there's been no meaningful review, no meaningful

15  attempt to even start the review of this process.  We simply don't

16  understand what's going on.

17           Our case from the defensive standpoint is largely at a

18  standstill because we don't have meaningful infringement

19  contentions.

20           THE COURT:  Well, you're supposed to be getting those on

21  the 8th.

22           MR. HOHENTHANER:  Right.  So I can't stress enough how

23  important it is that these contentions are set forth product by

24  product so that we finally can understand what is actually accused

25  of --

1          THE COURT:  We'll just have to see.

2          MR. HOHENTHANER:  Very good.

3          THE COURT:  What about your discovery?  What is the,

4    what is the status on that?

5          MR. HOHENTHANER:  As far as I understand, the core

6    documents have been produced months ago.  The documents that are

7    at issue here to the extent this was ever raised before today are

8    documents relating to custodians, new custodians that TecSec keeps

9    identifying, keeps expanding the scope of this case.

10         There's complaints about not calendaring deposition

11   witnesses.  Well, this is due because TecSec keeps adding more and

12   more and more witnesses.  There's no end in sight to this process.

13         So to the extent the Court is contemplating some sort of

14   short extension to finish depositions, we would strongly recommend

15   that we put a stop to the identifying new witnesses so we can

16   finish what's outstanding currently.  Absent that, there's no end

17   in sight on this case.

18         THE COURT:  What about your documents that are going --

19   that are still being produced?

20         MR. HOHENTHANER:  So the documents, again, the vast

21   majority that I'm aware of, there are from new custodians that

22   TecSec has identified.  The one caveat is there is this e-mail

23   production issue raised long ago where TecSec's search terms that

24   they're providing us are getting hits on tens and tens and tens of

25   thousands of e-mails.

1        It's creating major problems in finishing the review of

2  these e-mails four days in advance of the depositions that need to

3  occur.  There was a procedure put in place where TecSec's

4  consultant would get together with a consultant of ours and try to

5  narrow these things.  That's going nowhere.

6        So what we're facing is we have dozens and dozens of

7  individuals, tens of thousands of e-mails for many of them.  It's

8  a review nightmare to get through these things on time because of

9  the overbroad search terms that we're receiving from the

10  plaintiff.  We're trying everything we can do to get this done.

11  It's largely the e-mail that's slowing this thing down.

12        THE COURT:  So the experts are meeting over the e-mail,

13  though, and they have not been able to figure out how to narrow

14  this better?

15        MR. HOHENTHANER:  The last update I got was -- any

16  limitation on what they're finding on the e-mail is, say, bringing

17  it down from 70,000 e-mails to 68,000 e-mails, so they're not

18  meaningfully reducing the scope of this.

19        THE COURT:  All right.

20        MR. HOHENTHANER:  And the plaintiff is so worried about

21  missing something in there, it's the same problem again.  They

22  want everything, no matter how relevant, and it's --

23        THE COURT:  What about, for instance, your evaluation of

24  TecSec's technology that supposedly was done?  Why hasn't that

25  been produced?

1       MR. HOHENTHANER:  Well, to the extent that we've found

2  anything, it has been produced.

3       THE COURT:  Okay.

4       MR. HOHENTHANER:  The suggestion that TecSec has that

5  IBM somehow evaluated their patented technology and put them in

6  IBM's products is simply a fallacy.  It never happened.  There's

7  no documents showing that, because it didn't exist.

8       THE COURT:  Okay.

9       MR. HOHENTHANER:  But to the extent we found anything

10  relating to TecSec, we've looked for that.  If it's there, it's

11  been produced to the extent we've been able to find that.

12       THE COURT:  Okay.

13       MR. HOHENTHANER:  So we think the schedule is doable if

14  the parties finish what is outstanding currently rather than

15  continuing to add new and new requests, new, you know, deponent

16  after deponent after deponent, which should have been laid out a

17  long time ago.

18       THE COURT:  All right, here's what I am going to do:

19  Obviously, the fact discovery has to be produced by September 17

20  in its entirety.  That's part of the order of the Court already,

21  and I don't need to reiterate that.

22       As to the depositions, what I'm going to do is decide

23  whether or not to give a few more days to complete the depositions

24  of the fact witnesses when I hear who it is that's still out

25  there, what your list is and who you need and why, so in terms of

1  whether we're going to add people who have -- we're not going to

2  add people; I can tell you that.

3          Whatever the names are that we deal with on Wednesday,

4  that's going to be it, so you'd better make sure you have

5  everybody in that list.  Tell me why you need that person's

6  deposition if they're new and IBM hasn't heard about them, and as

7  I said, we're going to go through one by one, and we're going to

8  just set dates, and they're going to be done, all right?

