UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| TECSEC, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>ADOBE INC., *et al.*,<br><br>     Defendants. | Case No. 1:10-cv-00115-LO-TCB |

**DEFENDANT ADOBE INC.'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A REMITTITUR**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................................1

II.   ADOBE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .............................1

    A.    There Is No Evidence That Adobe Directly Infringed the Asserted Method Claims During the Relevant Damages Period ........................................................1

    B.    There Is No Evidence of Damages for Any Alleged Direct Infringement ..............5

    C.    The Evidence Shows the Asserted Claims Are Invalid As a Matter of Law ........10

        1.    PKZIP Anticipates and Renders Obvious the Asserted Claims.................11

        2.    The PEM Papers Render the Asserted Claims Obvious ............................13

        3.    TecSec's Proffered Secondary Considerations Are Irrelevant and Cannot Overcome the Strong Showing of Obviousness............................14

        4.    The Invalidity Verdict Was Tainted By The Erroneous Implication That Third-Party Fact Witness Testimony Required Corroboration .........17

III.  ALTERNATIVELY, ADOBE IS ENTITLED TO A REMITTITUR .............................18

IV.   CONCLUSION............................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)................................................................4

*Apple Inc. v. Samsung Electronics Company*,
   839 F.3d 1034 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 420 (2017) ...............................16, 17

*AstraZeneca AB v. Apotex Corp.*,
   782 F.3d 1324 (Fed. Cir. 2015)................................................................19

*Dow Chemical Co. v. Mee Industries*,
   341 F.3d 1370 (Fed. Cir. 2003)................................................................10

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
   424 F.3d 1276 (Fed. Cir. 2005)................................................................20

*Finnigan v. International Trade Commission*,
   180 F.3d 1354 (Fed. Cir. 1999)................................................................18

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
   No. 2017-2107, 2019 WL 404570 (Fed. Cir. Jan. 31, 2019) ...........................................11, 12

*Kearns v. Chrysler Corp.*,
   32 F.3d 1541 (Fed. Cir. 1994)................................................................4

*Keystone Mfg. Co. v. Jaccard Corp.*,
   394 F. Supp. 2d 543 (W.D.N.Y. 2005) ................................................................4

*Leo Pharm. Prods., Ltd. v. Rea*,
   726 F.3d 1346 (Fed. Cir. 2013)................................................................14

*Lutron Elecs. Co. v. Crestron Elecs., Inc.*,
   970 F. Supp. 2d 1229 (D. Utah 2013)................................................................15

*Medicines Co. v. Mylan Inc.*,
   No. 11-cv-1285, 2014 WL 1227214 (N.D. Ill. Mar. 25, 2014) ...........................................16

*Mirror Worlds, LLC v. Apple Inc.*,
   692 F.3d 1351 (Fed. Cir. 2012)................................................................3

*NantKwest, Inc. v. Lee*,
   686 F. App'x 864 (Fed. Cir. 2017) ................................................................14, 15

*Netscape Commc'ns Corp. v. ValueClick, Inc.*,
    704 F. Supp. 2d 544 (E.D. Va. 2010) ....................................................................18

*Novartis AG v. Torrent Pharm. Ltd.*,
    853 F.3d 1316 (Fed. Cir. 2017)............................................................................16

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996)...............................................................................20

*Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
    75 F.3d 1568 (Fed. Cir. 1996)..........................................................................16, 17

*Promega Corp. v. Life Technologies Corp.*,
    875 F.3d 651 (Fed. Cir. 2017), *cert. denied*, 139 S. Ct. 156 (2018) ...................9, 19

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
    811 F.3d 1345 (Fed. Cir. 2016)............................................................................15

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001)............................................................................18

*TecSec, Inc. v. IBM Corp.*,
    No. 10-cv-115, 2011 WL 779886 (E.D. Va. Mar. 3, 2011), *rev'd on other grounds*, 731 F.3d 1336 (Fed. Cir. 2013) ................................................................3

*Thomson, S.A. v. Quixote Corp.*,
    166 F.3d 1172 (Fed. Cir. 1999)............................................................................18

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012)..........................................................................3, 5

*United States v. Kumar*,
    No. 17-cv-5, 2019 WL 1387687 (E.D.N.C. Mar. 27, 2019)...................................17

*ViaSat, Inc. v. Space Sys./Loral, Inc.*,
    No. 12-cv-260, 2014 WL 3896073 (S.D. Cal. Aug. 8, 2014)...................................5

*Western Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010)............................................................................15

## I.    INTRODUCTION

TecSec's Opposition confirms that Adobe is entitled to judgment as a matter of law of invalidity, no direct infringement of the asserted method claims, and no direct infringement damages.  TecSec ignores the vast majority of Adobe's arguments.  And, for the few arguments it addresses, rather than identify competent evidence that could support the jury's verdict, TecSec offers nothing more than attorney argument and irrelevant evidence.  The Court should reject TecSec's approach, and grant Adobe judgment as a matter of law.

## II.    ADOBE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.    There Is No Evidence That Adobe Directly Infringed the Asserted Method Claims During the Relevant Damages Period

TecSec's vague and conclusory argument that "it [is] more likely than not that *someone at Adobe* performed the claimed method[s] during the relevant period" confirms there is no evidence supporting the jury's finding that Adobe directly infringed the asserted method claims.  Dkt. 1383 at 5.  To support its argument, TecSec proffers three bases for the jury's infringement finding.  But all of TecSec's proffered evidence is from *outside of the damages period*, unrelated to conduct *within the damages period*, and cannot support the jury's infringement finding as a matter of law.[1]

**Adobe's Stipulation.**  First, TecSec attempts to rewrite and distort the simple Stipulation of Infringement that Adobe submitted.  That attempt is meritless.  Adobe never admitted infringement of the asserted method claims *during the damages period*.  To the contrary, Adobe only stipulated that Mr. Landwehr manipulated Acrobat to perform multi-level encryption in *February 2009*, almost a year *before the damages period began*.  *See* PX-69 at 1; Tr. at 1071:7-1073:17 ("[I]t is still just an '09 stipulation.  And that's why we said on that one occurrence. . . .").

---

[1] TecSec does not dispute that it must show that Adobe directly infringed the method claims between February 5, 2010 and March 3, 2011.  Nor could it.

