**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| TECSEC, INC.,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION, et al.,<br><br>　　　　　　Defendants. | CASE NO. 1:10-cv-00115-LO-TCB |

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**DEFENDANTS ORACLE AMERICA, INC.'S AND ORACLE CORPORATION'S**</u>
<u>***DAUBERT* MOTION TO EXCLUDE CERTAIN DAMAGES-RELATED OPINIONS OF**</u>
<u>**TECSEC'S EXPERTS**</u>

1

REDACTED VERSION

████████████████████████

## TABLE OF CONTENTS

I.       **INTRODUCTION**.............................................................................................. 1

II.     **BACKGROUND** .............................................................................................. 1

      A.    Mr. Wagner's Damages Calculation for the DCOM Patents.................................. 2

      B.    Mr. Wagner's Damages Calculation for the '448 Patent ...................................... 4

III.    **LEGAL STANDARDS** ...................................................................................... 6

IV.    **ARGUMENT** ..................................................................................................... 8

      A.    Mr. Wagner's Inclusion of All Database Enterprise Edition Revenues in the Royalty Base For His DCOM Damages Theory Is Improper and Should Be Excluded...................................................................................... 9

            1.    Mr. Wagner's Royalty Base Improperly Includes the Entire Market Value of the Oracle Database products and Violates the Smallest Salable Patent-Practicing Unit Principle....................................... 9

            2.    Mr. Wagner's Purported "Economic Relationship" Calculation Is Not Based on Sound Methodology............................................ 13

      B.    The Technical Apportionment Analysis On Which Mr. Wagner Relies Lacks Reliable Quantitative Support. ................................................. 14

            1.    Dr. Rubin's Apportionment Analysis Is Based On Arbitrary Calculations Plucked Out Of Thin Air.......................................... 15

            2.    Dr. Jones's Apportionment Opinion Is Unsupported and Unreliable............................................................................. 19

V.      **CONCLUSION** .............................................................................................. 21

i

REDACTED VERSION

███████████████████████████

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Atlas IP, LLC v. Medtronic, Inc.*,
  No. 13–CIV–23309, 2014 WL 5741870 (S.D. Fla. Oct. 6, 2014)..............................18, 20, 21

*Cooper v. Smith & Nephew, Inc.*,
  239 F.3d 494 (4th Cir. 2001) ...................................................................................................7

*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009)......................................................................................7

*Cornell Univ. v. Hewlett-Packard Co.*,
  No. 01-CV-1974, 2008 WL 2222189 (N.D.N.Y. May 28, 2008).............................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).......................................................................................... *passim*

*Ericsson, Inc. v. D-Link Systs., Inc.*,
  773 F.3d 1201 (Fed Cir. 2014)...............................................................................................12

*Exmark Manufacturing Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)..............................................................................................12

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018)........................................................................................10, 19

*Good Tech. Corp. v. MobileIron Inc.*,
  No. 5:12–cv–05826–PSG, 2015 WL 4090431 (N.D. Cal. July 5, 2015).........................18, 20

*GPNE Corp. v. Apple, Inc.*,
  No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ....................8, 10, 12

*Guardant Health Inc. v. Foundation Med. Inc.*,
  No. 17-1616-LPS-CJB, 2020 WL 2461551 (D. Del. May 7, 2020) ..................................15, 17

*Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*,
  No. 12-1369, 2017 WL 3140798 (W.D. Pa. July 25, 2017) ....................................................15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)............................................................................. *passim*

*Netfuel v. Cisco Systems, Inc.*,
  No. 5:18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 27, 2020) ..................... *passim*

REDACTED VERSION

*Open Text S.A. v. Box, Inc.*,
    No. 13-cv-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015).........................................17

*Rembrandt Social Media, LP v. Facebook, Inc.*,
    22 F. Supp. 3d 585 (E.D. Va. 2013) ...........................................................................10, 11, 12

*ResQNet.com v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010).....................................................................................................8

*Stragent, LLC v. Intel Corp.*,
    No. 6:11–cv–421, 2014 WL 1389304 (E.D. Tex. Mar. 6, 2014)................................18, 20, 21

*Suffolk Techs. LLC v. AOL Inc.*,
    No. 1:12-cv-625, 2013 U.S. Dist. LEXIS 64630 (E.D. Va. Apr. 12, 2013) ..............................8

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...........................................................................................7, 12

*VirnetX v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).................................................................................7, 10, 12

**Statutes**

35 U.S.C. § 284...................................................................................................................................7

**Rules**

Federal Rule of Evidence 702...........................................................................................1, 6, 7, 8

REDACTED VERSION

## I.     INTRODUCTION

TecSec demands over ██████████ in "reasonable royalty" damages based on Oracle's alleged infringement of (i) TecSec's DCOM patents,[1] and (ii) TecSec's U.S. Patent No. 7,069,448 (the "'448 patent").   In support, TecSec offers opinions from its damages expert—Michael Wagner—who in turn relies on apportionment opinions from TecSec's two technical experts— Drs. Aviel Rubin and Mark Jones.  Those opinions do not meet Federal Rule of Evidence 702's standard for admitting expert testimony for three reasons.  First, the royalty base used by Mr. Wagner for the DCOM patents improperly includes all revenues for every sale of the Oracle Database products at issue in the lawsuit, though the functionality that TecSec accuses of infringement is purchased through an optional add-on package that must be separately purchased from Oracle—the Oracle Advanced Security package—and which was purchased by ██████ of Oracle's Database customers during the relevant time period.  Second, Mr. Wagner's attempt to rectify his use of a legally improper royalty base through calculating a purported "economic relationship" between the Oracle Database products and the Advanced Security option by dividing the price of the optional add-on by the price of the Database product is not supported by any economic principle, academic literature, or other discernable methodology, and leads to absurd results.  Finally, the apportionment figures from Drs. Rubin and Jones on which Mr. Wagner's damages opinions rely—without additional analysis or confirmation—lack any reliable quantitative support.  Accordingly, these opinions should be excluded.