9          And we will try to deal with the technical people first,

10 because they obviously have to get those depositions done.

11         So as far as that's concerned, I'm going to deny it at

12 this point, because I'm not sure we need it.  I'll see what we

13 need when we get to the scheduling of the expert depositions.  The

14 fact discovery closes on the 17th.  There's no reason for me to

15 say that again.

16         Now, as to the other part of the motion to extend the

17 pretrial schedule and for the supplemental conference, I don't

18 think it's appropriate.  As I started to say before, I think this

19 case should have been more manageable from the very beginning, and

20 it wasn't.

21         I understand that it's not entirely -- I understand that

22 you, you know, you have a lot of problems with IBM's production,

23 but I don't think, quite frankly -- I think this case could have

24 been handled better on TecSec's part, and I don't understand why

25 you've chosen to do things the way that you did, but I don't see

1  any reason now to extend the discovery schedule generally.

2          I don't think that it's appropriate that the case be

3  winnowed down further in terms of how it's to proceed in terms of

4  dealing with the software first and so forth.  It's just not

5  appropriate, and I'm certainly not going to limit IBM in terms of

6  their claims of prior art.

7          I mean, you decided to pursue the case this way.  You

8  know, months ago when we dealt with this, everyone said that you'd

9  be done by this point.  I already gave you one extension.  So I

10  think we're going to have to live with it as it is, and so I deny

11  that motion.  Then I'll hear from you guys on Wednesday.

12          Is there something else that we need to deal with?

13          MR. PHAIR:  Your Honor, just one thing just to clarify,

14  and maybe Your Honor is going to address this on Wednesday, the

15  next big date before the 17th is that September 8 date for the

16  contentions?

17          THE COURT:  Right.

18          MR. PHAIR:  To the extent that we don't get the

19  technical deponents before --

20          THE COURT:  No, you're going to get them.

21          MR. PHAIR:  Okay, all right.

22          THE COURT:  Okay?  I'm telling you right now you're

23  going to get them.

24          MR. PHAIR:  Okay.

25          THE COURT:  So you'd better be ready to go with those

1  technical expert depositions when we talk on Wednesday.

2           I can do it Tuesday if it's better.  Can you-all be

3  ready on Tuesday?

4           MR. PHAIR:  Your Honor, were you contemplating a filing

5  before Tuesday or Wednesday in terms of the --

6           THE COURT:  Sorry, what did you say?

7           MR. PHAIR:  Sorry.

8           THE COURT:  Sorry, go ahead.

9           MR. PHAIR:  Were you contemplating or expecting a

10 filing, like a --

11          THE COURT:  No.

12          MR. PHAIR:  No, okay.

13          THE COURT:  I don't want a filing.  You-all just have

14 your lists ready and have talked.  Maybe you can work some of

15 these out before Tuesday --

16          MR. PHAIR:  Right.  Your Honor --

17          THE COURT:  -- but everybody have their list.

18          MR. PHAIR:  -- would you like a list, a comprehensive

19 list beforehand just so you are following along the same list?

20          THE COURT:  If you have time to do it, fine, fax me a

21 list, but please, let's not do a lot of whining back and forth.

22 You just tell me who it is you want, why you want them, what date

23 you want them.

24          You tell me why you can't produce them that date, and

25 then we'll deal with it.

1          And then the same thing for your witnesses who are

2   outstanding:  Who you want when.

3          And you tell me why they're not available that date.

4          We're going to deal with every single witness out there

5   on Wednesday, and if you can fax me a list even -- excuse me,

6   Tuesday.  If you can fax me a list Tuesday morning, just give me a

7   list, that would be good.  You don't have to give to me the whole

8   long explanation of anything on that.  Just give me the list.

9          MR. PHAIR:  And just to clarify, we will still have

10  their documents four days in advance of the depositions?

11         THE COURT:  Well, we may have to amend that slightly.

12  We'll see.

13         MR. PHAIR:  Okay.

14         THE COURT:  Okay?  And that will be, let's make it

15  Tuesday at eleven, okay?  And I'll hear from you then.

16         Anything else?

17                        (No response.)

18         THE COURT:  Okay.  I'm going to get out of here before

19  you think of something.

20                        (Which were all the proceedings

21                         had at this time.)

22

23

24

25

54

1                     CERTIFICATE OF THE TRANSCRIBER

2        I certify that the foregoing is a correct transcript from the

3   official electronic sound recording of the proceedings in the

4   above-entitled matter.

5

6                                         /s/
                                   _____
7                                  Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25