TecSec attempts to sidestep this important fact by arguing that Adobe's "Stipulation is not confined to a particular time period." Dkt. 1383 at 3. But the Court already rejected this argument when it adopted in part Adobe's proposed Jury Instruction No. 25 ("Stipulation of Infringement"). Tr. at 1070:5-1073:20. Adobe explained that this instruction was necessary because its "stipulation [] is to a *certain time frame*," and "[t]he jury should be instructed that what [Adobe] admitted was *outside the period* that has now narrowed in the case." *Id.* at 1071:7-1072:5. Adobe also explained that it "is still just *an '09 stipulation*. And that's why we said on that *one occurrence*, that's what the stipulation says." *Id.* at 1073:15-17. The Court agreed, giving the following instruction:

> The parties agree that the *one time* for which Adobe has admitted infringement, that is, Adobe's use in connection with creating a *February 2009 blog post*, *occurred before TecSec filed its lawsuit in February of 2010*.

*Id.* at 1220:17-20. Thus, contrary to TecSec's argument, it would have been legally erroneous for the jury to—in direct contravention of the Court's instructions—rely on Adobe's Stipulation as a basis for finding direct infringement of the method claims during the damages period.

TecSec's contention that Adobe's stipulation is not limited in time is also belied by its own assertion—on the very next page of its Opposition—that Mr. Landwehr "confirmed that he directly infringed the asserted method claims *in 2009*." Dkt. 1383 at 4. In addition, TecSec's counsel elicited testimony from Mr. Landwehr on cross-examination that directly connects Adobe's stipulation to Mr. Landwehr's February 2009 blog post:

> Q.    Thank you, sir. And you understand that Adobe has admitted to infringing TecSec's patents, correct?
>
> ***
>
> A.    Okay. My understanding is that for *this one file on this one blog post*, that the Adobe lawyers have acknowledged that the process used to manipulate Acrobat does intersect and align with the claims . . .

Tr. (Landwehr) at 796:16-797:17 (exchange removed); PX-69 at 1.  TecSec's choice to ignore this testimony, and the Court's jury instruction, speaks volumes about the merits of its position.

Tacitly recognizing that its reliance on Adobe's Stipulation is misplaced, TecSec argues "[e]ven if the stipulation had been limited to a particular time period," it is "circumstantial evidence that Adobe directly infringed the method claims during the relevant damages period."  Dkt. 1383 at 4.  Not so.  TecSec cites no case supporting this argument, which is contrary to Federal Circuit law holding that "[c]ircumstantial evidence must show that at least one person directly infringed an asserted claim *during the relevant time period*."  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012).  No such evidence exists here.  Isolated acts *outside of* the damages period are not circumstantial evidence of alleged infringement *during* the damages period.  *See Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1359 (Fed. Cir. 2012) (finding that circumstantial evidence "does not provide a reasonable jury adequate ground on which to find direct infringement").[2]

**Mr. Landwehr's Testimony.**  TecSec asserts (in a single sentence) that Mr. Landwehr "confirmed that he directly infringed the asserted method claims *in 2009*."  Dkt. 1383 at 4.  But TecSec fails to explain why Mr. Landwehr's manipulation of Acrobat in *2009* could support a finding of infringement between February 5, 2010 and March 3, 2011.  It cannot.  As the Court explained, Mr. Landwehr's "use in connection with creating a February 2009 blog post [] occurred before TecSec filed its lawsuit in February of 2010."  Tr. at 1220:17-20.[3]

---

[2] Judge Brinkema rejected a similar theory.  *See TecSec, Inc. v. IBM Corp.*, No. 10-cv-115, 2011 WL 779886, at *14 (E.D. Va. Mar. 3, 2011), *rev'd on other grounds*, 731 F.3d 1336 (Fed. Cir. 2013) ("TecSec's 'circumstantial evidence' theory [] fails as a matter of law" because "'it requires too speculative a leap to conclude that any [user] actually performed the claimed method.'").

[3] Contrary to TecSec's assertion (at 5), Adobe did not (and does not) ask "the Court to reweigh the evidence in Adobe's favor" by identifying testimony from other Adobe employees showing they

**Mr. Borstein's Testimony.**  TecSec asserts (again in a single sentence) that Mr. Borstein "confirmed that he *performed encryption* with every released version of Acrobat . . . and that he directly performed the claimed methods at least *in 2017*."  Dkt. 1383 at 4.  This argument should be rejected for two separate and independent reasons.

First, that Mr. Borstein "performed encryption"—not *multi-level* encryption—is irrelevant because it is undisputed that merely encrypting a file once does not infringe TecSec's patents.[4] *See* Tr. (Jones) at 544:3-6 ("[Q.] And the claims don't cover just encrypting the files one time, correct? You'd have to do multi-level encryption, correct? A. That's correct."); *id.* at 544:12:15, 544:22-545:7; Tr. (Wagner) at 635:5-21 (admitting that "merely encrypting a file once does not infringe"); Tr. (Scheidt) at 440:12-14.  TecSec's resort to conflating encryption with multi-level encryption speaks volumes about the merits of its position (and its lack of evidence).

Second, that Mr. Borstein allegedly "performed the claimed methods [] in 2017," while preparing for his deposition, is also irrelevant.[5]  Dkt. 1383 at 4.  Since "there can be no infringement once [a] patent expires," Mr. Borstein in 2017 could not have directly infringed the asserted method claims—which expired in 2013—as a matter of law.  *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994); *see also Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 550 (W.D.N.Y. 2005) ("It is axiomatic then, that the [accused product] does not infringe

---

*did not* perform the claimed methods.  Dkt. 1377 at 4.  Adobe identified this testimony only to show it cannot be the basis for the jury's infringement finding.  TecSec does not suggest otherwise.

[4] Under TecSec's argument that merely "perform[ing] encryption" would infringe, no reasonable jury could find that the asserted claims are not invalid because PKZIP could (at a minimum) perform single-level encryption.  *See* Tr. (Jones) at 1132:5-21 ("That's a single step or a single level of encryption.  That's something that we all agree PKZIP is capable of."); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

[5] That Mr. Borstein may have used Acrobat to perform multi-level encryption for his deposition is not circumstantial evidence of any use during the damages period because, as Mr. Wagner admitted, such use does not show any customer demand or importance.  Tr. (Wagner) at 646:6-14.

any of these four expired patents."). Moreover, Mr. Borstein's alleged use of the claimed methods occurred *over seven years* after the damages period ended.[6]  *See Toshiba*, 681 F.3d at 1364.