## II.    BACKGROUND

TecSec's damages expert, Mr. Wagner, opined that Oracle should be liable for ████████ ██████████████████████ in "reasonable royalty" damages for alleged infringement of

---

[1]     The DCOM patents are U.S. Patent Nos. 5,369,702, 5,680,452, 5,717,755, and 5,898,781.

REDACTED VERSION

█████████████████████████████████████

the DCOM patents (depending on the length of the damages period) and ████████████

████████████████   in "reasonable royalty" damages for alleged infringement of the '448 patent

(██████████████████████████████████████):



Ex. 58 (Wagner Report) at 5–6.[2]  For the DCOM patents, Mr. Wagner calculated damages based

on three different potential damages windows, the broadest of which spanned from February 5,

2010—the date the complaint was filed in this matter—to October 18, 2013—the expiration of the

DCOM patents.  *Id.* at 4.  For the '448 patent, Mr. Wagner calculated damages from the date of

first sale of the earliest '448 Accused Product to the present, and provided two alternate scenarios:

████████████████████████████████████████

████████████████████████████████   *Id.*

### A.   Mr. Wagner's Damages Calculation for the DCOM Patents

TecSec accuses functionality used in conjunction with Oracle Database Enterprise Edition

Versions 11gR1, 11gR2, and 12c (the "DCOM Accused Products") of infringing the DCOM

---

[2]   All cites to Exhibits refer to the exhibits attached to the Declaration of Akshay Deoras filed
concurrently herewith as Dkt. 1570.

REDACTED VERSION



patents. Ex. 46 (Jones Report) at 9; Ex. 58 at 25–34.[3]  More specifically, TecSec alleges that the

DCOM patents are infringed when ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████  Ex. 46 at 10–17. ████████████████████████████ are part of Oracle's

Transparent Database Encryption (or "TDE") feature, which is *only available in the Oracle*

*Advanced Security package*, *an optional add-on* for Database Enterprise Edition that is separately

priced and purchased, and must be separately licensed by Oracle customers who wish to use the

accused features.  *See, e.g.*, Ex. 59 (ORACLE00717478, Oracle Technology Global Price List).

████████████████████ of Oracle's Database Enterprise Edition customers did not

purchase the Advanced Security option during the damages period.  Ex. 60 (Wagner Dep. Tr.) at

63:14–24.  Nevertheless, the royalty base that Mr. Wagner used to calculate his reasonable royalty

damages for the DCOM patents included the *entirety of all revenues for all sales of the Oracle*

*Database Enterprise Edition* (and allegedly associated support revenues) during the damages

period—████████████████████, depending on the damages window (Ex. 58 at 4)—██████

████████████████████████████████████████████████████████████████████████████████

████████████████████, less than ████ of the royalty base used by Mr. Wagner.  He did so

although the functionality required to satisfy TecSec's infringement theory is provided through

Oracle's Advanced Security add-on, which Oracle customers ████████████████████████

████████████████████████████ *Id.* at 119–20.

   To that royalty base, Mr. Wagner applied a royalty rate that he derived by first calculating

a "baseline royalty rate" using the estimated contribution margin (*i.e.*, profit margin) for the entire

---

[3]   Oracle's Database product is, as the name implies, a relational database system which allows
for the management of a large amount of data in a multi-user environment so that many users
can concurrently access the same data.  *Id.* at 25.

REDACTED VERSION



Oracle Database Enterprise Edition core product (███), then adopting and applying an apportionment factor provided by Dr. Jones (████)[4] without adding any of his own analysis, then applying a further adjustment based on a purported "economic relationship" between the allegedly infringing Advanced Security option and the core Oracle Database Enterprise Edition product (████).[5] *Id.* at 50–51. This resulted in a baseline royalty rate of ████████ ████ *Id.* at 51. Mr. Wagner thereafter adjusted this so-called baseline rate using the *Georgia-Pacific* factors to arrive at a rate of ███ percent, which he applied to his royalty base— ████ ████—to calculate his damages numbers. *Id.* at 3, 51–118.

### B.    Mr. Wagner's Damages Calculation for the '448 Patent

TecSec accuses certain versions of Oracle's UltraSPARC and SPARC processors[6] of infringing the '448 patent. Ex. 1 (Rubin Report) at 9–10. Though the accused functionality resides in Oracle's processor chips and software run by those chips, Mr. Wagner's royalty base for his

---

4    In calculating his apportionment factor, Dr. Jones used ████████████ ████████████ dated after the damages period for each version of the DCOM Accused Products. Ex. 61 (Jones Dep. Tr.) at 209:17–210:15. Dr. Jones admitted in his deposition that if he had used documents from the correct time period, he would have reached a lower number (███). *Id.* at 210:6–15. In his apportionment analysis, Dr. Jones weighted all features equally, though he did no analysis to determine whether equally weighting the features was appropriate. *Id.* at 153:9–158:6. Mr. Wagner did not conduct any independent analysis to determine if Dr. Jones' apportionment factor was correct. Ex. 60 at 36:8–37:16.