### B.     There Is No Evidence of Damages for Any Alleged Direct Infringement

This Court held that "there was no direct testimony on direct infringement damages." Dkt. 1373 at 2.  The Court was correct.  TecSec chose not to present evidence of direct infringement damages at trial.  TecSec's post hoc attempt to create an evidentiary basis for the jury's damages award is meritless, untimely, and should be rejected.

Notably, as set forth in detail in Adobe's Motion (at 7-8), TecSec's expert testimony and argument concerning damages exclusively related to *sales of Acrobat to customers*.  TecSec does not argue otherwise.  And TecSec cites no case where a court upheld a damages award for direct infringement based only on evidence for indirect infringement (or vice-versa).  Tellingly, Adobe's cited cases—which TecSec ignores—suggest the opposite is true.  *See, e.g.*, *ViaSat, Inc. v. Space Sys./Loral, Inc.*, No. 12-cv-260, 2014 WL 3896073, at *7-10 (S.D. Cal. Aug. 8, 2014) (concluding that "the jury's royalty award is unsound" because, among other reasons, "[b]efore trial, ViaSat relied on SS/L's alleged inducement of Hughes's infringement to bring Hughes's profits into play[,] [b]ut the jury found no contributory or induced infringement").  Regardless, even if such authority existed (it does not), TecSec does not explain how damages based on Adobe's sales of Acrobat to customers has any nexus, much less a sufficient one, to Adobe's alleged direct infringement—its own alleged use of Acrobat.  That is because the two are unrelated.  Instead of directing the Court to competent evidence that could support the damages award, TecSec makes three arguments to support the jury's damages award.  All three should be rejected.

---

[6] TecSec criticizes Adobe for not addressing the Court's Omnibus JMOL Order (Dkt. 1373).  But the Court's Order supports Adobe, not TecSec, because the Court noted that TecSec presented evidence that "at least two of Adobe's employees utilized the software to multi-level encrypt *outside the damages period*."  Dkt. 1373 at 2.

First, TecSec contends the damages award was proper because it "falls squarely between the reasonable royalty" proposed by both damages experts, and "[i]t would have been permissible for the jury to have accepted one of th[em]" or "arrive[] at a different rate based on the evidence."[7] Dkt. 1383 at 6-7. But neither parties' expert's royalty (nor the range between the two parties' experts' royalty rates) can form the basis for direct infringement damages because, as the Court found, "there was no direct testimony on direct infringement damages."[8] Dkt. 1373 at 2; *see also* Dkt. 1377 at 5-9. Instead, as the Court correctly found, "TecSec's expert, Mr. Wagner, provided the jury with his calculation of *a reasonable royalty rate for Adobe's sale of Adobe Acrobat to customers*." Dkt. 1373 at 2. Dr. Sullivan did the same. It would be legal error for the Court to determine whether the damages award for *direct* infringement is sound by comparing it to the parties' proposed damages for Adobe's alleged *indirect* infringement, particularly here, where there is no record evidence connecting Adobe's alleged direct infringement to its sales of Acrobat. The Court should ask only if the damages award is supported by any evidence of *direct* infringement damages. It is not. *See* Dkt. 1377 at 5-9. Moreover, even if TecSec were correct that it did present a royalty rate that could be used for direct infringement damages (it is not), TecSec does not identify the appropriate royalty base (e.g., the number of Adobe employees in the United States using Acrobat during the damages period) to which that non-existent rate could be

---

[7] TecSec mischaracterizes Adobe's Motion by asserting (without quotation marks) that Adobe argues that because the damages award "was not the specific amount proposed by either party's expert, there was no support for [it] whatsoever." Dkt. 1383 at 7. Adobe made no such argument, much less suggest the jury must "adopt one of the two expert's proposed damages numbers." *Id.*

[8] The Court should reject TecSec's attempt to rely on Mr. Wagner's testimony about "the rate that TecSec would have been looking for" in 2001. Dkt. 1383 at 7. The Court found "there was no direct testimony on direct infringement damages," Dkt. 1373 at 2, and found evidence of TecSec's expectations based on IBM's policy to not be "evidence that an expert could reasonably rely on in coming up with his, his own royalty rate." Tr. at 475:19-479:22; *see also id.* at 477:13-19, 478:20-21 ("[T]here's no evidence that TecSec reasonably relied on the figure itself in promoting their own products. . . . what [Mr. Wack] testified to was, frankly, rather astonishing.").

applied.[9]   Simply put, there is no evidence, much less substantial evidence, that could have permitted the jury to calculate direct infringement damages based on Adobe's own use of Acrobat during the damages period.  TecSec failed to meet its burden of proving any such damages.

Second, TecSec argues without citing fact or law that the damages award is not "speculative simply because the [] hypothetical negotiation was based on *sales of the accused products*."  Dkt. 1383 at 8.  This is an admission that the hypothetical negotiation was *not* based on Adobe's use (rather than sales) of Acrobat, which is necessary for the jury's damages award to stand.  Regardless, TecSec makes no attempt to explain how a hypothetical negotiation "based on sales of [Acrobat]" can form the basis for damages based on Adobe's use of Acrobat.  It cannot.

Third, TecSec argues (citing to Acrobat documents and testimony from Adobe employees) that the jury "could have . . . arrive[d] at a damages number that was based on the value of Adobe's own internal installation and use of Acrobat."  *Id.* at 9.  Not so.  The cited testimony from Adobe's employees cannot form the basis for a direct infringement damages award because, as the Court correctly found, "there was no direct testimony on direct infringement damages."  Dkt. 1373 at 2.  Nor did TecSec elicit any such testimony on cross-examination.  As the Court noted, and TecSec agreed, "the damages experts didn't break out customer versus Adobe employee numbers."  Tr. at 1103:21-1104:21.  Moreover, TecSec failed to address Adobe's argument that TecSec could have, but chose not to, "present a damages theory based on the alleged value Adobe employees derived from using multi-level encryption in performing their jobs" by, for example, "present[ing]

---

[9] In an attempt to meet its burden, TecSec cites to Mr. Ydens' testimony that he was "Employee No. 1544" when he joined Adobe in *2004*—six years before the damages period began—and Mr. Landwehr's testimony that Adobe has "about 200" employees in its Virginia office in *2018*.  Tr. at 749:20-22.  This evidence is from outside of the damages period and is insufficient to form a damages award for any direct infringement.  Tellingly, TecSec cites no evidence to show the number of Adobe employees during the damages period, or the value they derived from using Acrobat, much less the allegedly patented subfeatures of Acrobat.  None exists.

evidence of payments made or an accounting for Acrobat products that Adobe's employees used during the relevant damages period." Dkt. 1377 at 7 n.4. Regardless, as explained below, TecSec expressly waived this alternative damages theory.