5    As explained in greater detail in Section IV.A.2, *infra*, Mr. Wagner calculated the "economic relationship" between the Advanced Security option and the core Oracle Database Enterprise Edition product by dividing the list price of a license to the Advanced Security option by the list price of a license to the core Oracle Database Enterprise Edition product.

6    Including the UltraSPARC T2/T2 Plus, SPARC T3, SPARC T4, SPARC T5/M5, SPARC M6, SPARC S7/M7, and SPARC M8, and SPARC servers (including the T2, T3, T4, T5/M5, T7/S7/M7, and T8/M8) (the "SPARC Accused Products").

REDACTED VERSION

████████████████████████████████████████

reasonable royalty calculation consisted of the total revenues for the Oracle servers that contained

the processors (and allegedly associated support revenues).  Ex. 58 at 127–46.

To that royalty base, Mr. Wagner applied a royalty rate that he calculated by first

determining a "baseline royalty rate" using an estimated contribution margin (*i.e.*, profit margin)

for Oracle's SPARC servers as a whole (█████), then applying an apportionment factor

calculated by TecSec's technical expert (this time, Dr. Rubin, who calculated an apportionment

factor of ████).  Ex. 58 at 48–49.  This resulted in a baseline royalty rate of █████████

████).  *Id.* at 49.  From there, Mr. Wagner further adjusted the rate using the *Georgia-Pacific*

factors, ultimately adjusting the rate to ███, which he applied to his royalty base to calculate his

damages numbers.  *Id.* at 118–19.

For purposes of calculating his rate, Mr. Wagner again simply incorporated Dr. Rubin's

apportionment factor rather than conducting any independent analysis.   To arrive at his

apportionment figure, Dr. Rubin started by ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ Ex. 1 at 62–63.  Without explanation, and without citing any

evidentiary support or even discussing the number of features in each of his two feature buckets

(or in total), Dr. Rubin opined that ██████████████████████████████████

████████████████████████████████████ *Id.* at 63.  From

there, Dr. Rubin assembled a feature list for ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

REDACTED VERSION



again without explanation or support.  *Id.*

*Id.* at 65.

*Id.* at 66.  Dr. Rubin further opined that each of these areas, "unweighted,

" and that because "

" the apportionment factor applicable to the SPARC Accused

Products was "                                                      .  *Id.* at 66–67.  As he did with Dr.

Jones's apportionment figure, Mr. Wagner added nothing to Dr. Rubin's apportionment analysis,

but instead simply adopted it without further analysis.

## III.    LEGAL STANDARDS

Expert testimony is admissible only if it is both relevant and reliable.  *Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Rule 702 makes clear that expert testimony must

REDACTED VERSION

not only be "based on sufficient facts and data," but also the "product of reliable principles and methods, reliably applied . . . to the facts of the case." Fed. R. Evid. 702.  An expert's subjective beliefs, speculation, and his unsupported hunches thus must be excluded. *Daubert*, 509 U.S. at 590.  The same is true for testimony that is "[not] sufficiently tied to the facts of the case." *Id.* at 591.  District courts serve an important "gatekeeping role" by ensuring that expert testimony is admitted only if it meets Rule 702's threshold requirements of relevance, reliability and fit. *Id.* at 597.  The party offering the expert evidence bears the burden of proving Rule 702's requirements are met. *Cooper v. Smith & Nephew, Inc.*, 239 F.3d 494, 498 (4th Cir. 2001).

A patentee who successfully proves infringement is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  A reasonable royalty is often determined through the lens of a hypothetical negotiation between the parties at the time when the infringement began. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011).  The reasonable royalty analysis should reflect the product of two elements: (1) the royalty base implicated by the infringement; and (2) the royalty rate adequate to compensate the plaintiff. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).  When the accused product is a multi-component product that includes both accused and non-accused features, unless the patented feature is the basis for consumer demand for the product, the reasonable royalty analysis must start with the smallest salable patent-practicing unit "with close relation to the claimed invention." *VirnetX v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326–27 (Fed. Cir. 2014).  And if the smallest salable patent-practicing unit ("SSPU") also includes non-accused features, the analysis must then do more to account for those features. *Id.*

7

REDACTED VERSION

███████████████████████████████████

Consistent with Rule 702, the patentee bears the burden of showing that proffered expert damages testimony is both relevant and reliable.  *Suffolk Techs. LLC v. AOL Inc.*, No. 1:12-cv-625, 2013 U.S. Dist. LEXIS 64630, at *2 (E.D. Va. Apr. 12, 2013).  And experts offering damages testimony must "follow some discernable [*sic*] methodology" and ground their analyses in "sound economic and factual predicates."  *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4–5 (N.D. Cal. Apr. 16, 2014) (citations omitted); *see also ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (reasonable royalty analysis must be carefully tied to the claimed invention's footprint in the marketplace and cannot be supported by mere speculation); *Cornell Univ. v. Hewlett-Packard Co*., No. 01-CV-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 28, 2008) ("where . . . sound economic and factual predicates are absent from a reasonable royalty analysis, a district court must exercise its discretion to exclude the proffered testimony").