While opposing Adobe's proposal that the verdict form include an "instruction asking for the number of times [the asserted patents] ha[ve] been infringed," TecSec's counsel "remind[ed] the Court that the damages experts both submitted damages and royalty numbers ***based on sales***," and that "the damages evidence that has been submitted has ***focused on revenue and sales***." Tr. at 1102:17-1103:15. Adobe then confirmed its "agreement that [TecSec's damages evidence] ***just has to do with the customer*** revenue, sales, and use":

> MR. MORIN: . . . I just want to make sure we are all on the same page with what ***they just said that damages are going to be based on customer sales and revenue, is what I just heard***. I worry a little bit because we have had discussions with them about ***dropping direct infringement because it's a moot point***, ***that's how Adobe uses the product***. ***There's been no evidence of damages on that***. It's only been on the sales and revenue, which is what we just heard. And I am glad he brings it up that way. It was one of the things we were going to bring up before closing. ***That all of a sudden that they can't come in and say, well, it's really valuable at Adobe to use multi-level encryption and, therefore, you should give us a whole lot of money***. ***But I am glad we are now all in agreement that it just has to do with the customer revenue, sales, and use***. . . .
>
> THE COURT: Am I correct that the damages experts didn't break out customer versus Adobe employee numbers, right? They just got wholesale numbers and worked from that?
>
> MR. FARRES: ***That's correct***, Your Honor --

*Id.* at 1103:21-1104:21. Adobe then reiterated its position and "thr[ew] down a marker" about any later attempt by TecSec to (as it seeks to do now) equate direct and indirect infringement damages:

> MR. MORIN: That's the point, Your Honor. It is only customer sales. And all the damages have only talked about customer sales. . . . What I am little worried about, because we asked, why don't you drop direct infringement because there is no damages evidence for their own use. . . . [T]hey never made that claim. It's not in their expert reports, and it wasn't in the testimony. And that's all we are trying to get to. So it was 100 percent -- and ***I think Mr. Farres will agree, the damages was 100 percent on customer sales and use***. ***And there was no, like imputed, hey,***

> *that would equate to this much for every system installation by Adobe. There was no such evidence. We're just throwing down a marker. I assume they are not going to do it, but I get a little worried . . . But I think we're all on the same page. Their experts did it based on customer sales and revenue.*

> THE COURT:  Right.  I think that's where we are, right?

> MR. FARRES: Thank you, Your Honor.

*Id.* at 1105:1-1106:10.  By forgoing such a theory, TecSec cannot now argue that it is entitled to damages based on Adobe's own use of Acrobat.  This alternative damages theory has been waived.

*Promega Corp. v. Life Technologies Corp.*—on which TecSec relies, *see* Dkt. 1383 at 6— is instructive.  875 F.3d 651 (Fed. Cir. 2017), *cert. denied*, 139 S. Ct. 156 (2018).  In *Promega*, the Federal Circuit held that Promega waived its alternative damages theory by "choosing . . . to solely pursue an all-or-nothing damages strategy" based only on "worldwide sales":

> If Promega wanted to argue that the evidence at trial supported a damages calculation based on anything other than worldwide sales, it should have raised such an argument at trial . . .  Promega did not, choosing instead to continue to solely pursue an all-or-nothing damages strategy. . . . Promega was on notice that its untested interpretation of § 271(f)(1) might not prevail [b]ut . . . declined to use its opportunity to establish entitlement to an alternative, smaller damages award.

*Id.* at 665-66.  The same is true here.  TecSec chose "to solely pursue" a damages theory based Adobe's alleged indirect infringement—sales of Acrobat to customers.  *Id.*  Although it knew this theory might not prevail, by representing to the Court that it would only pursue damages based on "customer revenue, sales, and use," *see supra* at 8-9, TecSec "declined to use its opportunity to establish entitlement to an alternative, smaller damages award" based on direct infringement. *Promega*, 875 F.3d at 665-66.

The fact that TecSec "solely pursue[d] an all-or-nothing damages strategy" based on Adobe's alleged *indirect* infringement is confirmed by its decision to only pursue damages from February 5, 2010 to March 3, 2011, rather than the period of February 5, 2010 to October 18, 2013:

> MR. OAKES: . . . We just both, I think, wanted to clarify on the record the stipulation is for *purposes of inducement and damages*, not for any other purpose, but the parties are agreeing that *when Mr. Wagner comes on, he will only be talking about the damages period between February 2010 and March 2011*.

Tr. at 468:15-20.  If TecSec believed the evidence could support an award for direct infringement damages, it would not have limited Mr. Wagner's testimony to the February 5, 2010 to March 3, 2011 period.[10]  Moreover, based on TecSec's representation, the Court instructed the jury that "the damages [it] will award will start on . . . February 5 of 2010" and "run[] through March 3 of 2011." *Id.* at 1234:13-18; *see also* Dkt. 1377 at 8.  That concession is 100% irreconcilable with TecSec's position now that it was entitled to damages for direct infringement, which would have been equally available after March 3, 2011 as before.

TecSec cites *Dow Chemical Co. v. Mee Industries* and argues in a footnote (Dkt. 1383 at 7 n.2) that damages are still appropriate "even if . . . TecSec failed to present *any evidence* of direct infringement damages."  341 F.3d 1370, 1381 (Fed. Cir. 2003).  TecSec is wrong.  In *Dow*, the Federal Circuit held that the trial court erred by, *inter alia*, failing to consider "*other evidence in the record*, including the evidence supporting [the patentee's damages expert's] excluded opinions," and instructed the trial court on remand to "award such reasonable royalties *as the record evidence will support*." *Id.* at 1381-82.  *Dow* thus confirms that judgment as a matter of law of no direct infringement damages is appropriate because, unlike in *Dow*, there is no "other evidence in the record" that could support an award of direct infringement damages. *Id.* at 1381.