## IV.   ARGUMENT

Several aspects of TecSec's damages-related expert opinions should be excluded because they are fundamentally unreliable, including:

- Mr. Wagner's inclusion of the entirety of all revenues for all sales of Oracle Database Enterprise Edition sales, rather than revenues for Oracle's Advanced Security optional add-on (which is required to license the accused features), as the royalty base for calculating damages for the DCOM patents, Ex. 58 at 119–20, 125–26;

- Mr. Wagner's calculation of a purported "economic relationship" between the Advanced Security option and the Oracle Database Enterprise Edition product, *id.*;

- Dr. Rubin's calculation of a ████ apportionment factor for the alleged contributions of the accused features to the SPARC Accused Products, including his opinion that the ██████████████████████████████████, Ex. 58 at 48–49; Ex. 1 at 59–74; and

- Dr. Jones's calculation of a ████ apportionment factor for the alleged contributions of the accused features of the DCOM Accused Products, including his opinion that the features he considered should be weighted equally, Ex. 58 at 50–51; Ex. 46 at 44–57.

8

REDACTED VERSION

███████████████████████████████

### A.   Mr. Wagner's Inclusion of All Database Enterprise Edition Revenues in the Royalty Base For His DCOM Damages Theory Is Improper and Should Be Excluded.

TecSec's infringement theory requires specific functionality that is part of Oracle Advanced Security, an ***optional add-on to which customers must separately purchase a license***. And ███████ of Oracle's Database customers during the damages period even purchased that optional add-on,[7] such that ████ of Oracle's Database customers[8] were not even licensed to use the allegedly infringing technology.  Ex. 60 at 63:14–24.  Nevertheless, the royalty base that Mr. Wagner used to calculate his reasonable royalty damages for the DCOM patents included the entirety of all revenues for all sales of Oracle's Database Enterprise Edition during the damages period—***including all revenues for sales of the Oracle Database to the*** ████ ***of customers who did not purchase the Advanced Security Option required to license the accused technology***.  Ex. 58 at 119–20, 125–26.  Mr. Wagner's opinion that all revenues from all sales of Oracle Database should be included in his royalty base is contrary to substantial Federal Circuit authority and should be excluded for multiple reasons.

### 1.   Mr. Wagner's Royalty Base Improperly Includes the Entire Market Value of the Oracle Database products and Violates the Smallest Salable Patent-Practicing Unit Principle.

In a patent infringement case involving multi-component products, when a product includes patented and non-patented features, apportionment is required unless the basis for

---



[7]  ████████████████████████████████████████████████████████ Exs. 62–63 (Summary of ORACLE01131982; Summary of ORACLE01151117).

[8]  ████████████████████████████████████████████████████████ *Id.*

REDACTED VERSION

████████████████████████████

customer demand for the products is the patented feature.  *VirnetX*, 767 F.3d 1308 at 1326.  To the address this issue, "the smallest salable unit approach"—where the royalty base consists of the revenues for sales of the SSPU—"was intended to produce a royalty base much more closely tied to the claimed invention than the entire market value of the accused products."  *Id.* at 1326–27; *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018).  The SSPU doctrine protects against the introduction of revenue for entire products when the patented features do not drive demand for those products, which "cannot help but skew the damages horizon for the jury." *VirnetX*, 767 F.3d 1308 at 1327.

The "component that directly implements the invention" is the "smallest salable patent-practicing unit for reasonable royalty purposes."  *GPNE*, 2014 WL 1494247, at *12–13.  In *GPNE*, the court found that the SSPU was the broadband chip that implemented the claimed invention because the patent's contribution to the art was found in the chip, even though the claims purported to cover the devices in which those chips were implemented.  *Id.* at *13 ("Adopting GPNE's reasoning would allow patent drafters to effectively abolish the smallest salable patent-practicing unit doctrine by simply drafting patent claims to cover end products rather than the individual components that actually embody the invention.");  *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (royalty calculated based on percentage of entire market value of laptop rather than patent-practicing optical disc drive—the SSPU—without proof that patented technology drove demand for laptop was improper); *Rembrandt Social Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594 (E.D. Va. 2013) ("[T]he smallest salable infringing unit must be the starting point for the royalty base . . . [and] must be closely tied to the patent to suffice.").