### C.    The Evidence Shows the Asserted Claims Are Invalid As a Matter of Law

Adobe explained in detail how it proved by clear and convincing evidence that the asserted claims are invalid.  *See* Dkt. 1377 at 9-17.  No reasonable jury could find otherwise.  Instead of

---

[10] Even if TecSec's "decision was aimed at simplifying the case for the jury," that does not change that it knowingly chose not to pursue damages for the longer timeframe.  Dkt. 1383 at 9-10 n.3.

addressing the substance of the evidence, TecSec spends most of its time attacking the purported

bias, memory, and "friendships" of Adobe's witnesses.  TecSec's argument should be rejected.

### 1.     PKZIP Anticipates and Renders Obvious the Asserted Claims

TecSec does not dispute that PKZIP is prior art, or that the only element it allegedly does

not disclose is the preamble reciting "multi-level multimedia security."[11]  Dkt. 1377 at 13.  TecSec

also does not dispute the substance of Messrs. Mundy, Rosenthol, Scheidt, Shanton, or Ydens'

testimony.[12]  And TecSec ignores Mr. Scheidt's admission that he described "[o]bject-oriented,

multi-level security. . . in July 1992," and fails to substantively address his testimony recognizing

in 1995 that PKZIP—which was indisputably available by 1992 (DX-4)—was an "interim

solution."  *See* Tr. (Scheidt) at 439:1-15, 448:11-18; Dkt. 1377 at 13.  Instead, TecSec relies only

on the testimony of its expert, Dr. Jones, to argue that the asserted claims are not invalid.  On this

record, no reasonable jury could find the asserted claims are not invalid.

First, TecSec asserts that Dr. Clark "fully agreed with Dr. Jones" that the PKZIP shareware

manual does not "lay out the steps for encrypting a ZIP file that contains an encrypted ZIP file."

Dkt. 1383 at 15.  TecSec mischaracterizes Dr. Clark's testimony, as he testified unequivocally that

PKZIP version 2.04c discloses the claimed invention and invalidates the asserted claims.  *See, e.g.*,

Tr. (Clark) at 902:13-903:9, 941:14-18, 962:7-10.  Regardless, it is unnecessary for the PKZIP

---

[11] TecSec criticizes Adobe for using the terms "multi-level encryption" or "multi-level security" to refer to the preamble of the asserted claims but repeatedly uses the same terminology.  *See, e.g.*, Dkt. 1383 at 15 ("Dr. Jones, testified that the PKZIP shareware manual . . . does not disclose multi-level security."); Tr. (Scheidt) at 440:12-14 ("Q. But you would agree that TecSec is claiming the concept of multi-level encryption, right? A. In the context of what we're writing, yes."); Tr. (Jones) at 544:12-15 ("Q. Okay. And TecSec's asserted claims require encryption at multiple levels, what we've been calling multi-level encryption, correct? A. Correct."); Dkt. 869 at 17.

[12] TecSec's only criticism of Messrs. Rosenthol and Ydens, that they "are Adobe employees," is insufficient.  *See Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 2017-2107, 2019 WL 404570, at *5 (Fed. Cir. Jan. 31, 2019).

shareware manual to "lay out the steps" for performing multi-level encryption in order to invalidate the asserted claims because "[an anticipatory] reference need not satisfy an *ipsissimis verbis* test."[13] *Imperium*, 2019 WL 404570, at *3. This is particularly true for the asserted system claims, as the parties agree that PKZIP only needs to be "capable of" performing multi-level encryption in order to invalidate those claims. *See* Dkt. 1377 at 11 n.8.

Second, unable to refute the substance of Mr. Mundy's testimony, TecSec argues the jury "could have" discounted Mr. Mundy's testimony because he was reimbursed for his time ("at the lower range of $250 an hour," Tr. at 882:2-6), is "a friend of Dr. Clark," and did not testify about "the same copy" of the PKZIP shareware manual (DX-4) that he downloaded in 1992. Dkt. 1383 at 17. TecSec's arguments should be rejected. There is no legal requirement requiring the admitted record copy of the PKZIP version 2.04c shareware manual—that is undisputedly authentic—to be "the same copy" Mr. Mundy downloaded in 1992. Nor is there any dispute that the copy of the PKZIP 2.04c shareware manual with a 2017 download date (DX-4) is any different, much less materially different, from the PKZIP 2.04c shareware manual available in 1992. *See* Tr. (Ydens) at 710:9-21; Tr. (Mundy) at 860:10-861:24, 863:4-14; Tr. (Clark) at 905:19-25; Tr. (Jones) at 1127:11-15, 1128:14-1129:1. And, as in *Imperium*, Mr. Mundy's "prior work together [with Dr. Clark 25 years earlier, *see* Tr. (Clark) at 897:1-4], standing alone, is not enough for a reasonable jury to disbelieve [him]," particularly when TecSec did not impeach Mr. Mundy or identify "any inconsistency or equivocation in" his testimony, which was unrebutted. 2019 WL 404570, at *5.

Third, TecSec asserts that Dr. Clark did not review the PKZIP source code and thus could not identify the PKZIP "files and subroutines" required for the asserted system claims. Dkt. 1383

---

[13] The same is true for TecSec's argument that "Dr. Jones pointed out . . . that some of Dr. Clark's so-called 'commands' were . . . not found in the PKZIP shareware manual." Dkt. 1383 at 15.

at 17-18.  But there is no legal requirement for Dr. Clark to have reviewed the PKZIP source code. To the contrary, to invalidate the system claims, Adobe need only show that the PKZIP shareware manual discloses a system capable of performing multi-level encryption.  Dkt. 1377 at 11 n.8.  At bottom, TecSec's argument is (yet another) attempt to improperly leverage this Court's *in limine* order to improperly and incorrectly argue that the absence of an actual PKZIP system from trial somehow indicates that PKZIP does not invalidate the asserted claims.  *See id.* at 19 n.11.