REDACTED VERSION

██████████████████████████████

Here, as explained in Section II.A, *supra*, the functionality accused of infringing the DCOM patents is licensed to customers through the Oracle Advanced Security package (Ex. 61 at 73:5–11, 74:23–75:6), a separate, optional add-on for Oracle Database Enterprise Edition that is separately priced and must be separately licensed by Oracle customers (*id*. at 73:17–20).   But the two products do not necessarily go together: Oracle's customers can use Oracle Database Enterprise Edition with or without using the Advanced Security add-on, and ███ of customers of Oracle Database Enterprise Edition did not purchase the allegedly infringing add-on during the damages period.   *Id.* at 75:3–6.   Oracle produced license revenue for the Oracle Advanced Security option during discovery.   *See, e.g.*, Ex. 64 (Davis Rebuttal Report) at 27–30 (using Advanced Security revenue as the royalty base).   Because the Advanced Security option is the component that directly implements the claimed invention (if TecSec's infringement theory is correct), the proper starting point for Mr. Wagner's royalty base was the revenue for the Advanced Security add-on, ***not all revenues for Oracle Database Enterprise Edition***, ██████████████████ represents sales to customers who never licensed the allegedly infringing technology**.** *LaserDynamics*, 694 F.3d at 68.   For Mr. Wagner to use a royalty base that includes all revenues of the entire market value of sales of the Oracle Database products rather than those associated with the allegedly infringing option seeks damages "far in excess of the contribution of the claimed invention to the market and thus claims more than the damages adequate to compensate for the infringement."   *Rembrandt*, 22 F. Supp. 3d at 594 (internal quotations omitted).[9]

---

[9]   TecSec may argue, as Mr. Wagner asserted in his report, that the revenue for Oracle Database Enterprise Edition is a proper starting point because the code for that product includes the code for Oracle Advanced Security.   Ex. 58 at 119.   However, that does not excuse Mr. Wagner's failure—or Dr. Jones' failure, if it was his task—to identify the SSPU.   Nor does it change the fact that to lawfully use the Advanced Security features, Database Enterprise Edition customers must separately pay for and license the Advanced Security add-on.   *See* Section II.A, *supra*. And TecSec has not pointed to a single instance where any Oracle customer used the accused

REDACTED VERSION

███████████████████████████████

This is not a situation where, for instance, Mr. Wagner was unable to ascertain the dollar value of the Advanced Security option or the number of instances in which customers purchased it: Oracle produced license revenue in discovery for every instance in which Oracle Advanced Security was purchased during the relevant time period. *See, e.g.*, Ex. 64 at 27–30 (using Advanced Security revenue as the royalty base). Accordingly, Mr. Wagner (and TecSec) affirmatively chose *not* to rely on the SSPU, and their use of the revenues for Oracle Database Enterprise Edition is clearly contrary to controlling precedent and unreliable. *Rembrandt*, 22 F. Supp. 3d at 594 (excluding expert's report where he failed to use portion of the revenue stream attributable to allegedly infringing features in reasonable royalty analysis).[10]

---

features in the way TecSec alleges infringe during the damages window. Ex. 60 at 101:8–102:8. Nor does that argument change the fact that Oracle Advanced Security is the SSPU, or suggest that Oracle Advanced Security is the basis for customer demand for the Oracle Database products, such that use of the entire market value rule would be permitted. *See also GPNE*, 2014 WL 1494247, at *12–13 (SSPU is the component that implements the alleged invention).

[10] In his report, Mr. Wagner cites *Exmark Manufacturing Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332 (Fed. Cir. 2018), to contend that using the revenue for Oracle's Database Enterprise Edition for the revenue base was acceptable as long as he applied some apportionment analysis in the calculation of the revenue rate. Ex. 58 at 42–43. That is not correct. In *Exmark*, the Federal Circuit allowed the patentee to use accused lawn mower sales as the royalty base (rather than limiting the base to the value of the patented flow control baffles) but noted that doing so was particularly appropriate there because the asserted claim was directed to the lawn mower as a whole. *Exmark*, 879 F.3d at 1348. Here, TecSec's infringement theory requires functionality licensed through the Advanced Security option, and does not cover Oracle's database in its entirety. Moreover, in *Ericsson, Inc. v. D-Link Systs., Inc.*, 773 F.3d 1201 (Fed Cir. 2014), on which *Exmark* relies, the Federal Circuit made clear that the reasonable royalty analysis cannot ignore the SSPU principle. *Ericsson,* 773 F.3d at 1227 ("[W]here the entire value of a machine as a marketable article is 'properly and legally attributable to the patented feature,' the damages owed to the patentee may be calculated by reference to that value. Where it is not, however, *courts must insist on a more realistic starting point for the royalty calculations by juries—often, the smallest salable unit and, at times, even less.*") (citing *Uniloc*, 632 F.3d at 1323; *LaserDynamics*, 694 F.3d at 67–68; and *VirnetX*, 767 F.3d at 1327–28).

REDACTED VERSION

████████████████████████████

### 2.   Mr. Wagner's Purported "Economic Relationship" Calculation Is Not Based on Sound Methodology.

Mr. Wagner's inclusion of all revenues for all sales of the Oracle Database products also should be excluded for an additional reason: the calculation he performs to attempt to justify including all such revenues in his royalty base is fundamentally unsound.  Mr. Wagner purports to calculate an "economic relationship" between Oracle Database Enterprise Edition and the Advanced Security add-on by dividing the list price for the Advanced Security option (████) by the list price for Oracle Database Enterprise Edition (████) (as shown in the Oracle price list below), and then including the result of that calculation (████) in the calculation of the royalty rate:



But Mr. Wagner's calculation is not indicative of any actual "economic relationship" between the products and lacks any factual predicate or economic support.  Indeed, in his deposition, Mr. Wagner admitted this calculation of a supposed "economic relationship" was "████████████

REDACTED VERSION

████████████████████████████████████████████████

████████████████ " and that he did not " ████████████████████████████████████████ "

Ex. 60 at 70:15–71:2.