## 2.     The PEM Papers Render the Asserted Claims Obvious

As with PKZIP, TecSec does not dispute that the PEM Papers are prior art or disclose almost every element of the asserted claims.  *See id.* at 14-15.  Instead, TecSec proffers three reasons for why the jury's invalidity verdict is supported by substantial evidence.  All three fail.

First, TecSec argues that both Dr. Jones and Dr. Clark disagreed about whether the PEM Papers disclosed "multi-level security" due to the purportedly "ambiguous" meaning of the term "recursively" used in RFC 1113.  Dkt. 1383 at 18.  But there is nothing "ambiguous" about that term, or what it teaches to a POSITA, and the fact that it may be "used to discuss the processing of digital certificates" in another part of the PEM papers does not change its plain English meaning in the relevant passage.  *See, e.g.*, Tr. (Clark) at 925:17-927:6.

Second, TecSec repeats Dr. Jones' criticism that Mr. Balenson's "drawing isn't shown . . . in those papers."  Dkt. 1383 at 19.  But Mr. Balenson testified that his drawing (the accuracy of which TecSec does not challenge) merely represents "an accurate, graphic depiction of [his] testimony and what's disclosed in RFC 1113."  Tr. (Balenson) at 228:22-229:1.  And TecSec does not substantively challenge any other portion of Mr. Balenson's testimony, including that the PEM Papers specifically disclose that "privacy enhancement processing can be applied recursively," and that he used the TISPEM system to perform multi-level encryption before September 1993.  *Id.* at 234:9-235:1; *see also* Tr. (Clark) at 953:7-10.

Third, just like with Mr. Mundy, TecSec argues that the jury could have discounted Mr. Balenson's testimony because he was being reimbursed for his time—at "half of [his] normal hourly billing rate"—and "was a long-time friend and colleague of Dr. Clark."[14]  Dkt. 1383 at 20; Tr. at 240:11-14.  TecSec's attempt to (once again) avoid the merits of Mr. Balenson's testimony is telling, and its argument should be rejected for the same reasons described above for Mr. Mundy.

### 3.     TecSec's Proffered Secondary Considerations Are Irrelevant and Cannot Overcome the Strong Showing of Obviousness

TecSec contends that it "presented ample relevant evidence showing commercial success and licensing efforts."[15]  Dkt. 1383 at 21.  The opposite is true.  TecSec failed to present any competent evidence of secondary considerations at trial and, even if it did, its proffered evidence cannot overcome Adobe's strong showing of obviousness.  *See* Dkt. 1377 at 15.

**Commercial Success.**  TecSec does not argue that either TecSec or its practicing products were commercially successful.  Nor could it.  Instead, TecSec argues that Boeing's investment in TecSec demonstrated commercial success.  Dkt. 1383 at 21.  But Boeing's investment in TecSec, Inc. (i.e., ***the company***) lacks any nexus to the alleged merits of the claimed invention—multi-level encryption—and is therefore irrelevant as a matter of law.  *See* Dkt. 1377 at 15-16.

The Federal Circuit has rejected TecSec's argument.  In *NantKwest, Inc. v. Lee*, the Federal Circuit rejected the patentee's reliance on "a news article announcing a $48 million investment in [the patentee's company] as evidence of commercial success" because "there is no direct nexus

---

[14] TecSec contends Mr. Balenson's testimony about his use of the TISPEM system in 1992 is "improper" because it goes "beyond the four corners of the PEM Papers."  Dkt. 1383 at 20.  But TecSec cites no law to support this assertion, and did not object to this testimony at trial.  Even if TecSec were correct, this testimony confirms TISPEM could perform multi-level encryption.

[15] If PKZIP anticipates, secondary considerations are irrelevant.  But, for purposes of obviousness, the Court should decline TecSec's invitation to ignore "the issue of secondary considerations" because "consideration of the objective indicia is *part of* the whole obviousness analysis, not just an afterthought."  *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013).

between the $48 million stock purchase and the merits of the claimed invention." 686 F. App'x 864, 873 (Fed. Cir. 2017). Similarly, in *Purdue Pharma L.P. v. Epic Pharma, LLC*, the Federal Circuit affirmed a finding of no nexus because "Purdue invested in Rhodes not because of the [claimed] features," but for unrelated reasons. 811 F.3d 1345, 1354 (Fed. Cir. 2016); *see also Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1372-73 (Fed. Cir. 2010) (holding that district court erred by "denying MoneyGram's JMOL of obviousness" based on evidence of "investments made . . . in developing formless money transfer systems" as commercial success because it lacked "any relation to the patentable features of the claimed inventions").

Boeing's investment in TecSec is legally irrelevant for the same reasons. As in *NantKwest*, "there is no direct nexus between the [Boeing investment] and the merits of the claimed invention." 686 F. App'x at 873. The Boeing press release (PX-441) does not mention the asserted patents, much less multi-level encryption. And the portion of Dr. Jones' testimony on which TecSec relies to show a nexus does not mention multi-level encryption, either. *See* Tr. at 1149:3-1152:3.

TecSec's argues that the Boeing investment "*involved CKM*, which is tied to the DCOM patents." Dkt. 1383 at 21. But CKM is a software program that embodied 13 TecSec patents, none of which are asserted in this case. *See* PX-204 at 2; *Lutron Elecs. Co. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229, 1240 (D. Utah 2013) ("When a product is marked with multiple patents [] it is more difficult to establish a nexus between commercial success and the relevant claimed invention."). CKM was also marketed for its "key split combiner," which is not claimed and is unrelated to multi-level security. *See* Tr. at 1176:23-1178:2. Regardless, Dr. Jones admitted there is no connection between CKM and multi-level encryption, which is necessary for a nexus to exist:

> Q.   No.  You haven't shown any today to this jury that CKM is connected to multi-level encryption, right?
>
> A.   That's correct.

15

Tr. (Jones) at 1175:6-8.  Dr. Jones' admission is fatal to TecSec's argument.

**Licensing.**  TecSec asserts that the Sterling license is relevant secondary considerations evidence "because it involved the '702 patent as well as related software for which Sterling Software paid TecSec a royalty."  Dkt. 1383 at 21.  But TecSec does not dispute that the Sterling license does not mention multi-level encryption, and includes rights to many other types of IP, such as software, copyrights, and trade secrets.  *See* Dkt. 1377 at 16.  Nor does TecSec argue that the license "arose out of recognition and acceptance of the patent."  *Id.*  These undisputed facts confirm the Sterling license is irrelevant because it lacks a nexus to the claimed invention.