Perhaps unsurprisingly, Mr. Wagner's approach leads to nonsensical results.  For example, if functionality accused of infringing a patent resided in the Communications Data Model Option (another optional Oracle add-on included in the price list above), priced at ████, strict application of Mr. Wagner's methodology would lead to an "economic relationship" of ████—*i.e.*, greater than the total revenues for Oracle Database Enterprise Edition.  To avoid that result, Mr. Wagner testified in deposition that in such a scenario, the "economic relationship" would be "████████," because "████████████████████" Ex. 60 at 72:9–20.  Yet again, Mr. Wagner did not identify any economic principle or justification for ████████████████████████████, confirming the arbitrariness and hence unreliability of his methodology.  Moreover, there are ████████ different Oracle Enterprise Edition options identified in the price sheet on which Mr. Wagner relies: applying his methodology to each of his options would turn the ████ list price for Enterprise Edition itself into over ████ in revenues, an absurd result that grossly inflates the "value" of the options on its face.  Mr. Wagner should not be permitted to present this unsupported and unprincipled methodology to the jury.  *See, e.g., LaserDynamics*, 694 F.3d at 69 (damages theory must be based on "sound economic and factual predicates" and must not be "plucked out of thin air."); *Netfuel v. Cisco Systems, Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *11 (N.D. Cal. Mar. 27, 2020) (excluding damages expert opinion that was not "backed by sufficient facts or data or by reliable principles and methods" (citations omitted)).

### B.   The Technical Apportionment Analysis On Which Mr. Wagner Relies Lacks Reliable Quantitative Support.

The apportionment analysis on which Mr. Wagner's damages calculations rely also should be excluded.  Mr. Wagner wholesale adopts and relies upon on the technical opinions of Drs. Jones

REDACTED VERSION

and Rubin for the technical apportionment aspect of his damages calculations, without any independent analysis or confirmation.  Ex. 58 at 49–51.  In fact, during deposition, Mr. Wagner admitted that he himself was not "offering any technical opinions about apportionment," and did not provide "any input whatsoever into the apportionment opinions provided by Drs. Rubin or Jones," unreservedly relying wholesale on the technical experts' opinions for apportionment.  Ex. 60 at 36:8–37:16.  Those apportionment analyses are based on arbitrary figures, plucked from thin air without any quantitative support, and should be excluded.  Indeed, a very similar technical apportionment opinion offered by Dr. Rubin was recently excluded for the same reason, and his opinion here is no less arbitrary or more quantitative than his excluded opinion.

### 1. Dr. Rubin's Apportionment Analysis Is Based On Arbitrary Calculations Plucked Out Of Thin Air.

Dr. Rubin's apportionment opinion lacks the "sound economic and factual predicates" necessary to pass muster under *Daubert* and instead is nothing more than a rate arbitrarily "plucked out of thin air based on vague qualitative notions of the relative importance" of the accused features.  *NetFuel,* 2020 WL 1274985, at *7 (quoting *LaserDynamics,* 694 F.3d at 69); *see also, e.g.*, *Guardant Health Inc. v. Foundation Med. Inc.*, No. 17-1616-LPS-CJB, 2020 WL 2461551, at *18–19 (D. Del. May 7, 2020) (excluding expert's allegedly "conservative" 50% apportionment rate that did not "explain **why** the patented features amount to approximately *50%* of what makes the products successful") (emphasis in original); *Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, No. 12-1369, 2017 WL 3140798, at *4 (W.D. Pa. July 25, 2017) (excluding expert opinion that provided "no objective support for his 50% apportionment rate").  In the *NetFuel* case—where Dr. Rubin also served as the plaintiff's expert—the court recently excluded Dr. Rubin's apportionment opinion that "security, reliability, and availability" represented 33% of the value of the accused products, of which 33% to 50% was attributable to the accused features.  *NetFuel*,

REDACTED VERSION

█████████████████████████████████████████████

2020 WL 1274985, at *6.  As the court there explained, Dr. Rubin never explained *how* he arrived at these figures, which was fatal to his analysis: "The complete lack of economic analysis to support Dr. Rubin's apportionment 'echoes the kind of arbitrariness of the "25% Rule" that [the Federal Circuit] recently and emphatically rejected from damages experts.'"  *Id.* at 7 (quoting *LaserDynamics*, 694 F.3d at 69).  That Dr. Rubin based his opinions on his experience and knowledge of the accused products was of no import—a quantitative analysis is required.  *Id.*

The apportionment opinion Dr. Rubin provides is just as arbitrary and plucked from thin air as his apportionment opinion excluded in the *NetFuel* case.  First, Dr. Rubin divides servers into ████████████████████████████████████████.  Ex. 1 at 63.  In his report, he provides no methodological basis whatsoever for this ███ division, other than vaguely stating that counting each component equally would ████████████████████████████ ██████████████████████████████  *Id.* at 62.  And when pressed to provide any justification for his ████ split between █████████████████████████████████ at his deposition, he explained that he "███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████ he was analyzing. Ex. 30 at 233:10–235:4; *see also id.* at 233:5–9 (didn't do analysis of consumer demand).  Moreover, he conceded that he "██████████████████████████████" to arrive at his ████ split between processor and non-processor components.  *Id.* at 233:11–14.  Critically, while Dr. Rubin somehow determined that the █████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████  *Id.* at 236:4–13.  There is no possible way Dr. Rubin could have determined that ████ ███████████████████████████████████████████████████████████████████

16

REDACTED VERSION



. *Id.* at 236:14–23.  At bottom, this "complete absence of ***what methodology***" underlies Dr. Rubin's ▮▮▮▮ split confirms that the "figures are 'arbitrary' and thus unreliable." *NetFuel*, 2020 WL 1274985, at *13 n.9 (emphasis added).  This renders his entire apportionment figure unreliable, requiring exclusion.