Unable to identify evidence of a nexus, TecSec urges the Court to apply the presumption of nexus. Dkt. 1383 at 22. The Court should decline. Dr. Jones provided no testimony establishing that TecSec's products are coextensive with the asserted patent claims. The presumption also does not apply because it is undisputed that TecSec's products are, according to TecSec, covered by more than just the four asserted patents. *See* DX-43 at 9; PX-204 at 2; *Medicines Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 WL 1227214, at *6 (N.D. Ill. Mar. 25, 2014) (finding "the presumption does not apply" because "[i]t is undisputed that [the product] is covered by multiple patents"). Even if the presumption applies, it is rebutted because, as described above, "the proffered objective evidence was due to extraneous factors other than the merits of the claimed invention." *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1330-31 (Fed. Cir. 2017). For example, the Sterling license includes rights to many other types of IP (e.g., software, copyrights, and trade secrets), and there is no evidence that Boeing invested in TecSec due to its purported invention of "multi-level encryption." Tr. (Jones) at 1175:21-1176:8; PX-210 § 1.2.

TecSec's cited cases—*Apple Inc. v. Samsung Electronics Company* and *Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*—undercut its argument that a sufficient nexus exists between its

proffered evidence and the merits of its alleged invention.  Dkt. 1383 at 23.  In *Apple*, the Federal

Circuit held there was "substantial evidence of a nexus between the slide to unlock feature and the

iPhone's commercial success," as well as industry praise, copying by Samsung, and long-felt need.

839 F.3d 1034, 1052-57 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 420 (2017).  In *Pro-Mold*, the

Federal Circuit reversed a ***summary judgment*** order finding the claims to be obvious because the

trial court "did not provide a basis for its discounting of Pro-Mold's evidence of . . . ***high sales*** of

the patented product."  75 F.3d 1568, 1572-74 (Fed. Cir. 1996).  Here, unlike those cases, it is

undisputed that TecSec and its products were not commercially successful.  Dkt. 1377 at 16.

### 4.    The Invalidity Verdict Was Tainted By The Erroneous Implication That Third-Party Fact Witness Testimony Required Corroboration

Largely ignoring the substance of Adobe's argument that the Court erred in allowing

TecSec's counsel **and** Dr. Jones to argue—over Adobe's objections—that Messrs. Balenson and

Mundy's testimony required corroboration, TecSec mischaracterizes Adobe's argument as "a red-

herring" and urges the Court to reject it for two reasons.  Dkt. 1383 at 23-25.  Both fail.

First, TecSec claims it only "asked Dr. Jones what *he* as a technical expert looks for in

assessing oral testimony,"[16] and "***never*** argued to the jury that corroboration is required in order

for Adobe's witnesses to be credited."  Dkt. 1383 at 23.  That is simply not true.  As Adobe

described, TecSec's counsel argued that Messrs. Balenson and Mundy's testimony should be

discredited because it purportedly was not corroborated.  Dkt. 1377 at 18-19.  Tellingly, TecSec

does not address these statements in its Opposition.  Regardless, whether the suggestion was made

by Dr. Jones or TecSec's counsel during closing argument is a distinction without a difference—

---

[16] Contrary to TecSec's argument, Dr. Jones is not "entitled to opine on the testimony offered by Adobe's witnesses" because, "[a]bsent unusual circumstances, the [court] must exclude expert testimony on issues of witness credibility," which is "usually within the jury's exclusive purview." *United States v. Kumar*, No. 17-cv-5, 2019 WL 1387687, at *11 (E.D.N.C. Mar. 27, 2019).  Even if Dr. Jones were qualified to give such testimony, his testimony is contrary to controlling law.

it was improper, contrary to law, and tainted the jury's invalidity verdict. *See id.* at 17-20.

Second, TecSec's argument that "Adobe's contention that corroboration is not required is wrong" (Dkt. 1383 at 23) is contrary to this Court's prior ruling and controlling Federal Circuit law—both of which were cited by Adobe and ignored by TecSec. *See* Dkt. 1377 at 17-20.  TecSec makes no attempt to address, much less distinguish, this Court's statement—"I'm unaware of corroboration being necessary," Tr. at 1027:3-1028:6—and *Thomson, S.A. v. Quixote Corp.*, which issued before *every case* TecSec relies on.  And, while it relies heavily on *Finnigan v. International Trade Commission*, TecSec does not address any of the arguments Adobe raised about why TecSec's "reliance on *Finnigan* would be misplaced."  *See* Dkt. 1377 at 19.  Indeed, TecSec's own cited cases recognize that "courts—including the Federal Circuit—have applied the corroboration requirement somewhat inconsistently," but even "the Federal Circuit has affirmed a decision invalidating patents *based solely on the testimony of one witness*."  *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 553-54 (E.D. Va. 2010).  Regardless, the testimony of both Messrs. Balenson and Mundy was corroborated by documentary evidence (RFC 1113 and the USENIX paper, as well as the PKZIP Shareware manual, respectively), expert testimony (from Dr. Clark), and fact witness testimony from Messrs. Rosenthol, Scheidt, and Ydens.

## III.   ALTERNATIVELY, ADOBE IS ENTITLED TO A REMITTITUR

TecSec's Opposition to Adobe's alternative request for a remittitur is long on rhetoric and attorney argument, but short on evidence.  Rather than identify evidence to support a damages award, or explain why $200,000 is not "the highest amount [calculable] . . . 'based on the relevant evidence,'" TecSec attempts to shift the blame for its failure of proof to Adobe.[17]  *Shockley v.*

---

[17] TecSec ignores the Fourth Circuit cases on remittitur Adobe cited in its Motion.  *See* Dkt. 1377 at 3 n.1.  TecSec also applies the legal standard—"grossly excessive or monstrous"—applicable in the Ninth Circuit.  Dkt. 1383 at 25.  TecSec's other two cited cases do not even involve remittitur.  TecSec's failure to apply the correct legal standard is fatal to its arguments on remittitur.

*Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001).  But "[i]n patent cases, '[t]he burden of proving

damages falls on [TecSec],'" and TecSec "must show [its] damages by evidence.'"  *Promega*, 875

F.3d at 660.  TecSec's attempt to confuse the issues should be rejected.[18]

First, TecSec asserts without citation to law or evidence that "$200,000 is not a reasonable

royalty at all."  Dkt. 1383 at 25.  Putting aside that it provides no explanation for its assertion,

TecSec's argument was rejected by the Federal Circuit in *AstraZeneca AB v. Apotex Corp.*:

> To the extent Apotex means to say that the costs the infringer would incur to produce a non-infringing product are not relevant to the reasonable royalty for a license to sell a product covered by the patent, we disagree.  When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low.

782 F.3d 1324, 1334 (Fed. Cir. 2015).  Since TecSec did not identify any other damages number,

the appropriate number for any remittitur is at most $200,000—the upper bound to design around.

Second, TecSec criticizes this amount because Dr. Sullivan allegedly "did not even adopt"

it or testify "that the hypothetical negotiation would have been conducted in such a manner."[19]

Dkt. 1383 at 25-26.  TecSec is wrong.  TecSec cites no case requiring a damages expert to adopt

the cost of a design around for it to serve as a basis for damages.  Indeed, TecSec argues the

opposite: "there is no requirement to present expert testimony at all."  *Id.* at 7.  And, as explained

below, neither TecSec nor any other witness rebutted or otherwise challenged Mr. Ydens'

testimony that the accused functionality could have been removed in 2001 at a total cost of between

$120,000 to $200,000.  Dkt. 1377 at 23.  Moreover, TecSec does not dispute that the availability

of a design around is a valid consideration during the hypothetical negotiation.  Nor could it.  Mr.

Wagner testified that the design around cost "would have put[] a cap on . . . a reasonable royalty."

---

[18] TecSec does not request a new trial, or argue that one is warranted.  *See* Dkt. 1377 at 24 n.14.

[19] It is not surprising that neither party's expert presented $200,000 as a royalty rate for any direct infringement, as both experts focused only on damages for indirect infringement.

Tr. at 664:3-7.  Dr. Sullivan agreed, testifying that the design around cost "place[s] a limit on how much a licensee would be willing to pay for a technology" because the "cost of [a] non-infringing alternative[] limits the amount of royalties that would be agreed upon."  Tr. at 1008:24-1010:6.

Third, TecSec tries to explain away Mr. Ydens' testimony by arguing that Adobe "failed to establish that simply removing all encryption or embedding functionality would be an acceptable alternative."  Dkt. 1383 at 26.  Putting aside that TecSec mischaracterizes Mr. Ydens' testimony, TecSec's argument ignores that it did not challenge his testimony on cross-examination or present contradictory testimony from any other witness.[20]  Dkt. 1377 at 23-24.  Having failed to challenge this testimony at trial, TecSec cannot now attempt to rebut Mr. Yden's uncontroverted testimony by presenting unsupported attorney argument, which "is no substitute for evidence." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005).  Moreover, TecSec fails to explain why the design around would ***not*** be an acceptable alternative, particularly given that it is undisputed that customers neither wanted nor found important the ability to manipulate Acrobat to perform multi-level encryption.  Here, TecSec cannot complain about the sufficiency of this evidence because, "[d]ue to [TecSec's] failure of proof, the best remaining evidence is [Mr. Ydens' testimony]."  *Oiness v. Walgreen Co.,* 88 F.3d 1025, 1031 (Fed. Cir. 1996).  Because the evidence supports at most a $200,000 award, the Court should reduce the damages accordingly.[21]

## IV.    CONCLUSION

For the foregoing reasons, Adobe respectfully requests that the Court grant Adobe's motion for judgment as a matter of law or, in the alternative, a remittitur.

---

[20] Mr. Ydens did not testify that "all encryption or embedding functionality" would be removed. He testified that the accused functionality could have been removed.  Tr. (Ydens) at 735:3-736:22.

[21] Contrary to TecSec's assertion, Adobe did not argue that a remittitur is warranted because "the jury was not properly instructed to apportion damages between direct and indirect infringement." Dkt. 1383 at 26.

Dated:  April 19, 2019                              Respectfully submitted,

                                                    By:   */s/ Roman Lifson*
                                                           Maximilian A. Grant  (VSB No. 91792)
                                                           (max.grant@lw.com)
                                                           Tara D. Elliott  (admitted *pro hac vice*)
                                                           (tara.elliott@lw.com)
                                                           Michael A. Morin  (admitted *pro hac vice*)
                                                           (michael.morin@lw.com)
                                                           Rachel Weiner Cohen  (admitted *pro hac vice*)
                                                           (rachel.cohen@lw.com)
                                                           **LATHAM & WATKINS LLP**
                                                           555 Eleventh Street, N.W.
                                                           Suite 1000
                                                           Washington, DC 20004
                                                           Telephone:  (202) 637-2200
                                                           Facsimile:   (202) 637-2201

                                                           Dale Chang  (admitted *pro hac vice*)
                                                           (dale.chang@lw.com)
                                                           **LATHAM & WATKINS LLP**
                                                           330 North Wabash Avenue, Suite 2800
                                                           Chicago, IL 60611
                                                           Telephone:  (312) 876-7700
                                                           Facsimile:   (312) 993-9767

                                                           Brett M. Sandford  (admitted *pro hac vice*)
                                                           (brett.sandford@lw.com)
                                                           **LATHAM & WATKINS LLP**
                                                           140 Scott Drive
                                                           Menlo Park, CA 94025
                                                           Telephone:  (650) 328-4600
                                                           Facsimile:   (650) 463-2600

                                                           Michael W. Smith  (VSB No. 01125)
                                                           (msmith@cblaw.com)
                                                           Roman Lifson  (VSB No. 43714)
                                                           (rlifson@cblaw.com)
                                                           **CHRISTIAN & BARTON, LLP**
                                                           909 East Main Street, Suite 1200
                                                           Richmond, VA 23219
                                                           Telephone:  (804) 697-4100
                                                           Facsimile:   (804) 697-6112

                                                           *Counsel for Defendant Adobe Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2019, a true and correct copy of the foregoing was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record:

/s/ Roman Lifson
Roman Lifson  (VSB No. 43714)
(rlifson@cblaw.com)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, VA 23219
Telephone:  (804) 697-4100
Facsimile:   (804) 697-6112

*Counsel for Defendant Adobe Inc.*