Second, Dr. Rubin also failed to perform a sufficient analysis to justify the relative weighting of the individual features ***within*** the bucket he used to calculate his apportionment figure.  For the ▮▮▮▮▮▮ features included in that bucket, Dr. Rubin flatly admitted he did not value each individual feature other than "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 30 at 235:10–17.[11]  For the features within his ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Dr. Rubin tallied up a list of 12 feature areas for the accused SPARC processors within that area based on his review of publicly available Oracle marketing documentation.  Ex. 1 at 64.  Nothing in the Oracle documents Dr. Rubin cites quantifies any of the 12 features, however, or suggests how each of the features should be weighed relative to one another.  *Id.*  Nonetheless, Dr. Rubin "deemed" these features should be weighted equally, providing no explanation in his report for why he did so; rather, he simply stated that he did so "[f]or the ***purpose*** of apportionment," without explaining why.  *Id.* at 63.  Then at his deposition, Dr. Rubin conceded

---

[11]  The fact that Dr. Rubin's ▮▮▮▮ split is allegedly "highly conservative" (*id.* at 235:3–4) is irrelevant: merely labeling a value "conservative" does not free an expert from "showing that there is an evidentiary foundation for the particular percentage selected."  *Guardant Health*, 2020 WL 2461551, at *18; *see also Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *4, *6–7 (N.D. Cal. Jan. 23, 2015) (excluding purportedly "conservative" apportionment where the expert provided no "formula, method, or calculation, however approximate" to justify the figure).

REDACTED VERSION

████████████████████████████████████████████████████

that he "████████████████" to conduct "████████████████████████████████

████████████████████████████████████" Ex. 30 at 240:7–21.

This arbitrary assignment of equal weights to features without any analysis has repeatedly been excluded as insufficient to pass muster under *Daubert*. In *Stragent, LLC v. Intel Corp.*, the court excluded the opinions of the plaintiff's damages expert who arbitrarily assigned equal weight to each of 19 features listed in the defendant's documentation without conducting any analysis of the features' importance. No. 6:11–cv–421, 2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014) (Dyk, J., by designation). Likewise, in *Good Tech. Corp. v. MobileIron Inc.*, the court excluded opinions assigning equal values to a list of criteria where the expert did "no investigation into whether any of the criteria is more important than others, or how strongly each criterion is tied to the patents." No. 5:12–cv–05826–PSG, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015); *see also Atlas IP, LLC v. Medtronic, Inc.*, No. 13–CIV–23309, 2014 WL 5741870, at *5 (S.D. Fla. Oct. 6, 2014) (rejecting apportionment analysis that arbitrarily assigned equal weights to features).

The fatal flaws do not stop there. For example, although Dr. Rubin credited TecSec with the entirety of the ████ value of the "████████████████████████████████ ████ (Ex. 1 at 66), he openly admits that he made no effort to account for the ***unaccused*** ████████████████████████████ within that category. Specifically, Dr. Rubin admits that this category also includes a ████████████████████████████████ ████ which Dr. Rubin admits uses ████████████████████████ he accuses of infringement, including ████████████████████████████████ Ex. 30 at 244:18–245:8. This is not a small oversight—Dr. Rubin admits that ████████████ ████████████████████████████████████████ *Id.* at 245:11–246:6. Indeed, according to Dr. Rubin, ████████████████████

REDACTED VERSION

████████████████████████████████

████████████████████████████████ *Id.* at 246:9–20.  And yet, Dr. Rubin credited the

entirety of that ██████ value to TecSec—even though it is undisputedly present, used, and not

infringing.  *Id.* at 246:22–247:1; *see also Finjan*, 879 F.3d at 1310 (criticizing royalty analysis that

failed to account for non-infringing functions).

Because Dr. Rubin made no attempt to conduct "***any sort of quantitative or evidence based***

***analysis***" to justify his equal weighting of the features (Ex. 30 at 240:7–21), his opinions amount

to nothing more than plucking a value out of thin air and should be excluded for this additional

reason also.  *See NetFuel*, 2020 WL 1274985, at *13.

### 2. Dr. Jones's Apportionment Opinion Is Unsupported and Unreliable.

Like Dr. Rubin's arbitrary apportionment opinion, the apportionment opinion presented by

Dr. Jones for the DCOM patents likewise is arbitrary and lacking in quantitative support.  Dr. Jones

calculated an apportionment factor of ████████████ as the supposed percentage of technology

within the Oracle Advanced Security attributable to the DCOM patents.  Ex. 46 at 44–51.  Dr.

Jones arrived at this figure based on public licensing documents for Oracle Database 11gR1,

11gR2, and 12c.  *Id.* at 45.  An exemplary excerpt from those documents that Dr. Jones relies on

for Oracle Database 12c is shown below:

> Oracle Advanced Security includes the following features:
> - Transparent Data Encryption (TDE) for tablespaces and columns (including Oracle SecureFiles)
> - DataPump Export File encryption
> - RMAN backup encryption to disk
> - TDE master key storage in an Oracle Wallet or external Hardware Security Module
> - Data Redaction of sensitive data returned to applications
>   – Full, Partial, Regular Expression, and Random techniques

Ex. 65 (TEC-INF-0055304) at -55327.  Nothing in the Oracle licensing documents Dr. Jones cites

quantifies the relative value of any of the features, or suggests how each of the features should be

REDACTED VERSION



weighed against another, as Dr. Jones conceded. Ex. 46 at 47 ("███████████████████

████████████████████████████"). Nonetheless, Dr. Jones took each of these five

bullets from the above excerpt and arbitrarily weighted them equally, ███████████████

████████████████████████ for Oracle Database 12c are implicated by the

infringement analysis. *Id.* at 49. He conducted a similar analysis for Oracle Database 11gR1 and

11gR2, determining that ██████████ of the listed features respectively were implicated by the

infringement analysis for those releases, again by weighting all of the features equally.[12] *Id.* at 50.

But Dr. Jones provides no basis in his expert report (or elsewhere) for assigning equal weight to

each of the listed Advanced Security features, merely stating the reason that he did so: *i.e.*, "for

the purpose of apportionment." *Id.* at 49. And at his deposition, Dr. Jones confirmed that he was

"████████████████████████████████████████████████████

██████████████████████" (Ex. 61 at 154:12–16) and that he did nothing to determine the

importance of each feature beyond "████████████████████████████████" (*id.*

at 156:3–8).

As explained above, courts have regularly excluded expert opinions—like Dr. Jones's

opinion—that arbitrarily assign equal weight to features under the guise of apportionment without

any underlying analysis or justification. *Stragent*, 2014 WL 1389304, at *4; *Good Tech.*, 2015

WL 4090431, at *7; *Atlas IP*, 2014 WL 5741870, at *5. Here, Dr. Jones's apportionment

methodology suffers from the same fatal deficiencies: apart from merely counting the bullets in

Oracle documentation, Dr. Jones provides no analysis, no explanation, and no verifiable method

---

[12] Dr. Jones arrived at his apportionment factor of ████████████████████████████
██████████████, another arbitrary calculation with no basis in the evidence and in fact contrary
to the mountain of evidence that ██████████████████████████████████████████
████████. Ex. 46 at 50–51.

for evaluating his conclusions.  Ex. 61 at 154:12–16, 156:3–8.  "Little need be said about this theory, which 'appears to have been plucked out of thin air based on vague qualitative notions of the relative importance'" of Oracle's licensing documents.  *Atlas IP*, 2014 WL 5741870, at *5 (citing *LaserDynamics*, 694 F.3d at 69).  Thus, Dr. Jones's "attribution of equal value to all [Advanced Security] features is not based on any theory that meets the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community" and must be excluded.  *Stragent*, 2014 WL 1389304, at *4.

## V.   CONCLUSION

For the reasons stated herein, the Court should preclude TecSec from relying on the unreliable, unsubstantiated opinions of Mr. Wagner and Drs. Jones and Rubin.  *See* Ex. 61 at 44–57 (and all opinions relying on the analysis therein); Ex. 1 at 59–74 (same); Ex. 46 at 50–51, 119–20, 125–26, 143 (same).

Dated:  November 6, 2020

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly, Esq. (VSB # 20942)
THE OFFICE OF CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Tel: 703-549-5354
Fax: 703-549-5355
craig.reilly@ccreillylaw.com

Adam R. Alper (admitted *pro hac vice*)
Akshay Deoras (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Tel: 415-439-1400
Fax: 415-439-1500
adam.alper@kirkland.com
akshay.deoras@kirkland.com

REDACTED VERSION

Michael W. De Vries (admitted *pro hac vice*)
Eva K. Freel (admitted *pro hac vice*)
Sarah Mikosz (admitted *pro hac vice*)
555 South Flower Street
Los Angeles, California 90071
Tel: 213-680-8400
Fax: 213-680-8500
michael.devries@kirkland.com
eva.freel@kirkland.com
sarah.mikosz@kirkland.com

Allison W. Buchner (admitted *pro hac vice*)
Mark D. Fahey (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California, 90067
Tel: 310-552-4200
Fax: 213-680-8500
allison.buchner@kirkland.com
mark.fahey@kirkland.com

Jon R. Carter (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
Fax: 212-446-4900
jon.carter@kirkland.com

Karthik Ravishankar (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202-389-5000
Fax: 202-389-5200
karthik.ravishankar@kirkland.com

*Counsel for Defendants*
*Oracle America, Inc. and Oracle Corporation*

22

REDACTED VERSION

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2020, a true and correct copy of the foregoing was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record.

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
THE OFFICE OF CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Tel: 703-549-5354
Fax: 703-549-5355
craig.reilly@ccreillylaw.com

*Counsel for Defendants*
*Oracle America, Inc. and Oracle Corporation*

23

REDACTED VERSION